# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| CITY AND COUNTY OF BUTTE-SILVER BOW, | **CV-25-36-BU-BMM** |
| Plaintiff, | |
| v. | **ORDER** |
| | **ON MOTIONS TO DISMISS** |
| 3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY); DUPONT DE NEMOURS, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC., GLOBE MANUFACTURING COMPANY LLC; W.L. GORE & ASSOCIATES, INC.; AND LION GROUP INC, | |
| Defendants. | |

## INTRODUCTION

Plaintiff City and County of Butte Silver Bow, individually and on behalf of all others similarly situated, ("Plaintiff") filed an action against Defendants 3M Company ("3M")' Dupont De Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc. ("Dupont"), Globe Manufacturing

1

Company LLC ("Globe"), W.L. Gore & Associates, Inc. ("Gore"), and Lion Group Inc. ("Lion") (collectively "Defendants") on April 3, 2025. (Doc. 1.) Defendants filed motions to dismiss Plaintiff's Complaint. (Docs. 100, 103, 105, and 107.) Plaintiff opposes the Defendants' motions. (Docs. 128, 129, 130, and 131.) The Court held a hearing on the matter on December 8, 2025. (Doc. 145.)

## BACKGROUND

Plaintiff brings this nationwide class action against Defendants for the alleged sale, manufacture, and distribution of protective firefighter gear ("turnout gear") containing per- and polyfluoroalkyl substances ("PFAS") to fire departments and fire responding agencies. (Doc. 1 ¶¶ 1-9.) Plaintiff alleges PFAS, found in the firefighter turnout gear, are associated with serious health effects, including cancer. (*Id*.) Plaintiff contends that Defendants concealed the known dangers of PFAS and failed to provide adequate safety warnings to the public and class members, despite having knowledge of the risks and harms of PFAS for decades. (*Id*. ¶¶ 10-12.) Plaintiff asserts that the ineffective safety warnings render the products defective and unreasonably safe. (*Id*.) Plaintiff alleges that Defendants worked together to conceal the known dangers of PFAS from Plaintiff and the public. (*Id*. ¶ 12.) Plaintiff alleges that Defendants' failure to warn of the harms from PFAS caused foreseeable injuries to class members who used turnout gear as intended. (*Id*.)

Plaintiff is a consolidated city and county government in Montana. (*Id.* ¶ 22.) Plaintiff's claims arise under the Racketeer and Corrupt Organization Act ("RICO"), Montana law, and the laws of 34 U.S. states. (*Id.* ¶¶ 434-67.) Plaintiff seeks monetary damages to replace the defective turnout gear purchased. (*Id.* ¶ 21.) Defendants contend that Plaintiff lacks standing to assert its various claims. (Docs. 100, 103, 105, and 107.) Defendants argue that the Court lacks personal jurisdiction over Defendants. (*Id.*) Defendants further seek to dismiss all Plaintiff's claims alleged in the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (*Id.*)

## LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires claimants to include in their complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint under the plausibility pleading standard of Rule 8(a)(2). *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal proves appropriate under Rule 12(b)(6) where the complaint fails to state a claim upon which relief can be granted. *Mendiondo v. Centinela Hospital Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A court may dismiss a complaint "based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

A complaint must contain sufficient factual matter to state a plausible claim for relief on its face to survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim proves plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard does not require probability, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A court must "take[] as true and construe [] in the light most favorable to plaintiffs" all factual allegations set forth in the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks omitted).

## DISCUSSION

Defendants seek to dismiss Plaintiff's claims contained in the Complaint on various grounds. Defendants contend that Plaintiff lacks Article III standing to assert their claims. Defendants next assert that the Court lacks personal jurisdiction over Defendants. Lastly, Defendants request dismissal of Plaintiff's claims for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6). In the alternative, Defendants asks the Court to stay the action pursuant to the first-to-file rule. The Court will address each issue.

## I.    FIRST-TO-FILE RULE

Defendant Globe argues that the Court should stay Plaintiff's claims under the first-to-file rule, or in the alternative, stay the claims brought on behalf of the non-Montana fire departments. (Doc. 108 at 43 and 45.) "Under the first-to-file rule, 'when cases involving the same parties and issues have been filed in two different districts, the second district court has discretion to transfer, stay, or dismiss the second case in the interest of efficiency and judicial economy.'" *Emrit v. Musk*, No. CV-25-08-BLG-SPW-TJC, 2025 WL 1057060, at * 2 (D. Mont. Mar. 20, 2025) (citation omitted); *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1240-41 (9th Cir. 2015), *report and recommendation adopted*, *Emrit*, 2025 WL 1042811. "Courts should be driven to maximize 'economy, consistency, and comity.'" *Kohn*, 787 F. 3d at 1240 (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 604 (5th Cir. 1999)).

A court should consider the following factors when deciding to apply the first-to-file rule: (1) the chronology of the lawsuits; (2) the similarity of the parties; and (3) the similarity of the issues. *Agri-Systems v. W. Nat'l Assur. Co*., No. CV 20-44-BLG-SPW-TJC, 2020 WL 6781685, at *2 (D. Mont. Nov. 18, 2020) (citation omitted). The Ninth Circuit looks to whether there remains a "substantial overlap" between the lawsuits wherein "[s]imultaneous adjudication of [] matters would waste judicial resources and undermine judicial efficiency." *Naden v.*

*Numerex Corp.*, No. CV-08-107-BLG-RFC, 2008 WL 11413566, at *2 (D. Mont. Dec. 9, 2008). A court may choose not to apply the first-to-file rule for purposes of fairness and equity even when the three factors have been met. *Widjaja v. YUM! Brands, Inc.*, 2009 WL 10673334, at *4 (C.D. Cal. June 8, 2009).

A group of plaintiffs filed a class action on June 25, 2024, in the District of Connecticut ("Connecticut Action"). *UPFFA et al. v. 3M Co. et al.*, 3:24-cv-01101-AWT (D. Conn. June 25, 2024). The Connecticut Action plaintiffs filed a First Amended complaint on July 25, 2024. (*Id.*) The plaintiffs in the Connecticut Action seek to represent a nationwide class of firefighter turnout gear purchasers, persons and entities, who purchased turnout gear allegedly containing PFAS from the named defendants. (*Id.*) The Connecticut Action putative class includes municipalities that purchased firefighter turnout gear like Plaintiff. (*Id.*) The District Court in the District of Connecticut has pending before it fully briefed motions to dismiss. (*Id. See* Docs. 252, 253, 254, 292, 319, 321, and 326.) The Court determines that a threshold analysis of the first-to-file rule proves appropriate given the pending motions in the Connecticut Action.

## A. Chronology

The parties do not dispute consideration of chronology as the first factor of under the first-to-file rule. The plaintiffs in the Connecticut Action filed before this

action in the District of Montana. This factor weighs in favor of Defendants'
request to apply the first-to-file rule.

### B. Similarity of the parties

For the similarity of parties, numerous courts have held that the parties do
not need to be the exact same. *See Kohn*, 787 F. 3d at 1240 (citations omitted). The
first-to-file rule requires only "substantial similarity" of the parties in the
concurrent actions. *Id*. Courts have held that the issue of class certification is not
determinative when comparing putative classes. *Adoma v. Univ. of Phoenix*, 711 F.
Supp. 1142, 1147 (E.D. Cal. 2010); *see also Wallerstein v. Dole Fresh Vegetables*,
967 F. Supp. 2d 1289 (N.D. Cal. 2013). "Courts look to whether the putative
classes seek to represent at least some of the same individuals." *Murphy v.
Sprint/United Mgmt. Co.*, 2021 U.S. Dist. LEXIS 236418, at * 18 (E.D. Cal. 2021)
(citing *Wallerstein*, 967 F. Supp. 2d at 1295 (N.D. Cal. 2013)).

The plaintiffs' complaint in the Connecticut Action names all Defendants in
this action. The Connecticut Action names additional defendants beyond the reach
of this action. Plaintiff, although not yet a class member, would be included in the
Connecticut Action if the District Court certifies the classes as proposed.
Municipalities, like Plaintiff, fall within the proposed class of purchasers of
firefighter turnout gear from the various named defendants. The Connecticut
Action includes some named plaintiffs, and the proposed classes differ from the

more limited proposed classes in this action. The proposed classes in the Connecticut Action include more potential class members.

The Connecticut Action appears to represent at least some of the same proposed classes. *Murphy,* 2021 U.S. Dist. LEXIS 236418, at * 18. Although the Connecticut Action includes a more expansive reach of defendants and potential class plaintiffs, all parties to this action remain part of the Connecticut Action to establish substantial similarity. This factor weighs in favor of Defendants' request to apply the first-to-file rule

### C. Similarity of the issues

The issues between the concurrent cases "need not be identical, only substantially similar" under the first-to-file rule. *Kohn*, 787 F.3d at 1240-41 (citing *Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp*., 665 F.3d 671, 677-78 (5th Cir. 2011). Courts have determined that the analysis rests on whether common facts lead to a central issue between the concurrent actions. *Adoma,* 711 F. Supp. 2d. at 1149.

Plaintiff argues that this case differs factually and legally from the Connecticut Action. (Doc. 130 at 41.) Plaintiff's argument rests mainly on the addition of Plaintiff's RICO claim and state law consumer protection claims absent from the Connecticut Action. (*Id*.) Plaintiff further asserts that the remedies sought in this action differ from the remedies sought in the Connecticut action. (*Id*.)

Plaintiff's arguments partially persuade the Court against applying the first-to-file rule.

It cannot be disputed that this action and the Connecticut Action have numerous common facts. Both actions seek to understand Defendants' inclusion of PFAS into equipment that firefighters wear while on duty and the harms caused to firefighters by the inclusion of PFAS in this equipment. The claims in the Connecticut Action revolve around firefighter turnout gear, like the claims in this action. The Connecticut Action expands to include other firefighter gear related to Aircraft and Rescue Fire Fighting. *See UPFFA et al. v. 3M Co. et al*., 3:24-cv-01101-AWT (Doc. 215 ¶¶ 187-194). Both actions seek to address and understand the harms caused, both medically and economically, by the alleged inclusion of PFAS in firefighter turnout gear. The necessary discovery in both actions would be similar to reach the answer to a central issue.

On the other hand, courts have found that including additional claims in the second-filed action makes the first-to-file rule inapplicable. *Clean Harbors, Inc. v. CBS Corp*., 2010 U.S. Dist. LEXIS 164031, at *6-7 (D. Kan. Apr. 19, 2010). *Clean Harbors, Inc*. acknowledged that the concurrent actions involved one common issue. The district court remained unpersuaded to apply the first-to-file rule because of the differences in the alleged causes of action. 2010 U.S. Dist. LEXIS 164031, at *6. Another court also did not apply the first-to-file rule when the

9

second-filed action asserted additional theories of recovery. *Adoma*, 711 F. Supp. 2d at 1150.

Plaintiff allege unique RICO claims and state law consumer protection act claims that are lacking in the Connecticut Action. Plaintiff seeks economic damages from Defendants under the RICO claims and for reimbursement of the damages incurred by purchasing turnout gear containing allegedly harmful PFAS. The Connecticut Action's remedies do not include replacement of the turnout gear. Plaintiff's addition of new legal claims and remedies weighs against applying the first-to-file rule here.

Common facts between the concurrent actions remain in ultimately determining the central issue of whether Defendants sold, manufactured, or distributed firefighter turnout gear containing PFAS. The Court finds that the issues between the concurrent actions remain similar. The addition of new claims and theories of recovery, however, provide the Court fair and equitable reasons to not apply the first-to-file rule. Resolution of this litigation only under the Connecticut Action claims would leave portions of Plaintiff's case unresolved. *Clean Harbors, Inc*., 2010 WL 11627433, at *3 (D. Kan. Apr. 19, 2010). This factor weighs against Defendants' request to apply the first-to-file rule.

### D. Other Considerations

Courts also have considered the stage of litigation of the concurrent actions when analyzing the first-to-file rule. *See Clark v. McDonald's*, 2023 U.S. Dist. LEXIS 51973, at *28 (S.D. Ill. 2023). Relevant factors of consideration include "docket congestion and likely speed to trial." *Id*. at *29. The Connecticut Action appears procedurally behind this pending action. The parties fully briefed the motions to dismiss in the Connecticut Action on October 16, 2025. The District Court has not held a hearing on the motions to dismiss. The District Court has not yet set a hearing on the motions to dismiss to the Court's knowledge. Conversely, the Court held a hearing on Defendants' motions to dismiss on December 8, 2025, and stands ready to provide a decision on the merits of Defendants' motions to dismiss. The lighter docket in the District of Montana likely would lead to an earlier trial for this action in the District of Montana than in the Connecticut Action at this stage in the litigation.

The Court deems dismissal under the first-to-file rule inappropriate as class certification in both actions remains uncertain. "[I]n cases where the first-filed action presents a likelihood of dismissal [whether jurisdictional or merit-based], the second suit filed should be stayed rather than dismissed." *Alltrade, Inc. v. Uniweld Prods. Inc*. 946 F.2d 622, at 629 (9th Cir. 1991). The Court further deems transfer of Plaintiff's claims to the District of Connecticut improper, given that Plaintiff already remains part the proposed class in the Connecticut Action. Lastly,

11

the Court finds that a stay also would be inappropriate as this pending action appears procedurally ahead of the Connecticut Action, despite the Connecticut Action having been filed first. The Court declines to exercise its discretion to apply the first-to-file rule under these specific circumstances. Judicial efficiency and the interests of justice would be better served by maintaining this pending action in the District of Montana.

## II. ARTICLE III STANDING

"[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold [*sic*] requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983); *Montana Wildlife Fed'n v. Bernhardt*, No. 4:18-CV-69-BMM, 2021 WL 4865257, at *1 (D. Mont. June 21, 2021). Article III standing requires the following plausible allegations: (i) that the plaintiff suffered an injury in fact that is concrete, particularized and actual or imminent; (ii) that the injury in fact is fairly traceable to the defendant; and (iii) that the injury in fact would likely be redressed by judicial relief and a favorable decision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, *Inc.*, 528 U.S. 167, 180-81 (2000) (citations omitted).

"[S]tanding is not dispensed in gross." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion*, 594 U.S. at 431). A plaintiff bears the burden of

demonstrating "standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy*, 603 U.S. at 44-45 and 61 (internal quotation marks omitted).

Plaintiff's main allegations revolve around Defendants' alleged conduct of "design[ing], develop[ing], manufactur[ing], test[ing], packag[ing], promot[ing], market[ing], advertis[ing], distribut[ing], and/or [selling] PFAS." (Doc. 1. ¶¶ 10, 106, 108, 110.) The various Defendants allegedly then distributed, marketed, or sold PFAS to companies like Globe, Gore, and Lion. (*Id*. ¶¶ 10.) Plaintiff alleges that Globe and Lion used the PFAS and PFAS-containing material from the other Defendants to create firefighter turnout gear. (*Id*.) Plaintiff allegedly purchased the turnout gear, sold by Globe and Lion, containing the harmful PFAS between 2008 and 2024. (*Id*. ¶ 24, 28.) Plaintiff alleges the following supply chain: 1) that 3M and Dupont manufacture the PFAS chemicals; 2) that Gore uses the PFAS to make components and technical fabrics; and 3) that Globe and Lion incorporate these components and technical fabrics into the turnout gear. Plaintiff alleges harm from the purchase of the allegedly defective turnout gear containing PFAS. Plaintiff seeks reimbursement to replace the allegedly harmful turnout gear containing PFAS purchased by Plaintiff. (Doc. 1 ¶ 21.)

Defendants argue that these allegations prove insufficient to establish Article III standing. Defendants specifically take issue with the ability of Plaintiff to trace

the injuries to Defendants. Defendants also raise concerns that Plaintiff lacks

standing to assert state law claims outside Montana. The Court will address each

issue in turn.

### A. Traceability

Defendants contend that Plaintiff has failed to establish Article III standing

because the alleged injuries are not "fairly traceable" to Defendants. (Docs. 101 at

17-21; 104 at 6-10; 108 at 26-28; 106 at 8-11.) A party must establish "a causal

connection between the injury and the conduct complained of" to establish

traceability for standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

Traceability "does not require parties to show proximate causation or but-for

causation." *In re Snowflake, Inc. Data Sec. Breach Litig.*, 2025 WL 3023007, at *5

(D. Mont. Oct. 29, 2025) (internal quotations omitted). Traceability instead

requires only that "[t]he line of causation between the defendant's action and the

plaintiff's harm" be "more than attenuated." *Wash. Envtl. Council*, 732 F.3d at

1141. The presence of multiple links in a causal chain does not bar traceability so

long as the links are not "hypothetical or tenuous." *See Id.* at 1141–42. For

example, the court in *Peeler v. SRG Glob. Coatings*, LLC, 2024 WL 4625640, at

*11-12 (E.D. Mo. Oct. 30, 2024), held that the plaintiffs had established causation

by alleging that one of the defendants had manufactured PFAS used in another

defendant's manufacturing process.

Plaintiff must establish Article III standing for each Defendant and "tie [its alleged] injur[ies] to each Defendant" individually. *In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig. (Hardwick)*, 87 F.4th 315, 320 (6th Cir. 2023). The law does not require Plaintiff to show that each Defendant was the "sole source" of the injuries. *Wash. Envtl Council*, 732 F. 3d at 1142. The Court will address the traceability of Plaintiff's alleged injuries to each individual Defendant.

### 1. 3M

Plaintiff alleges that 3M "manufactured, distributed, marketed, and/or sold PFAS to companies, including Defendants Globe, Gore, and Lion, which also manufacture, distribute, or sell turnout gear." (Doc. 1 ¶ 10.) Plaintiff makes allegations that 3M has been a dominant global producer of PFAS and PFAS-infused materials that manufacturers incorporate into turnout gear. (Doc. 1 ¶¶ 88, 98-99, 112, 118, 126, and 136.) Plaintiff also contends that "Defendants 3M and DuPont expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiff and members of the Class." (Doc. 1. ¶ 109.)

3M argues that Plaintiff's allegations against 3M and Dupont impermissibly "lump" together these Defendants by making allegations against 3M and Dupont by stating "and/or." Plaintiff alleges that both 3M and Dupont separately contributed to the manufacturing of PFAS. Plaintiff makes specific allegations

15

about the alleged manufacturing of PFAS against Defendant 3M and Dupont. The use of "and/or" cannot defeat Plaintiff's claims. Plaintiff's use of "and/or" instead indicates that both Dupont and 3M contributed to the PFAS found within the turnout gear.

It would be impossible for Plaintiff, at the motion to dismiss phase, to know specifically the manufacturer of the various PFAS chemicals that were used in the production of the turnout gear. Plaintiff alleges that both 3M and Dupont supplied the PFAS-containing material used within Globe's and Lion's manufacture of the turnout gear. (Doc. 1 ¶¶ 101, 104.) No rule requires that a plaintiff scientifically test a product and determine its source before bringing a claim. *Winans v. Ornua Foods N. Am. Inc.*, 731 F. Supp. 3d 422, 428 (E.D.N.Y. 2024); *Clinger v. Edgewell Pers. Care Brands, LLC*, 2023 WL 2477499, at *3 (D. Conn. Mar. 13, 2023). Further discovery and time will determine "[w]hether Plaintiffs will ultimately be able to prove that a particular [m]anufacturer or [s]upplier sold [the PFAS] product that was used in [Plaintiff's turnout gear]." *Banks v. E.I. DuPont de Nemours & Co.*, 2022 WL 3139087 at *9 (D. Del. Aug. 4, 2022).

It remains "irrelevant that the [plaintiff's complaint] leaves open the possibility that plaintiff also [was exposed to] PFOA sold by other suppliers." *Lucey v. Saint-Gobain Performance Plastics Corp.,* 2018 WL 2926289, at *9 (N.D. N.Y. June 11, 2018). The law does not require Plaintiff to allege that 3M or

other Defendants were the "sole source" of PFAS in the turnout gear. Plaintiff has

alleged plausible allegations that 3M's contribution of PFAS that manufacturers

eventually placed in turnout gear casually connects to Plaintiff's complained

injuries. Plaintiff further alleges that 3M manufactured the PFAS that was placed

in Globe's and Lion's turnout gear purchased by Plaintiff. (Doc. ¶ 99, 104.) It is

reasonable to infer that much of the PFAS found within the turnout gear came from

PFAS manufactured by 3M and Dupont. *See Lucey*, 2018 WL 2926289, at * 31.

Like *Peeler*, Plaintiff alleges that 3M manufactured the PFAS used by the

other Defendant's, Lion, Globe, and Gore, and that these other Defendants placed

PFAS in the turnout gear at issue. 2024 WL 4625640, at *4. The Complaint draws

a clear line of traceability to 3M. *Id*. The Court reasonably may infer that 3M's

widespread production of PFAS and sale to other Defendants, as alleged by

Plaintiff, causally connects 3M's manufacture of PFAS to Plaintiff's injuries.

Plaintiff has provided sufficient factual support to establish Article III traceability.

The causal chain between 3M's conduct and Plaintiff's injuries does not prove too

hypothetical or tenuous. *Wash. Envtl. Council*, 732 F.3d at 1141-42.

## 2. Dupont, Chemours, Corteva (collectively "Dupont")

Plaintiff alleges that Dupont also "manufactured, distributed,

marketed, and/or sold PFAS to companies, including Defendants Globe, Gore, and

Lion, which also manufacture distribution or sell turnout gear." (Doc. 1 ¶ 10.)

17

Plaintiff alleges that it began purchasing Globe and Lion turnout gear containing the PFAS manufactured by Dupont. (*Id*. ¶ 104.) Plaintiff alleges that Dupont invented PTFE and continues manufacturing PFAS today. (*Id*. ¶ 97.) Plaintiff made allegations that "Dupont was the largest chemical company in the world in terms of sales" before Dupont spun off into other smaller entities. (*Id*. ¶ 121.)

For similar reasons as above, Plaintiff sufficiently has established traceability. Plaintiff reasonably tied its injuries to Dupont's alleged manufacture of PFAS and Dupont's sale of PFAS to companies who sold to Plaintiff the turnout gear containing Dupont's PFAS. Plaintiff has established a sufficient chain of traceability between Dupont's conduct and Plaintiff's complained injuries.

### 3.  W.L. Gore

Plaintiff alleges that Gore invented and commercialized a form of PTFE in 1968, the chemical present in the turnout gear sold to Plaintiff. (Doc. 1 ¶ 102.) Plaintiff alleges that Gore manufactured, marketed, and supplied PFAS-containing materials to Globe and Lion, who incorporated those materials into the turnout gear sold to Plaintiff. (Doc. 1 ¶¶ 83, 101, 104, 108, 110-111, 133, 142.) Plaintiff reasonably ties its injuries to Gore's alleged manufacture of PFAS-containing materials and sale to companies who sold turnout gear to Plaintiff. Plaintiff has established a clear chain of traceability between Gore's conduct and Plaintiff's complained injuries.

### 4. Globe and Lion

Plaintiff alleges that Globe and Lion assemble the turnout gear using technical fibers sourced from other textile manufacturers. (Doc. 1 ¶ 83, 100-01.) Plaintiff alleges that Globe and Lion manufacture, market, and sell turnout gear that contains PFAS derived from the inputs provided from other Defendants. (*Id.* ¶ 101.) Plaintiff alleges that Globe and Lion directly manufacture products purchased by Plaintiff. (Doc. 1 ¶¶ 24, 28.) Plaintiff "currently uses turnout gear manufactured by . . . Globe," and Plaintiff "purchased turnout gear sold by Globe and Lion, with purchases being made from 2008 to 2024." (*Id.*) Plaintiff's allegations of purchasing defective turnout gear containing PFAS directly from Globe and Lion establish traceability. Plaintiff's complained injuries remain directly connected and traceable to Globe and Lion.

The causal chain involves multiple Defendants, but not "third parties whose independent decisions collectively have a significant effect on plaintiffs' injuries" that would make Plaintiff's causal chain too weak for standing. *Wash. Envtl. Council*, 732 F.3d at 1142 (quoting *Native Vill. of Kivalina v. ExxonMobil* Corp., 696 F. 3d 849, 867 (9th Cir. 2012)). Plaintiff further connects the plausible links in the chain of traceability for all Defendants by alleging the collective enterprise of Defendants in concealing the known dangers of PFAS in the turnout gear. (Doc. 1 ¶ 21.)

### B. Standing for non-Montana state law claims

Defendants argue that Plaintiff lacks standing to assert non-Montana state law claims. (Docs. 101 at 22-23; 106 at 11.) Defendants argue that Plaintiff's non-Montana state law claims must be dismissed because Plaintiff is from Montana and Plaintiff's allegations relate to the purchase of turnout gear in Montana. (*Id*.) The Court disagrees.

Courts remain split on whether to allow a class action plaintiff to assert laws of other states without having a named plaintiff from that state. A "growing minority of courts in this circuit have held . . . that whether a named plaintiff can represent class members whose claims arise under the laws of different states is not a standing question that needs to be decided at the motion to dismiss stage." *Sultanis v. Champion Petfoods USA Inc.*, 2021 WL 3373934, at *5 (N.D. Cal. Aug. 3, 2021). Many courts instead address this issue at the class certification stage. *Murphy v. Olly Pub. Benefit Corp.,* 651 F. Supp. 3d 1111, 1134 (N.D. Cal. 2023).

The Court denies Defendants' motion to dismiss Plaintiff's non-Montana state law claims at this early juncture. Plaintiff seeks to include other potential class members from various other states. Dismissal now of Plaintiff's class allegations involving other states and potential out-of-state class plaintiffs "would deprive [plaintiff] of the opportunity to 'marshal information about the respective claims, similarities, and variations in the laws of the applicable states, and the

20

potential need for subclasses based on any state law variations.'" *Nelson v. Forest River, Inc.*, 2023 WL 2610769, at *8 (D. Mont. Mar. 23, 2023) (citing *Langan v. Johnson & Johnson Consumer Cos.*, 897 F. 3d 88, 95 (2d Cir. 2018). Defendants may reassert these arguments at the class certification stage. The Court denies Defendants' motion to dismiss Plaintiff's non-Montana state law claims based on a lack of Article III standing. Plaintiff may seek leave to amend its Complaint if further discovery enables Plaintiff to locate other potential plaintiffs from the varying states.

### III.    PERSONAL JURISDICTION

Defendants argue that the Court lacks personal jurisdiction over Defendants in Montana. (Docs. 101 at 26-30; 108 at 19-22; 106 at 12-17.) Both parties acknowledge that the Court lacks general jurisdiction over Defendants as no Defendants' "place of incorporation" or "principal place of business" is in Montana. *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2014). Plaintiff must establish specific personal jurisdiction over each Defendant.

A plaintiff must show "minimum contacts" that are the result of the defendant's "purposeful availment" or "purposeful direction" to establish specific jurisdiction over a non-resident defendant. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801-02 (9th Cir. 2004). The defendant must have "committed an intentional act" that was "expressly aimed at the forum state." *Schwarzenegger*,

374 F.3d at 803. The plaintiff's claim also must "arise[] out of or relate[] to" that act. *Id.* at 802. The Court will address first whether Defendants aimed their contacts at Montana. The Court will then analyze whether any of Defendants' acts relate to Plaintiff's claims and if exercising jurisdiction would prove reasonable.

### A. Defendants' contacts aimed at Montana

The Court previously noted that "Defendants, by selling products to Montana customers in Montana, have established contacts with Montana and exposed themselves to being sued in the District of Montana." (Doc. 85 at 13.) The Plaintiff further asserts that each Defendant is registered to do business in Montana. (Doc. 128 at 20; Doc. 129 at 18; Doc. 130 at 11.)

A plaintiff cannot establish that a defendant purposefully availed itself to a particular jurisdiction simply by showing that "a defendant manufacturer 'placed its product into the stream of commerce.'" *Rodoni v. Royal Outdoor Prods., Inc.*, 2019 WL 2300400, at *3 (D. Mont. May 30, 2019) (quoting *Holland Am. Line Inc. v. Warsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007)). A national corporation's actions must "target" the specific forum. *Id.* at *5. Such targeting can take the shape of "a regular flow or regular course of sales in the state or a special state-related design, advertising, advice, marketing, or [something] else." *J. McIntyre Machinery v. Nicastro*, 564 U.S. 873, 886 (2011) (Breyer, J., concurring) (quoting *Asahi Metal Indus. Co., Ltd. v. Sup. Calif., Solano Cnty.*, 480 U.S. 102,

22

111 (1987) (O'Connor, J., concurring)). A defendant's contacts with the state

cannot be based on the "random, fortuitous, or attenuated" contacts he makes by

interacting with other persons affiliated with the state. *Cataraha v. Elemental

Prism, LLC*, 2018 WL 3448283, at *4 (D. Mont. July 17, 2018) (citing *Walden v.

Fiore*, 571 U.S. 277, 286 (2014)).

3M's website shows that a distributor of its products sits in Billings,

Montana. (Doc. 128 at 20.) Plaintiff's Administrative Specialist, Diane

Evankovich, attests that she received marketing and sales solicitation from 3M

"sales representatives and distributors" in Montana. (Doc. 46-1 at 2-3.) Similarly,

Plaintiff's fire chief, Zach Osborne, received marketing and sales solicitations from

3M in Montana. (Doc. 46-2 at 3.) 3M holds targeted events and promotions to

firefighters in Montana. For example, 3M held an event on August 13-14, 2021, in

Big Sky, Montana called the "3M Scott Firefighter Combat Challenge." (Doc. 132

¶ 5.) 3M promoted and marketed its products at this event. (*Id*.) Defendants 3M,

Lion, and Globe participated in another event in Butte, Montana on October 8-12,

2025, where they sold firefighter products. (*Id*. ¶ 7.)

Evankovich and Osborne declare that they were contacted directly by LN

Curtis or SeaWestern regarding turnout gear containing Dupont's PFAS. (*Id*.; Doc.

46-2.) Plaintiff asserts that Dupont, in partnership with MSA/Globe, also holds an

annual giveaway event for Globe turnout gear, wherein volunteer fire departments

23

must apply to win the turnout gear. (Doc. 129 at 19.) Plaintiff alleges that this Globe turnout gear allegedly contains Dupont's PFAS. (Doc. 129 at 19.) Evankovich declared that she has been made aware of the Dupont and MSA/Globe turnout set giveaway. (Doc. 132 ¶ 16.) Montana fire departments have won turnout gear sets from the giveaway held by Dupont and Globe. (*Id.*) Dupont and Globe shipped the turnout gear sets to these Montana fire departments and sought to have the winners advertise the giveaway sets on social media. (Doc. 129 at 19.) Dupont contends, through declarations, that it made no sales into Montana. (Doc. 106 at 16-17.) Alleged "conflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor" at this stage of the litigation. *Kell v. Freedom Arms Inc*., 748 F. Supp. 973, 980 (D. Mont. 2024) (citations omitted).

Plaintiff contends that Globe sells its products in Montana through online searches and a sales manager covering Montana, or through a distributor covering Montana. (Doc. 130 at 12.) Globe's website also appears to target Montana consumers through its sales agents and website. (*Id.* at 15-16.) Plaintiff alleges it has received turnout gear directly shipped from Globe. (Doc. 132 ¶ 15.) Plaintiff has shown that the turnout gear purchased by Plaintiff contains a Globe or Lion tag.

These contacts prove sufficient to establish Defendants' purposeful availment to Montana. "Physical entry into the state, either by the defendant in person or through an agent, goods, mail, or some other means, qualifies as a relevant contact." *Cataraha v. Elemental Prism*, LLC, 2018 WL 3448283, at *4 (D. Mont. July 17, 2018) (citing *Walden*, 571 U.S. at 285). Defendants' products did not enter Montana randomly through the stream of commerce. Defendants made efforts to market, sell, and advertise their products into Montana. Defendants conduct establishes contacts expressly aimed at the forum state, not merely contacts that were "random, fortuitous, or attenuated." *Walden,* 571 U.S. at 286.

## B. Forum-related activities

A plaintiff must establish an affiliation between the forum and the underlying controversy. *Ford*, 592 U.S. at 359. "[P]rincipally, [an] activity or an occurrence that takes place in the forum State [] is therefore subject to the State's regulation." *Id*. at 359-60 (quoting *Bristol-Myers*, 582 U.S. at 262). Plaintiff's claims relate to the purchase in Montana of allegedly defective turnout gear manufactured, sold, marketed, and distributed by Defendants. Plaintiff's alleged injuries, buying and using defective turnout gear that needs replacement, occurred in Montana. The above purposeful contacts by Defendants of selling, advertising, and marketing the turnout gear connects to conduct in the forum state of Montana. Unlike *Tackett v. Duncan*, 334 P.3d 920, 929 (Mont. 2014), Defendants' links to

25

Montana go beyond only a connection with Plaintiff. Defendants' contacts with the forum and the underlying controversy remain sufficiently related to establish specific personal jurisdiction at this stage of the litigation.

## C. Reasonableness

Courts must consider whether the exercise of personal jurisdiction would comport with due process. *Kell*, 748 F. Supp.  at 980-81 (citing *Milky Whey*, 342 P.3d at 17. Due process "depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316-17, 66 S. Ct. 154, 90 L. Ed. 95 (1945)).

Courts may consider the following factors when examining the reasonableness of personal jurisdiction: (1) the extent of the defendant's purposeful interjection into Montana; (2) the burden on defendant of defending in Montana; (3) the extent of the conflict with the sovereignty of another possible forum; (4) Montana's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of Montana to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Cataraha*, 2018 WL 3448283, at *5. The "burden falls on the defendant to

overcome a presumption of reasonableness by presenting a compelling case that jurisdiction would be unreasonable." *Id*.

The Court finds that exercising personal jurisdiction over Defendant's appears reasonable. The Court addressed some of the factors in its previous order when denying the Defendants' motion to transfer the action to the District of Delaware. (See Doc. 85.) Montana continues to have a strong interest in protecting its citizens involved in this action. (*Id*. at 18.) Litigation does not appear that it would be more burdensome or expensive in Montana than any other forum. (*Id*. at 12, 15-18.) Immovable evidence, not within Montana, would not be an issue in the case. (*Id*.) The District of Montana efficiently can resolve the disputes between Plaintiff and Defendants, as explained above relating to the first-to-file rule.

The Court understands that Defendants may be burdened by adjudication of these claims in Montana. Defendants' contacts with the forum outweigh these concerns. Defendants will be burdened by adjudication of Plaintiff's claims in any forum. Defendants have directed contacts to the Montana market with the products at issue in this case. These directed contacts support the Court's exercise of personal jurisdiction over the Defendants.

## IV.    PLAINTIFF'S RICO CLAIMS

RICO makes it unlawful "for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). A RICO claim requires plausible allegations "that the defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity and, additionally, that (5) the defendant caused injury to plaintiff's business or property." *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1086 (9th Cir. 2002). These elements must be pleaded with particularity. *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065 (9th Cir. 2004); *see* Fed. R. Civ. P. 9(b). The particularity requirement means that "the pleader must state the time, place, and specific content of the false representations," "the identities of the parties to the misrepresentation," and "'the role of each defendant in each scheme.'" *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

## A. INDIRECT PURCHASER RULE

Defendants argue that Plaintiff lacks statutory standing to assert a RICO claim. (Docs. 101 at 30-32; 104 at 11-13; 106 at 17-18; 108 at 28-29.) Defendants argue that Plaintiff did not directly purchase the alleged defective turnout gear from Defendants. (Doc. 101 at 32.) As a result, Defendants claim that the indirect-purchaser rule bars Plaintiff's civil RICO claim. (*Id.*)

The U.S. Supreme Court has barred claims by indirect purchasers in the antitrust context. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726–27, 746 (1977).

28

*Illinois Brick* stands for the proposition that "indirect purchasers who are two or more steps removed from the violator in a distribution chain" cannot sue for damages. *Apple Inc. v. Pepper*, 587 U.S. 273, 279 & n.1 (2019). The Ninth Circuit has not determined whether *Illinois Brick* applies to civil RICO claims. *Biederman v. FCA US LLC*, 765 F. Supp. 3d 920, 932 (N.D. Cal. 2025), *appeal pending*, No. 25-3063 (9th Cir. 2025). Every other federal court of appeals has held, however, that *Illinois Brick* applies to civil RICO claims. *Id.*

Plaintiff alleges that Defendants 3M, Dupont, and Gore, supplied PFAS and PFAS-containing materials to Globe and Lion, who in turn produced the turnout gear that Plaintiff purchased. Defendants 3M, Dupont, and Gore argue that "[t]he presence of the turnout gear manufacturers as an intermediary between Plaintiff and manufacturer Defendants like 3M [and Dupont] forecloses Plaintiff's RICO claim." (Doc. 101 at 34.) Plaintiff asks the Court to defer ruling on the indirect-purchaser rule pending the Ninth Circuit's decision in *Biederman.* (Doc. 128 at 24.)

A certification of appeal under § 1292(b) proves warranted when the district court finds that there exist "substantial grounds for difference of opinion" as to the issue. *ICTSI Or., Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1130 (9th Cir. 2022) (citation omitted). Courts traditionally find substantial difference in opinions when the circuit courts may be in dispute regarding the issue, and when a

circuit court has not yet addressed the issue. *Biederman v. FCA US LLC*., 2025 U.S. Dist. LEXIS 83591, at * 14. The Ninth Circuit must agree that the requirements of § 1292(b) have been met before granting permission to appeal. *ICTSI,* 22 F.4th at 1131.

Biederman certified an interlocutory appeal under § 1292(b). The Ninth Circuit granted permission to hear the appeal in *Biederman* on June 18, 2025. The appeal in *Biederman* presents the specific issue of "whether *Illinois Brick* applies to claims brought under 18 U.S.C. § 1964(c) [RICO]." *Biederman v. FCA US LLC*, 2025 WL 1266907, at *3. The parties have fully briefed the issue. *Biederman v. FCA US, LLC, et. al*., Case No. 25-3063 (9th Cir. 2025).

The Ninth Circuit's grant of appeal indicates that substantial grounds exist for differences of opinion as to whether *Illinois Brick's* indirect-purchaser rule applies to civil RICO claims. The Court determines that reserving ruling on this issue will promote judicial efficiency given the uncertainty and differences of opinion in the application of the indirect-purchaser rule to RICO claims in the Ninth Circuit. The Court denies Defendants' motion to dismiss Plaintiff's RICO claim without prejudice pending the Ninth Circuit's decision in *Biederman*. The Court will address below Defendants remaining arguments against Plaintiff's RICO claim.

**B. PARTICIPATION IN AND EXISTENCE OF AN ENTERPRISE**

Defendants argue that Plaintiff failed to allege that Defendants participated in the conduct of an enterprise. (Doc. 101 at 34-37.) Defendants assert that Plaintiff's allegations establish merely that Defendants "conducted [their] own affairs" which does not support a RICO claim. (Doc. 101 at 34 (citing *Borrego Cmty. Health Found. v. Hebets*, 2025 WL 934528, at *17 (S.D. Cal. Mar. 27, 2025)). Defendants contend that any allegations of collaborative conduct between Defendants proves consistent only with typical "ordinary business interactions." (Doc. 101 at 36 (citing *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1057 (C.D. Cal. 2016)).

A RICO conspiracy under § 1962(d) requires only that the defendant was "aware of the essential nature and scope of the enterprise and intended to participate in it." *Christensten*, 828 F.3d at 780 (citation omitted). The Court determines that Plaintiff's allegations sufficiently establish that Defendants participated in an enterprise. Plaintiff alleges that each Defendant knew of the dangers of PFAS and actively hid the dangers for decades. (Doc. 1 ¶ 112-154.) 3M shared this knowledge with Dupont by providing a Material Safety Data Sheet in 1997 that noted PFAS's cancer risks. (*Id*. ¶ 14.) Plaintiff alleges that Defendants collaborated in joint studies to unravel the dangers of PFAS. Plaintiff's Complaint includes allegations that Defendants continued to market PFAS and PFAS

31

containing turnout gear as safe for decades despite having knowledge of the harms. (*Id*. ¶ 133-154.) Such joint concealment cannot simply be ordinary business. Plaintiff alleges that Defendants made efforts to keep from the public, Plaintiff, and the putative class, information that they had on the dangers of PFAS as part of conduct related to the enterprise's larger purpose.

Defendants also argue that Plaintiff has failed to allege that an enterprise existed as required for a RICO claim. (Doc. 101 at 37.) A RICO enterprise includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). This "expansive definition is 'not very demanding.'" *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2016) (quoting *Odom v. Microsoft Corp*., 486 F.3d 541, 548 (9th Cir. 2007) (*en banc*)).

An associated-in-fact enterprise involves "a group of persons associated together for a common purpose," proof of which requires "evidence of an ongoing organization, formal or informal" and "evidence that the various associates function as a continuing unit." *Odom*, 486 F.3d at 549. A plaintiff must allege (1) an ongoing organization, formal or informal; (2) the various associates functioning as a continuing unit; and (3) a group associated for a common purpose. *Doan v. Singh*, 617 F. App'x 684, 686 (9th Cir. 2015). Even if the enterprise proves informal, some evidence of structure must be present outside the allegations of

racketeering. *Boyle v. United States*, 556 U.S. 938, 945-48 (2009). The enterprise does not need to have a common name, meetings, dues, or other established procedures. *Id*.

Plaintiff sufficiently have alleged that an enterprise existed. A plaintiff must plead "'all the participants acted with the same purpose in mind pursuant to a unified agenda.'" *Marshall v. Goguen*, 604 F. Supp. 3d 980, 1012 (D. Mont. 2022). Plaintiff's allegations that Defendants were aware that exposing the known dangers of PFAS would halt sales for each company establishes a common purpose and scheme. (*Id*. ¶ 196.) The Third Circuit in *In re Ins. Brokerage Antitrust Litig*., 618 F. 3d 300, 378 (3d. Cir. 2010), recognized that "if defendants band together to commit [violations] they cannot accomplish alone . . . then they cumulatively are conducting the association-in-fact enterprise's affairs, and not [simply] their own affairs."

Defendants could not have achieved their goals of selling PFAS and turnout gear containing PFAS if Defendants' knowledge of the harms of PFAS had been exposed. These actions by Defendants, allegedly acting together to conceal the known dangers of PFAS, do not constitute merely normal or ordinary commercial relationships. These allegations indicate a continuing effort of concealment by Defendants. Plaintiff alleges that Defendants have continued to conceal the dangers of PFAS to plausibly show "that persons associated with the enterprise engaged in

a pattern of racketeering activity." *Boyle*, 556 U.S. at 947. Defendants' active concealment appears to be ongoing and continuous as Plaintiff alleges that it purchased turnout gear from 2008 to 2024 without knowledge of the harms of PFAS. (Doc. 1 ¶ 28.)

## C. PROXIMATE CAUSE

Lastly, Defendants argue that Plaintiff failed to allege that Defendants proximately caused its injuries. (Doc. 101 at 41.) The causation element of a RICO claim requires a plaintiff "to show that a RICO predicate offense not only was a 'but for' cause of his injury but was the proximate cause as well." *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 9 (2010). The plaintiff's injury must have some direct relation with the defendant's alleged conduct. *Id*. at 9-10. The connection between plaintiff's injury and defendant's conduct "that is 'too remote,' 'purely contingent,' or 'indirect' proves insufficient" to establish causation. *Id*. A plaintiff's damages under a RICO claim "cannot be contingent on or derivative of harm suffered by a different party." *Williams & Cochran, LLP v. Quechan Tribe of the Fort Yuma Indian Reservation*, 2018 U.S. Dist. LEXIS 196075, *35 (S.D. Cal 2018 (citing *Slay's Restoration, LLC v. Wright Nat'l Flood Ins. Co*., 884 F.3d 489, 494-95 (4th Cir. 2018)).

The Court determines that the connection between Plaintiff's injury, buying allegedly defective turnout gear and needing replacement gear, and Defendants'

alleged conduct of concealing the known dangers of PFAS proves sufficient for proximate causation at this stage. Plaintiff's claims revolve around the alleged collective effort to conceal the dangers of PFAS to continue manufacturing, selling, and distributing PFAS-laden turnout gear. Defendants alleged collaborative effort in keeping PFAS information from the public directly connects to Plaintiff's alleged injury of purchasing defective turnout gear without knowing its harms.

The Court recognizes that multiple Defendants had to work together to allegedly conceal the dangers of PFAS. Unlike the allegations in *Slay's Restoration*, 884 F.3d at 494-95, Plaintiff's injuries are not contingent on, or derivative from, an injury of another party closer to Defendants in the chain of causation. *See Albert v. Glob. Tel*Link Corp.*, 68 F.4th 906, 911 (4th Cir. 2023). Plaintiff claims to have remained unaware of PFAS dangers due to Defendants' alleged concealment efforts. Plaintiff alleges that this lack of awareness caused it to purchase the turnout gear containing PFAS, and to suffer harm caused by Defendants' conduct. Plaintiff's injuries do not appear too remote, indirect, or contingent on another's harm. Plaintiff plausibly has alleged that Defendants' racketeering activity proximately caused Plaintiff's injury.

## V.     PLAINTIFF'S MONTANA AND OTHER STATE LAW CLAIMS

Plaintiff asserts the following Montana state law claims: (1) strict-liability design defect (Count IV); (2) strict-liability failure to warn (Count V); (3) implied

warranty of merchantability (Count VI); and (4) violation of the Montana

Consumer Protection Act ("Montana CPA") (Count VII). (Doc. 1 ¶¶ 222-63.)

Defendants argue that Plaintiff has failed to allege causation, an element to each of

the Montana state law claims. (Docs. 101 at 44; 104 at 13-14; 106 at 18;108 at 29-

31.) Defendants also argue that Plaintiff's Montana state law claims fail for failing

to plead "detrimental reliance." (Docs. 101 at 45; 104 at 13-14.) Defendants finally

take issue with Plaintiff's state law claims under the Montana CPA.

### A. Causation

Defendants argue that Plaintiff's state law claims do not plausibly allege

causation, similar to the Article III traceability argument from above. (Doc. 101 at

45.) The Court discussed at length that Plaintiff sufficiently have alleged

traceability. For similar reasons, Plaintiff has plausible alleged that Defendants

caused Plaintiff's injuries.

Plaintiff alleges that 3M, Dupont, and Gore manufactured and sold the PFAS

and PFAS-containing material that was incorporated into the turnout gear. Plaintiff

purchased the allegedly defective turnout gear from Lion and Globe, who

incorporated the other Defendants PFAS products into the turnout gear. Plaintiff

asserts further that Defendants were aware of the known risks of PFAS contained

within the purchased product and failed to warn Plaintiff. Each Defendants alleged

involvement in the manufacture, distribution, and sale of turnout gear makes it

reasonably plausible that Defendants actions caused Plaintiff's injuries. Plaintiff's allegations that Defendants' conduct caused injury and forced Plaintiff to purchase replacement turnout gear sufficiently pleads the element of causation. (Doc. 1 ¶¶ 10–12, 24, 28, 38, 43, 101, 104, 112–20, 134–35, 146–47, 190, 195, 205, 219, 256.)

## B. Reliance

Defendant argues that Plaintiff failed to plead "detrimental reliance." (Doc. 101 at 45.) Plaintiff counters that it relied on Defendants' "material misrepresentations and omissions," including Defendants' failure to alert Plaintiff to the known dangers of PFAS. Plaintiff further argues that these actions by Defendants ultimately caused Plaintiff's injury to establish reliance. The Court agrees.

Plaintiff alleges specific public announcements, marketing, and advertisements by Defendants that PFAS was safe and that the turnout gear containing PFAS was also safe for firefighters. (Doc. 1 ¶¶ 112–20, 135–38, 141-148, 150-151, 153, 190-194, 214, 255–59.) Plaintiff alleges that it reasonably relied on such representations when purchasing the turnout gear. Plaintiff alleges such misrepresentations and omission of material facts deceived Plaintiff. (Doc.1 ¶ 257.) Plaintiff contends that it would have acted differently if it had known about the dangers of PFAS contained in the turnout gear. (*Id*. 254-257.) Plaintiff

sustained damage from Defendants' misrepresentations as it needs to replace the allegedly defective turnout gear containing harmful PFAS. (*Id*. ¶¶ 20.)

### C. Montana CPA claims

Plaintiff alleges a violation of Montana Unfair Trade Practices & Consumer Protection Act ("Montana CPA"). Mont. Code Ann. § 30-14-101, *et seq*. To state a claim under the Montana CPA, Plaintiff must allege the following elements: (1) that Plaintiff was a consumer of defendant's services; (2) that the defendant employed an unfair or deceptive act or practice in the conduct of trade or commerce with plaintiff; (3) causation; and (4) ascertainable loss. *See Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 861 (Mont. 2022), citing Mont. Code Ann. § 30-14-101, *et seq*. The scope of Montana's CPA protection is broad. *Waddell v. Shamrock Motors*, 1995 Mont. Dist. LEXIS 682 (Mont. Dist. Ct. 1995).

Defendants argue that Plaintiff's Montana CPA claim fails because Plaintiff cannot be considered a "consumer." (Doc. 101 at 46-47.) Defendants contend that Plaintiff's Montana CPA claim must be dismissed because Plaintiff buys the turnout gear for the firefighters to use at work, not for personal use. (*Id*.) Montana law defines a "consumer" as "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes." Mont. Code. Ann. § 30-14-102(1). Plaintiff relies on *Mayor of Balt. v. Merck Sharp & Dohme Corp.*, 2023 U.S. Dist. LEXIS 207929, at *45 (E.D. Pa.

Nov. 29, 2023) to establish its purchase of turnout gear on behalf of firefighters constitutes as a consumer transaction. A review of *Mayor of Balt.* proves instructive.

In *Mayor of Balt.*, the defendant argued that the plaintiff and members of the putative class could not constitute "consumers" who made purchases for "personal, family, or household use" as required under the various state law CPA claims. *Mayor of Balt.*, 2023 U.S. Dist. LEXIS 207929, at *45. The action related to claims by the plaintiff, a third-party payor, against a vaccine manufacturer for having an alleged monopoly over the rotavirus vaccine market. *Id.* at *1-2. As an initial matter, *Mayor of Balt.* concluded that the third-party payor plaintiff had standing to bring a CPA claim as the statute defined broadly the word "person." *Id.* at *46-47. *Mayor of Balt.* noted that Montana allowed CPA claims brought by "natural persons, corporations, trusts, partnerships, incorporated, or unincorporated associations, and any other legal entity." *Id.* (citing Mont Code Ann. §§ 30-14-102(1), (6)). Other courts similarly have not limited application of Montana CPA claims only to those who engage directly in consumer transactions. *Mayor of Balt.*, at *47 (citing *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 193 (D. Me. 2004)).

The defendant in *Mayor of Balt.* also argued that the plaintiff did not constitute a "consumer" as the third-party payor did not purchase the vaccines at

issue for "personal, family, or household purchases." *Mayor of Balt.*, 2023 U.S. Dist. LEXIS 207929, at *48. The plaintiff countered that the third-party payor's purchases of vaccines was consumer in nature because the third-party payor "transitively purchas[ed] these vaccines for such uses." *Id*. at *50. The plaintiff's argument hinged on the fact that the vaccine recipients, reimbursed by the third-party payor plaintiff, ultimately used the vaccines for personal use. *Id. Mayor v. Balt.* concluded that the plaintiff's transitive purchase of vaccine on behalf of the individual vaccine recipients qualified as a "consumer" transaction under the relevant CPA statutes. *Id*. at *51.

As a threshold matter, the broad language of "person" under Mont. Code Ann. §§ 30-14-102(1), (6), supports Plaintiff's standing to bring a Montana CPA claim. Plaintiff, as a consolidated city-county government, constitutes a legal entity. A closer call remains on whether Plaintiff's purchase of the turnout gear on behalf of the firefighters constitutes a "consumer" transaction as further required under the Montana CPA. Mont Code Ann. § 30-14-133(1)(a). The Court determines that a transitive purchase by Plaintiff on behalf of the firefighters may constitute a "consumer" transaction depending on the use to which the employees put the purchased item.

The transitive purchases by Plaintiff does not differ from the covered purchases in *Mayor of Balt*. The benefit of the vaccines to vaccine recipients in

*Mayor of Balt.* covered the insured members who benefitted from the vaccines personally. Plaintiff alleges that it "currently owns approximately 400 sets of turnout suits to protect its full-time firefighters and volunteers." (Doc. 1 ¶ 24.) The transitive purchase of turnout gear on behalf of Plaintiff's firefighters constitutes a "consumer" transaction as the Plaintiff's employee firefighters use the turnout gear "primarily for personal, household, or family purposes" as analyzed below.

Numerous courts have held that "if an item is purchased primarily for business or commercial rather than personal purposes, the [Montana CPA] does not supply protection." *In re Namenda Indirect Purchaser Antitrust Litig*., 2021 U.S. Dist. LEXIS 110081, at *95 (S.D.N.Y June 11, 2021) (quoting *Zine v. Chrysler Corp*., 236 Mich App. 261 (Mich Ct. App. 1999)). Courts find that the definition of consumer does not encompass "transactions intended primarily to promote business or professional interests." *Shaw v. Marriott Int'l, Inc*., 605 F.3d 1039, 1043 (D.C. Ct. App. 2010). For example, the court in *Crane v. Archer Daniels Midland Co*., 2024 U.S. Dist. LEXIS 96670, at *7-8 (E.D. Mo. May 31, 2024), held that a purchase of rabbit feed "for the purpose of selling [the rabbits'] progeny as show rabbits" constituted a business purpose, rather than, a personal purpose, under the CPA. *Crane* remained persuaded by the fact that the plaintiff's claim of damages involved her loss in business profits associated with her future rabbit progeny. *Id*. at *20-21.

41

The Montana Supreme Court has looked to dictionary definitions in defining what "business" and "commercial" mean, outside the context of the Montana CPA. *Myers v. Kleinhans*, 556 P.3d 529, 533 (Mont. 2024). The Court deems these definitions relevant to the inquiry on whether Plaintiff purchased the turnout gear for business or commercial purposes, rather than personal purposes. The Montana Supreme Court found "commercial" to mean "[o]f or relating to, or involving the buying and selling of goods." *Myers*, 556 P.3d at 533 (quoting *Commercial*, Black's Law Dictionary (11th ed. 2019)). The Montana Supreme Court cited the term "business" to mean "[a] commercial enterprise carried on for profit." *Myers*, 556 P. 3d at 533 (quoting *Business*, Black's Law Dictionary (11th ed. 2019)).

Plaintiff purchased the turnout gear primarily for the purpose of ensuring the safety of its employee firefighter while fighting fires. Plaintiff did not purchase the turnout gear for commercial purposes such as to resell the items to third parties. Plaintiff further does not run the fire department as a for-profit business entity. Fire departments and agencies operate without a profit motive. Fire departments work instead to offer safety and public services to the communities they serve. Indeed, Plaintiff does not receive any business or commercial benefit from the purchase of the turnout gear on behalf of the firefighters. The individual firefighters employed by Plaintiff personally use and benefit from the turnout gear.

Plaintiff alleges that it provides the turnout gear sets "to protect" the firefighters. (Doc. 1 ¶ 24.) Plaintiff does not purchase the turnout gear to make profits, expand future business, or to benefit commercially. Plaintiff provides each firefighter with their own set of turnout gear for safety reasons, alleging that some fire departments provide two suits for each firefighter. (Doc. 1 ¶ 20.). Each firefighter who prepares to go to the scene of a fire emergency wears the turnout gear for their personal use and benefit, ensuring they safely can serve their communities. The firefighters do not wear the turnout gear to help Plaintiff profit financially.

The purchase of turnout gear by Plaintiff, a municipality, differs from other employer "business or commercial" purchases made on behalf of its employees. For example, tools or gear purchased by other for-profit employers on behalf of their employees may not fit squarely into a consumer purchase. Other for-profit employers may purchase the gear and tools used by its employees to make profits for the employers. The employer would purchase the tool and gears primarily for its benefit under those circumstances and not the personal use and benefit of its employees. See *Brandon v. Am. Sterilizer Co.*, 880 S.W.2d 488, 489 (Tex. App. 1994) (determining that goods or services an employer purchases to benefit primarily the employee rather than the employer is entitled to consumer status

under the Deceptive Trade Practices-Consumer Protection Act (DTPA), Tex. Bus. & Com. Code Ann. §§ 17.41 - 17.63 (1994)). The same proves true here.

Plaintiff primarily purchases the turnout gear for its firefighter employee's personal protection and benefit. The firefighters do not receive a business or commercial advantage using such turnout gear. The firefighters admittedly use the turnout gear while at work. The primary purpose of purchasing the turnout gear appears, however, to provide protection and safety to the firefighters using the personal protective equipment. Neither Plaintiff's purchases of the turnout gear, nor the firefighters' use of the turnout gear, turns on a business or commercial purpose.

Further, unlike, *Crane,* 2024 U.S. Dist. LEXIS 96670, at *20-21, Plaintiff seeks damages in the monetary amount to replace the allegedly defective turnout gear and does not seek damages for lost business profits from the purchase of the turnout gear. Plaintiff, as a city-county government, has not lost profits from the allegedly defective turnout gear. Plaintiff's remedies seek to reestablish and provide the promised benefits to the firefighters that the turnout gear worn personally by each firefighter is safe, effective, and protective. Plaintiff's main objective continues to be to benefit the firefighters, by replacing the allegedly defective turnout gear, not profit off the defects. The damages sought by Plaintiff indicate that Plaintiff's purchase of the turnout gear on behalf of the firefighters

44

remains consumer in nature. The Court determines that Plaintiff plausibly has established that it purchased the turnout gear on behalf of the firefighters for the firefighter's "personal use" as defined by the Montana CPA. Plaintiff's transitive purchase of firefighter turnout gear on behalf of the firefighters plausibly constitutes as a consumer transaction. *Mayor of Balt.*, 2023 U.S. Dist. LEXIS 207929, at *50.

      Maryland, Missouri, and Pennsylvania similarly limit its consumer protection law to purchases to those made for "personal, family, and household purposes." *See* 73 Pa. Stat. § 201-9.2(a); Mo. Stat. § 407.025; Md. Code, Com. Law § 13-303(1)-(2). These state law CPA claims will remain for the same reasons stated above.

### D. Georgia, Iowa, and South Carolina's Consumer Protection Laws prohibition on class actions

      Globe argues that Plaintiff's consumer protection claims under Georgia, Iowa, and South Carolina are barred as these states prohibit class actions under a consumer protection law claim. (Doc. 108 at 37.) Globe cites to Georgia and South Carolina statutory law prohibiting bring an action "in a representative capacity." S.C. Code § 39-5-140(a); Ga. Code § 10-1-399(a). The court in *Fejzulai v. Sam's W., Inc.*, 205 F. Supp. 3d 723, 729 (D. S.C. 2016), dismissed a class action because the application of Rule 23 would transform the nature and scope of a state statutory

right. Globe further asserts that a private action under Iowa's consumer protection law requires approval by the Iowa Attorney General. Iowa Code § 714H.7.

Other courts have disagreed. The Fourth Circuit in *Grice v. Indep. Bank*, 147 F. 4th 440, 448 (4th Cir. 2025), held that "Rule 23 leaves no room because it 'permits all class actions that meet its requirements [to proceed], and a State cannot limit that permission' by 'impos[ing] additional requirements'—as [South Carolina's] Door Closing Statute does." The U.S. Supreme Court also held that a New York law prohibiting class actions under certain circumstances would not preclude a federal class action. *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010). Other courts have relied on *Shady Grove* in denying motions to dismiss class action consumer protection claims. *See In re Crop Prot. Prods. Loyalty Program Antitrust Litig.*, 779 F. Supp. 3d 624, 654 (M.D. N.C. 2025). *In re Crop Prot. Prods. Loyalty Program* noted that "[g]iven the parties' limited treatment of this issue and the relative uncertainty as to the appropriate test to apply under *Shady Grove* in this circuit, the court concludes that it is premature to preclude the challenged class action claims at this stage." *Id.*

The Court finds that Globe's limited analysis of this issue makes dismissal premature. Conflicting caselaw and application make dismissal of Plaintiff's consumer protection claims under Georgia, South Carolina, and Iowa state law inappropriate at this stage of the proceedings.

46

## VI.    Statute of Limitations or Repose

Defendant Globe argues that Plaintiff's claims are time-barred under the statute of limitations. (Doc. 108 at 28.) Plaintiff allegedly purchased the turnout gear sold by Globe and Lion from 2008 through 2024. (Doc. 1 ¶ 28.)

### A. Fraudulent concealment

"The doctrine of fraudulent concealment equitably estops a defendant who conceals its wrongdoing from arguing that the plaintiff's claim is time-barred." *Mattel, Inc. v. MGA Ent., Inc*., 2011 WL 13128608, at *1 (C.D. Cal. Jan. 17, 2011). "The prototypical example of fraudulent concealment is one in which the defendant misrepresents or conceals facts necessary to support the plaintiff's claim." *Id*. (internal quotation marks omitted). A party must plead fraudulent concealment with particularity under Fed. R. Civ. P. 9(b). *Yumul v. Smart Balance, Inc*., 733 F. Supp. 2d 1117, 1132 (C.D. Cal. 2010). A plaintiff must plead "the who, what, when, where, and how of the alleged fraudulent concealment." *Id*.

Plaintiff alleges that Defendants concealed the information of the presence of PFAS in the turnout gear purchased by Plaintiff for decades. Plaintiff alleges that Defendants knew of the risks of PFAS contained in the turnout gear products. Defendants allegedly chose to conceal the information regarding PFAS from Plaintiff, the public, and putative class members. (*See, e.g*., ¶¶ 10–12, 101, 111, 150, 155–156, 180–182, 193, 202, 212–214, 254–259.) The allegedly known risks

47

of PFAS were not found as a label or warning on the turnout gear purchased by

Plaintiff. (*Id.* ¶ 155-56, 259.) The harms and dangers of PFAS contained in the

turnout gear could provide information necessary to support Plaintiff's claims. To

construe the Complaint with the required liberality at this stage, requires the Court

to determine that Plaintiff sufficiently has shown that Defendants' alleged

fraudulent concealment tolled the applicable statute of limitation and repose. *See*

*TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999)

### B. Discovery Rule

Plaintiff also argues that the discovery rule tolls the statute of

limitations. (Doc. 130 at 37.) "[T]he period of limitation begins when the claim or

cause of action accrues." Mont. Code Ann. § 27-2-102(2). The discovery rule

provides, however, that "if the facts constituting the claim are concealed or self-

concealing in nature, or if the defendant has acted to prevent the injured party from

discovering those facts, the period of limitations does not begin to run until the

injured party has discovered, or in the exercise of due diligence should have

discovered, both the injury and its cause." *Barker v. Bank of Am., N.A.*, 2019 WL

4261983, at *8 (D. Mont. Aug. 12, 2019), *report and recommendation adopted*,

2019 WL 4257363 (D. Mont. Sept. 9, 2019).

The public remained unaware of the danger of PFAS until more recently.

(Doc. ¶¶ 83-92.) For example, Plaintiff's Complaint cites studies on the dangers of

PFAS starting in the 2020s. (Doc. 1 ¶¶ 83-92, 54, 114.) Plaintiff alleges that

Defendants knew of PFAS dangers long before these scientific investigations. (*Id.*

¶¶ 112-154.) Plaintiff contends that Defendants concealed the risks rather than

provide the public information on the dangers of PFAS. Plaintiff argues that it did

not discover the facts underlying its claims due to the concealment by Defendants.

The Court agrees.

Plaintiff reasonably could not have discovered the facts underlying its claims

until public acknowledgment of PFAS risks were made. One newspaper article

posted in 2017 that "[f]irefighters' gear may be hazardous," standing alone, does

not start the tolling period. "[P]ublic awareness of a problem through media

coverage alone does not create constructive suspicion for purposes of discovery."

*Landers v. Ford Motor Co.,* 2024 U.S. App. LEXIS 2929 (9th Cir. 2024.) (citations

omitted). The statute of limitations only begins to run under the discovery rule

once Plaintiff begins to have a suspicion of the injury. These questions of fact must

be resolved under the discovery rule. *Bibeau v. Pac. Nw. Rsch. Found. Inc.*, 188

F.3d 1105, 1108 (9th Cir. 1999). Plaintiff plausibly alleges that it did not discover

its injuries relating to the dangers of PFAS contained in the turnout gear until

recently. Plaintiff sufficiently has alleged the facts necessary at the motion to

dismiss phase to toll the running of the statute of limitations period.

Accordingly, **IT IS ORDERED** that Defendants Motions to Dismiss (Docs. 100, 103, 105, and 107.) are **DENIED.**

DATED this 6th day of January 2026.

_____
Brian Morris, Chief District Judge
United States District Court