**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| CITY AND COUNTY OF BUTTE-SILVER BOW, MONTANA; SANTA MONICA, CALIFORNIA; CITY OF STAMFORD, CONNECTICUT; OLD MYSTIC FIRE DISTRICT, CONNECTICUT; MAYOR AND CITY COUNCIL OF BALTIMORE, MARYLAND; CHARLES COUNTY, MARYLAND; and CITY OF ST. LOUIS, MISSOURI,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　　v.<br><br>3M COMPANY (F/K/A MINNESOTA MINING AND MANUFACTURING COMPANY); DUPONT DE NEMOURS, INC.; EIDP, INC. (F/K/A E. I. DUPONT DE NEMOURS AND COMPANY); THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CORTEVA, INC.; GLOBE MANUFACTURING COMPANY, LLC; FIRE-DEX LLP; MORNING PRIDE MANUFACTURING LLC, W.L. GORE & ASSOCIATES, INC.; and LION GROUP, INC.,<br><br>　　　　　　　　　Defendants. | Case No.  2:25-cv-00036-BMM<br><br>**JURY TRIAL DEMANDED** |

**<u>FIRST AMENDED COMPLAINT</u>**

**Table of Contents**

**Page**

I.     INTRODUCTION ........................................................................................ 1

II.    PARTIES .................................................................................................... 7

       A.     Plaintiffs ........................................................................................ 7

              1.     Montana Plaintiffs .............................................................. 7

              2.     California Plaintiffs ............................................................ 8

              3.     Connecticut Plaintiffs ........................................................ 9

              4.     Maryland Plaintiffs .......................................................... 10

              5.     Missouri Plaintiffs ........................................................... 12

       B.     Defendants .................................................................................. 13

III.   JURISDICTION AND VENUE ............................................................... 15

IV.    SUBSTANTIVE ALLEGATIONS ......................................................... 16

       A.     General Allegations Regarding Per- and Polyfluoroalkyl Substances ................. 16

       B.     General Allegations Regarding PFAS-Containing Turnout Gear ........................ 21

       C.     Defendants' Contributions to PFAS-Containing Turnout Gear ......................... 26

       D.     Defendants' Knowledge of the Dangers of PFAS ............................................... 28

              1.     Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS ......... 28

              2.     Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS ..... 32

              3.     The Remaining Defendants' Knowledge of the Dangers of PFAS ............. 36

       E.     Defendants' Failure to Provide Safety Warnings on Product Labels .................. 41

       F.     Defendants' Ability to Design Safer Turnout Gear ............................................. 44

V.     CLASS ALLEGATIONS ......................................................................... 45

A.    Class Definitions.........................................................................................45

B.    Class Characteristics under Rule 23 ...........................................................46

VI.    TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF
LIMITATIONS DISCOVERY RULE TOLLING..............................................48

VII.    FRAUDULENT CONCEALMENT TOLLING ................................................49

VIII.    CLAIMS ON BEHALF OF PLAINTIFFs AND ALL CLASS MEMBERS...................49

COUNT I (against all Defendants)  Violations of Racketeer Influenced and  Corrupt
Organizations Act (RICO) 18 U.S.C. § 1962(c), (d) ......................................49

1.    The members of the PFAS Concealment Enterprise. ............................50

2.    The Predicate Acts ...............................................................................59

A.    State Law Claims ........................................................................................64

1.    Claim brought on behalf of all Class members relating to their
state-law claims for a single state law class in each state. .......................64

COUNT II (against all Defendants)  Conspiracy.........................................................64

2.    Claims brought by Butte-Silver Bow and the Montana class for
purchase of turnout gear in Montana. .....................................................65

COUNT III (against all Defendants)  Strict Liability (design defect) ........................65

COUNT IV (against all Defendants)  Strict Products Liability (Failure to Warn)......67

COUNT V (against all Defendants)  Implied Warranty of Merchantability Mont. Code
Ann. § 30-2-314  For Plaintiff Butte-Silver Bow and the Montana Class......68

COUNT VI (against all Defendants)   VIOLATIONS OF MONTANA CONSUMER
PROTECTION ACT Mont. Code Ann §§ 30-14-101 et seq.  Brought on
Behalf of the Montana Class..........................................................................69

3.    Claims brought on behalf of Santa Monica and Class members
who installed their turnout gear in California ("California Class
members").............................................................................................71

COUNT VII (against all Defendants)  Breach of Implied Warrant of Merchantability...............71

COUNT VIII (against all Defendants)  Design Defect (strict liability)......................72

COUNT IX (against all Defendants) Design Defect (negligence) ..............................74

COUNT X (against all Defendants) Failure to Warn (strict liability) ........................................ 77

COUNT XI (against all Defendants) Failure to Warn (negligence) ............................................ 78

        4.      Claims brought on behalf of Class members who installed their turnout gear in Connecticut (collectively, "Connecticut Class members"). .................................................................................. 81

COUNT XII (against all Defendants) Breach of the Implied Warranty of Merchantability (CONN. GEN. STAT. ANN. §§ 42a-2¬314, et seq.) .................................. 81

COUNT XIII (against all Defendants) Breach of the Implied Warranty of Fitness for a Particular Purpose (CONN. GEN. STAT. ANN. §§ 42a-2-314, et seq.) ............................... 82

COUNT XIV (against all Defendants) Violations of the Connecticut Unfair Trade Practices Act (CONN. GEN. STAT. ANN. §§ 42-110a, et seq.) ........................................... 84

COUNT XV (against all Defendants) Connecticut Product Liability Act, Design Defect (strict liability) (CONN. GEN. STAT. ANN. § 52-572m, et seq.) ........................... 86

COUNT XVI (against all Defendants) CPLA Failure to Warn (strict liability) (CONN. GEN. STAT. ANN. § 52-572m, et seq.) ................................................................. 88

COUNT XVII (against all Defendants) CPLA Negligent Design, Manufacture and Failure to Warn (CONN. GEN. STAT. ANN. § 52-572m, et seq.) ...................................... 91

COUNT XVIII (against all Defendants) CPLA – Statutory Punitive Damages (CONN. GEN. STAT. ANN.. § 52-240b) ......................................................................... 94

        5.      Claims brought on behalf of the City of Baltimore, Charles County and Class members who installed their turnout gear in Maryland ("Maryland Class members"). .................................... 96

COUNT XIX (against all Defendants)  Design Defect (strict liability) ...................................... 96

COUNT XX (against all Defendants)  Design Defect (negligence) ............................................ 98

COUNT XXI (against all Defendants)  Failure to Warn (strict liability) ................................. 101

COUNT XXII (against all Defendants) Failure to Warn (negligence) ...................................... 103

COUNT XXIII (against all Defendants)  Violation of Maryland Consumer Protection Act (MD. CODE ANN., COM. LAW § 13-101 *et seq.*) ......................................................... 106

COUNT XXIV (against all Defendants) Breach of Implied Warrant of Merchantability (MD. CODE ANN., COM. LAW § 2-314, et seq.) ............................................................. 108

        6.      Claims brought on behalf of Class members who installed their turnout gear in Missouri ("Missouri Class members"). ......................... 109

COUNT XXV (against all Defendants)  Design Defect (strict liability)................................... 109

COUNT XXVI (against all Defendants)  Design Defect (negligence)..................................... 111

COUNT XXVII (against all Defendants)  Strict Products Liability (failure to warn)............... 114

COUNT XXVIII (against all Defendants) Failure to Warn (negligence)................................. 115

COUNT XXIX (against all Defendants)  Violation of the Missouri Merchandising Practices Act (MO. REV. STAT. § 407.005 *et seq.*) ......................................................... 119

COUNT XXX (against all Defendants) Breach of the Implied Warranty of Merchantability .................................................................................................... 121

       7.     Claims brought on behalf of Class members who installed their turnout gear in Alabama (the "Alabama Class members").................... 122

COUNT XXXI (against all Defendants)  Alabama Extended Manufacturer's Liability Doctrine (design defect)........................................................................................ 122

COUNT XXXII (against all Defendants)  Alabama Extended Manufacturer's Liability Doctrine (failure to warn) ....................................................................................... 124

       8.     Claims brought on behalf of Class members who installed their turnout gear in Alaska (the "Alaska Class members"). ......................... 125

COUNT XXXIII (against all Defendants)  Strict Products Liability (design defect)................ 125

COUNT XXXIV (against all Defendants)  Strict Products Liability (failure to warn).............. 127

COUNT XXXV (against all Defendants)  Violation of the Alaska Unfair Trade Practices and Consumer Protection Act (ALASKA STAT. ANN. § 45.50.471 *et seq.*).............................................................................................................. 128

       9.     Claims brought on behalf of Class members who installed their turnout gear in Arizona (the "Arizona Class members")........................ 130

COUNT XXXVI (against all Defendants)  Strict Products Liability (design defect) ................ 130

COUNT XXXVII (against all Defendants)  Strict Products Liability (failure to warn)............. 132

COUNT XXXVIII (against all Defendants)  Violation of the Arizona Consumer Fraud Act (ARIZ. REV. STAT. § 44-1521 *et seq.*) .................................................................. 134

      10.     Claims brought on behalf of Class members who installed their turnout gear in Arkansas ("Arkansas Class members")........................ 136

COUNT XXXIX (against all Defendants)  Strict Products Liability (design defect) ............... 136

COUNT XL (against all Defendants)  Strict Products Liability (failure to warn)..................... 138

  11. Claims brought on behalf of Class members who installed their turnout gear in Colorado ("Colorado Class members")......................... 139

COUNT XLI (against all Defendants)  Strict Products Liability (design defect)...................... 139

COUNT XLII (against all Defendants)  Strict Products Liability (failure to warn).................. 141

COUNT XLIII (against all Defendants)  Violation of the Colorado Consumer Protection Act (COLO. REV. STAT. § 6-1-101 *et seq.*) ..................................................... 142

  12. Claims brought on behalf of Class members who installed their turnout gear in Delaware ("Delaware Class members")......................... 144

COUNT XLIV (against all Defendants)  Negligence (design defect)........................................ 144

COUNT XLV (against all Defendants)  Negligence (failure to warn)...................................... 146

COUNT XLVI (against all Defendants)  Violation of the Delaware Consumer Fraud Act (DEL. CODE TIT. 6, § 2513 *et seq.*) ......................................................... 147

  13. Claims brought on behalf of Class members who installed their turnout gear in Georgia ("Georgia Class members")............................ 149

COUNT XLVII (against all Defendants)  Violation of the Georgia Fair Business Practices Act (GA. CODE ANN. § 10-1-390 *et seq.*)........................................ 149

COUNT XLVIII (against all Defendants)  Violation of the Georgia Uniform Deceptive Trade Practices Act (GA. CODE ANN. § 10-1-370 *et seq.*) ........................... 151

  14. Claims brought on behalf of Class members who installed their turnout gear in Hawaii ("Hawaii Class members"). .............................. 151

COUNT XLIX (against all Defendants)  Strict Products Liability (design defect)................... 151

COUNT L (against all Defendants)  Strict Products Liability (failure to warn) ....................... 153

  15. Claims brought on behalf of Class members who installed their turnout gear in Illinois ("Illinois Class members")............................... 155

COUNT LI (against all Defendants)  Strict Products Liability (design defect) ........................ 155

COUNT LII (against all Defendants)  Strict Products Liability (failure to warn)..................... 157

COUNT LIII (against all Defendants)  Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILL. COMP. STAT. ANN. 505/1 *et seq.*) ............. 158

16.    Claims brought on behalf of Class members who installed their turnout gear in Indiana ("Indiana Class members"). ............................. 160

COUNT LIV (against all Defendants)  Violation of Indiana Products Liability Act IND. CODE ANN. § 34-20-1-1 *et seq.* (design defect)........................................................ 160

COUNT LV (against all Defendants)  Violation of Indiana Products Liability Act IND. CODE ANN. § 34-20-1-1 *et seq.* (failure to warn).............................................................. 162

17.    Claims brought on behalf of Class members who installed their turnout gear in Iowa ("Iowa Class members"). ..................................... 163

COUNT LVI (against all Defendants)  Design Defect claim ..................................................... 163

COUNT LVII (against all Defendants)  Failure to Warn Claim ................................................. 165

COUNT LVIII (against all Defendants)  Violation of Iowa Private Right of Action for Consumer Frauds Act (IOWA CODE § 714h.1 *et seq.*) ..................................... 166

18.    Claims brought on behalf of Class members who installed their turnout gear in Massachusetts ("Massachusetts Class members")........................................................................... 168

COUNT LIX (against all Defendants)  Breach of the implied warranty of merchantability (design defect).......................................................... 168

COUNT LX (against all Defendants)  Breach of the Implied Warranty of Merchantability (failure to warn)...................................................... 170

COUNT LXI (against all Defendants)  Violation of the Massachusetts Consumer Protection Act (MASS. GEN. LAWS CH. 93A, § 1 *et seq.*)............................................... 171

19.    Claims brought on behalf of Class members who installed their turnout gear in Minnesota ("Minnesota Class members").................... 172

COUNT LXII (against all Defendants)  Strict Products Liability (design defect) .................... 172

COUNT LXIII (against all Defendants)  Strict Products Liability (failure to warn)................. 174

20.    Claims brought on behalf of Class members who installed their turnout gear in Nevada ("Nevada Class members"). ............................. 176

COUNT LXIV (against all Defendants)  Strict Products Liability (design defect).................... 176

COUNT LXV (against all Defendants)  Strict Products Liability (failure to warn).................. 178

COUNT LXVI (against all Defendants)  Violation of the Nevada Deceptive Trade Practices Act (NEV. REV. STAT. § 598.0903 *et seq.*) ..................................... 179

21.     Claims brought on behalf of Class members who installed their turnout gear in New Hampshire ("New Hampshire Class members"). ........................................................................ 180

COUNT LXVII (against all Defendants)  Strict Products Liability (design defect) .................. 180

COUNT LXVIII (against all Defendants)  Strict Products Liability (failure to warn).............. 182

COUNT LXIX (against all Defendants)  Violation of the New Hampshire Consumer Protection Act (N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)............................................. 184

22.     Claims brought on behalf of Class members who installed their turnout gear in New Jersey ("New Jersey Class members"). ................. 185

COUNT LXX (against all Defendants)  Strict Products Liability (design defect)..................... 185

COUNT LXXI (against all Defendants)  Strict Products Liability (failure to warn) ................. 187

COUNT LXXII (against all Defendants)  Violation of the New Jersey Consumer Fraud Act (N.J. STAT. ANN. § 56:8-1 *et seq.*).................................................... 189

23.     Claims brought on behalf of Class members who installed their turnout gear in New Mexico ("New Mexico Class members"). ............. 190

COUNT LXXIII (against all Defendants)  Strict Products Liability (design defect)................. 190

COUNT LXXIV (against all Defendants)  Strict Products Liability (failure to warn) .............. 192

COUNT LXXV (against all Defendants)  Violation of the New Mexico Unfair Trade Practices Act (N.M. STAT. ANN. § 57-12-1 *et seq.*) ......................................... 193

24.     Claims brought on behalf of Class members who installed their turnout gear in New York ("New York Class members"). ..................... 195

COUNT LXXVI New York Consumer Protection Claim.......................................................... 195

25.     Claims brought on behalf of Class members who installed their turnout gear in North Carolina ("North Carolina Class members"). ........................................................................ 196

COUNT LXXVII (against all Defendants)  Products Liability (design defect) ......................... 196

COUNT LXXVIII (against all Defendants)  Products Liability (failure to warn) ..................... 198

COUNT LXXIX (against all Defendants)  Violation of North Carolina Unfair and Deceptive Trade Practices Act (N.C. GEN. STAT. § 75-1.1 *et seq.*) ............................... 199

26.      Claims brought on behalf of Class members who installed their turnout gear in Oklahoma (collectively, "Oklahoma Class members")................................................................................................. 201

COUNT LXXX (against all Defendants)  Strict Products Liability (design defect).................. 201

COUNT LXXXI (against all Defendants)  Strict Products Liability (failure to warn) .............. 203

COUNT LXXXII (against all Defendants)  Violation of the Oklahoma Consumer Protection Act (OKLA. STAT. TIT. 15, § 751 *et seq.*) ....................................................... 204

27.      Claims brought on behalf of Class members who installed their turnout gear in Oregon (collectively, "Oregon Class members")................................................................................................ 206

COUNT LXXXIII (against all Defendants)  Strict Products Liability (design defect) .............. 206

COUNT LXXXIV (against all Defendants)  Strict Products Liability (failure to warn)............ 208

COUNT LXXXV (against all Defendants)  Violation of the Oregon Unlawful Trade Practices Act (OR. REV. STAT. § 646.605 *et seq.*) ........................................................ 209

28.      Claims brought on behalf of Class members who installed their turnout gear in Pennsylvania ("Pennsylvania Class members")............. 211

COUNT LXXXVI (against all Defendants)  Strict Products Liability (design defect).............. 211

COUNT LXXXVII (against all Defendants)  Strict Products Liability (failure to warn) .......... 213

COUNT LXXXVIII (against all Defendants)  Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 PA. CONS. STAT. § 201-1 *et seq.*)................................................................................................................... 214

29.      Claims brought on behalf of Class members who installed their turnout gear in South Carolina (collectively, "South Carolina Class members"). ................................................................................... 215

COUNT LXXXIX (against all Defendants)  Strict Products Liability (design defect).............. 215

COUNT XC (against all Defendants)  Strict Products Liability (failure to warn) .................... 217

COUNT XCI (against all Defendants)  Violation of the South Carolina Unfair Trade Practices Act (S.C. CODE ANN. § 39-5-10 *et seq.*) ........................................................ 218

30.      Claims brought on behalf of Class members who installed their turnout gear in South Dakota ("South Dakota Class members")............ 219

COUNT XCII (against all Defendants)  Strict Products Liability (design defect).................... 219

COUNT XCIII (against all Defendants)  Strict Products Liability (failure to warn) ................. 221

COUNT XCIV (against all Defendants)  Violation of the South Dakota Deceptive
        Trade Practices  And Consumer Protection Law (S.D. Codified Laws § 37-24-
        6 et seq.) ..................................................................................................................... 222

        31.    Claims brought on behalf of Class members who installed their
               turnout gear in Tennessee ("Tennessee Class members"). ..................... 224

COUNT XCV (against all Defendants)  Strict Products Liability (design defect)..................... 224

COUNT XCVI (against all Defendants)  Strict Products Liability (failure to warn) ................. 226

        32.    Claims brought on behalf of Class members who installed their
               turnout gear in Texas ("Texas Class members"). .................................. 227

COUNT XCVII (against all Defendants)  Strict Products Liability (design defect) ................. 227

COUNT XCVIII (against all Defendants)  Strict Products Liability (failure to warn) .............. 229

COUNT XCIX (against all Defendants)  Violation of the Texas Deceptive Trade
        Practices and Consumer Protection Act (TEX. BUS. & COM. CODE § 17.4 *et
        seq.*)............................................................................................................................ 230

        33.    Claims brought on behalf of Class members who installed their
               turnout gear in Utah ("Utah Class members"). ....................................... 233

COUNT C (against all Defendants)  Strict Products Liability (design defect)........................... 233

COUNT CI (against all Defendants)  Strict Products Liability (failure to warn)....................... 235

        34.    Claims brought on behalf of Class members who installed their
               turnout gear in the state of Washington ("Washington Class
               members")................................................................................................. 236

COUNT CII (against all Defendants)  Violation of Washington Consumer Protection
        Act (WASH. REV. CODE ANN. § 19.86.010 *et seq.*) ......................................... 236

        35.    Claims brought on behalf of Class members who installed their
               turnout gear in West Virginia ("West Virginia Class
               members")................................................................................................. 237

COUNT CIII (against all Defendants)  Strict Products Liability (design defect)....................... 237

COUNT CIV (against all Defendants)  Strict Products Liability (failure to warn).................... 239

COUNT CV (against all Defendants)  Violation of the West Virginia Consumer Credit
        and Protection Act (W. Va. Code § 46A-1-101 et seq.) ................................................ 241

36. Claims brought on behalf of Class members who installed their turnout gear in Wisconsin ("Wisconsin Class members")...................... 243

COUNT CVI (against all Defendants) Strict Products Liability (design defect) ...................... 243

COUNT CVII (against all Defendants) Strict Products Liability (failure to warn)................... 245

PRAYER FOR RELIEF .................................................................................................. 246

DEMAND FOR JURY TRIAL ......................................................................................... 247

Plaintiffs, the City and County of Butte-Silver Bow, Montana; the City of Santa Monica, California; the City of Stamford, Connecticut; the Old Mystic Fire District, Connecticut; the Mayor and City Council of Baltimore, Maryland; Charles County, Maryland; and the City of St. Louis, Missouri, individually and on behalf of all others similarly situated (together, "Plaintiffs"), allege the following based upon the investigation of Plaintiffs' counsel and on information and belief as follows.

## I.    INTRODUCTION

1.    Every day, hundreds of thousands of firefighters work to protect property and save lives. When called to respond, one of their first actions is to don "turnout" or "bunker" gear, which consists of a helmet, hood, jacket, pants, suspenders, boots, gloves, and, when needed, respirators. The turnout gear contains chemicals in the "PFAS" family.

2.    Per- and polyfluoroalkyl substances, abbreviated "PFAS," are human-made chemicals consisting of a chain of carbon and fluorine atoms used in manufactured products to, *inter alia*, resist and repel oil, stains, and water.

3.    PFAS are known as "forever chemicals" and, per the Stockholm Convention on Persistent Organic Pollutants (to which the United States is a signatory), are defined as: persistent (because they do not break down through organic processes or in the environment); transboundary (as they migrate through surface and ground water, as well as in the atmosphere and through wildlife); and bio-accumulative (as they concentrate within our bodies and are passed to the fetus within the womb and though breast milk). Exposure to PFAS in humans can occur through inhalation, ingestion, and dermal contact.

4.    PFAS have been associated with multiple and serious adverse health effects in humans, including cancer, tumors, liver damage, immune system, endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-

1

induced hypertension. PFAS have also been found to concentrate in human blood, bones, and organs.

5.      Turnout gear is impregnated with PFAS in the manufacturing process. Firefighters are exposed to PFAS from turnout gear through dermal exposure, the shedding of PFAS during normal use and aging of turnout gear. Firefighters are developing cancer at an alarming rate higher than the general population.

6.      Firefighter occupational cancer is the leading cause of line-of-duty deaths in the fire service.

7.      At the 2022 International Association of Fire Fighters ("IAFF") Fallen Fire Fighter Memorial, almost 75% of the names added to the wall (348 out of 469) were members who had died from occupational cancer.

8.      On March 6, 2023, President Joseph R. Biden, speaking in Washington, pledged: "We're going after toxic exposure to PFAS, so-called 'forever chemicals' that for years have been in your gear, your equipment … that you depend on to be able to do your job."

9.      Plaintiffs bring this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M"); DuPont de Nemours, Inc. ("New DuPont"); The Chemours Company, and The Chemours Company FC, LLC, (together, "Chemours"); EIDP, Inc. (formerly known as E. I. du Pont de Nemours and Company) ("Old DuPont")" and Corteva, Inc. (New DuPont, Chemours, Old Dupont and Corteva, together, "DuPont"); Fire-Dex LLP ("Fire-Dex"); Globe Manufacturing Company, LLC ("Globe"), W.L. Gore & Associates, Inc. ("Gore"); Lion Group, Inc. ("Lion");  and  Morning Pride Manufacturing LLC, ("Morning Pride"); (collectively, "Defendants"), for harm resulting from the sale of turnout gear containing PFAS to fire departments and fire responding agencies.

10.     3M and Chemours intentionally manufactured, distributed, marketed, and/or sold PFAS to companies, including Defendants Globe, Gore, and Lion, which also manufacture, distribute, or sell turnout gear without disclosing to Plaintiffs and the putative class the dangers of PFAS that were known to each of those entities.

11.     For decades, while fully aware of the health risks posed by PFAS products, Defendants, through a common enterprise (the "PFAS Concealment Enterprise"), sold PFAS-infused products to fire departments and public entities that respond to fires without disclosing the toxicity of turnout gear.

12.     Defendants never disclosed to fire departments and public entities using turnout gear that PFAS in turnout gear is extremely dangerous to health, property, and the environment. Instead, those entities collaborated to conceal the truth and such concealment was a common purpose of the PFAS Concealment Enterprise.

13.     By way of example, the common purpose and actions of Defendants DuPont and Chemours to hide the truth about PFAS and PFAS-infused products is exemplified by a 3M Material Safety Data Sheet that 3M had sent to Old DuPont in 1997. To protect workers who are exposed to hazardous chemicals in their work environment, OSHA adopted the Hazard Communication Standard in November 1983. The standard requires chemical manufacturers and importers to evaluate the hazards of chemicals that they produce and distribute. The Hazard Communication Standard requires information about hazards and protective measures to be disseminated on container labels and Material Safety Data Sheets. All employers with employees exposed to regulated chemicals must provide access to the labels and the Material Safety Data Sheets. Employers using the manufactured chemicals must also train employees to understand the information provided by the Material Safety Data Sheets and the labels and how to use the

information to protect themselves. The Hazard Communication Standard covers all chemicals in American workplaces.[1]

14.    The 1997 Material Safety Data Sheet that 3M sent *only* to Old DuPont stated:

> CANCER:
> WARNING: Contains a chemical which can cause cancer. (3825-24-1) (1983 and 1993 studies conducted jointly by 3M and Dupont).

The "chemical" referred to in that document was PFOA,[2] which is a particularly harmful PFAS and which 3M and DuPont knew, based on their own joint studies as shown in detail in this First Amended Complaint, could cause cancer.

15.    Instead of informing the public of those dangers, 3M and DuPont suppressed the 1997 Material Safety Data Sheet as part of the wrongful conduct of the PFAS Concealment Enterprise. A former Minnesota Attorney General testified before a Unites States House Committee about a lawsuit by Minnesota against 3M for PFAS pollution. In part, she testified about the 1997 Material Safety Data Sheet that 3M gave to DuPont.[3] After quoting from the document, she testified that "3M removed the label that same year and for decades sold PFAS products without warning the public of its dangers."[4] Her testimony only concerned 3M, but the

---

[1] "Hazard Communication in the 21st Century Workforce," Hearing Before the Subcommittee on Employment, Safety, and Training of the Committee on Health, Education, Labor, and Pensions, United States Senate (Mar. 25, 2004), https://www.govinfo.gov/content/pkg/CHRG-108shrg92926/html/CHRG-108shrg92926.htm.

[2] *See* Robert Bilott, *Exposure* (2019), at 351.

[3] Testimony of Lori Swanson, Former Minnesota Attorney General, Before the Committee on Oversight and Reform, Subcommittee on Environment, United States House of Representatives (Sept. 10, 2019), at 3, https://docs.house.gov/meetings/GO/GO28/20190910/109902/HHRG-116-GO28-Wstate-SwansonL-20190910.pdf. The Material Safety Data Sheet cited by Swanson is attached to that testimony as Exhibit A.

[4] *Id.*

4

same is true of DuPont, which associated with 3M to suppress the truth and to sell PFAS products for decades without warning the public of the dangers of those products.

16.     Defendants 3M and DuPont have been forced to pay for some environmental harms caused by their PFAS products, but they have not paid a penny for harms caused by turnout gear that was treated with Defendants' PFAS products. For example, 3M has agreed to pay $10.3 billion to settle claims that it contaminated public water systems with PFAS, while DuPont agreed to pay $1.19 billion to settle similar claims.[5] Objections to the settlement were filed by "22 governments and agencies in New York, Texas, Colorado, California and elsewhere. They said the settlements will not fully cover cleanup and legal costs facing water providers after the companies allegedly polluted drinking water with per- and polyfluoroalkyl substances, or PFAS."[6]

17.     Other examples are the $12 million class action settlement by 3M and Daikin in 2022 to resolve claims they contaminated residential water sources in Alabama. And 3M and another company agreed to a $54 million settlement with property owners in Michigan whose homes are atop toxic PFAS contamination.

18.     All of the Defendants either manufactured or sold, at some point during the class period, a range of products that use PFAS in addition to turnout gear. In addition, each of the Defendants in the manufacturing process of turnout gear and other products pollute their manufacturing sites with PFAS, causing water pollution in the water systems near their manufacturing sites. Beginning as early as 2000, in the case of 3M and DuPont, and at later times for other Defendants, each Defendant was gravely concerned that any admission regarding the

---

[5] Clark Mindock, "3M, DuPont PFAS settlements called inadequate by cities, other objectors," Reuters (Nov. 13, 2023), https://www.reuters.com/legal/litigation/3m-dupont-pfas-settlements-called-inadequate-by-cities-other-objectors-2023-11-13/.

[6] *Id.*

toxicity of turnout gear or PFAS-laden products would expose them to liability not only for turnout gear, but would (1) call into question PFAS toxicity in for a wide range of products they sold and with respect to manufacturing sites for such products and (2) encourage competition in that other companies would compete by developing turnout gear without PFAS. Fearful of these developments, which could expose them to billions in additional liabilities and create competitors with their product lines, each of the Defendants entered into an agreement to form an enterprise, the purpose of which was to conceal the dangers of PFAS and PFAS in turnout gear.

19.    Although some Defendants have paid billions of dollars as a result of water pollution from their PFAS production, Defendants in this action have not paid a dime for selling turnout gear infused with PFAS to fire departments. Plaintiffs file this action to remedy that injustice. The presence of PFAS in turnout gear requires that the PFAS-impregnated gear be replaced as soon as possible. The cost of turnout gear (excluding respirators) is approximately $3,000 per suit, with many departments providing two suits for each firefighter. There are approximately 1,042,000 firefighters in the United States, so replacement costs could and should run into the billions.

20.    Plaintiffs, on behalf of a class of fire departments and responding agencies who bought turnout gear treated/infused with PFAS, bring claims under the Racketeering Influenced and Corrupt Organization Act ("RICO") and various state laws seeking damages in the form of money to replace turnout gear, equitable relief, civil penalties, and a corrective notice to all members of the class that provides a proper warning regarding the dangers of PFAS-infused turnout gear.

6

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Montana Plaintiffs

21.    Plaintiff, the City and County of Butte-Silver Bow, in the state of Montana, is a consolidated city and county government. Butte was established as a mining camp in the early 1860s and quickly became the nation's largest supplier of copper, attracting immigrants from around the world to work in Butte's mines. In 1977, the city and county governments consolidated to form the sole entity of Butte-Silver Bow, encompassing 717 square miles. The City and County of Butte-Silver Bow continues to operate as a consolidated city-county government in Southwest Montana. Its current total population is estimated at nearly 36,000.

22.    The Butte Fire Department opened its first fire station in 1883 and today the Butte-Silver Bow Fire Department ("BSBFD") employs 176 full-time and volunteer firefighters and supports nine volunteer fire departments throughout both the city and the county. Over the years, BSBFD has responded to wildfires and structure fires in addition to medical emergencies, automobile accidents, aircraft crashes, and other emergencies. The department is professionally run and managed, and provides organizational structure and expert advice to various volunteer fire departments. BSBFD is an active department, responding on average to at least one structure fire per week.

23.    BSBFD currently owns approximately 400 sets of turnout suits to protect its full-time firefighters and volunteers. Within the full-time cadre, BSBFD typically has available two sets of turnout gear per firefighter for emergency response. After each deployment where gear is used as intended, such as responding to a structure or other fire, it must be washed and dried prior to use on another emergency run. BSBFD currently uses turnout gear manufactured by Defendants Lion, Morning Pride, Fire-Dex, and Globe.

24.    Within Butte-Silver Bow, the BSBFD serves the communities of Butte, Buxton, Centerville, Divide, Melrose, Ramsay, Rocker, Silver Bow, and—although Walkerville is a separate municipality—BSBFD assists the community when requested. The volunteer fire departments include Big Butte, Boulevard, Centerville, Floral Park, Home Atherton, Little Basin Creek, Racetrack, Rocker, and Terra Verde.

25.    The mission of the Fire Department is to provide the highest level of fire protection by means of prevention, suppression, and education. Divisions within the department include suppression, prevention, training, communications, and maintenance. The functions of the Fire Department include providing manpower and equipment to suppress fires, fire prevention services, building inspections, fire investigation, and delivery of emergency medical services.

26.    The BSBFD is served by 36 full-time firefighters and over 125 volunteer fire department personnel.

27.    BSBFD has purchased turnout gear sold by Globe and Lion, with purchases being made from 2008 through 2024. Most BSBFD's firefighters have a primary set of gear and a spare.

**2.    California Plaintiffs**

28.    **The City of Santa Monica, California ("Santa Monica")** is a municipal corporation established pursuant to Article XI, Sections 2 and 3 of the California Constitution, with full police powers to protect the general health and welfare of its population.

29.    Santa Monica has a population of approximately 90,000 people, with a daytime population of roughly 250,000 including tourists and commuting workers.

30.    Founded in 1889, the Santa Monica Fire Department ("SMFD") provides full-time fire and paramedic services, fire prevention, urban search and rescue, hazardous material response, and airport firefighting capabilities throughout its jurisdiction. Santa Monica owns and operates

five fire stations, and a fully accredited fire academy, complete with a one acre live-burn fire training center.

31.    SMFD currently employs approximately 117 firefighters, and it owns approximately 253 sets of turnout gear. SMFD typically has available two sets of turnout gear per firefighter so that one can be washed while the other is available for use.  After each deployment where gear is used as intended, such as responding to a structure or other fire, it must be washed and dried prior to reuse.

32.     Historically, SMFD purchased turnout gear manufactured by Defendant Morning Pride.  In 2022 SMFD purchased turnout gear manufactured by Defendant Fire-Dex, and from 2023 to the present SMFD has purchased Defendant Lion's turnout gear.

**3.    Connecticut Plaintiffs**

33.    **Plaintiff the City of Stamford** is a municipality located in Fairfield County, Connecticut covering nearly 40 miles, with approximately 136,000 residents. Its residents are protected by over 270 career firefighters staffing nine fire stations as well as hundreds of volunteer firefighters staffing five additional stations.

34.    The City of Stamford purchases and provides two sets of turnout gear to each of its firefighters.

35.    The City of Stamford currently owns 523 sets of turnout gear.

36.    It purchases 50 new sets of turnout gear per year, at a cost of approximately $4,000 for the jacket and pants.  Replacing approximately 10 percent of its turnout gear each year ensures that 100 percent of Stamford's gear is replaced every 10 years, as required by National Fire Protection Association ("NFPA") Standard No. 1851.

9

37.    The City of Stamford purchased turnout gear manufactured by Defendants Morning Pride, Lion, Globe and DuPont, containing materials manufactured by Defendants Gore, Morning Pride, and DuPont.

38.    **Plaintiff Old Mystic Fire District** is a taxing district within the City of Groton, Connecticut that purchases and provides firefighting equipment and funding for the firefighting services provided by The Reliance Fire Company, Inc.   The Reliance Fire Company, Inc. is a corporation registered in the state of Connecticut with its principal business address at the Old Mystic Fire Department.   The Reliance Fire Company, Inc.   provides fire prevention, fire suppression, code enforcement, rescue, and first emergency medical services to the properties within the 26 square miles of the Old Mystic Fire District.   It is made up of nine professional firefighters and 46 active volunteers.

39.    The Old Mystic Fire District is responsible for providing firefighter PPE to its volunteer members.   The Old Mystic Fire District owns 100 sets of turnout gear.

40.    The Old Mystic Fire District replaces 10 sets of gear per year.

41.    Old Mystic Fire District purchased turnout gear manufactured by Defendants Morning Pride, Globe, and Lion.

**4.    Maryland Plaintiffs**

42.    **Plaintiff the Mayor and City Council of Baltimore ("Baltimore City")** is a municipal corporation, which exercises the powers of both city and county governments. It was founded in 1729 as "Baltimore Town," and in 1797 was incorporated as the "City of Baltimore." In 1851 the Maryland Constitution formally recognized Baltimore as an independent city that does not belong to any county.   Baltimore is duly organized and existing by virtue of the laws of the state of Maryland, and is currently home to nearly 600,000 residents.

43.     The Baltimore City Fire Department ("BCFD"), is a municipal agency responsible for providing fire prevention, suppression, emergency medical services, and emergency management.

44.     BCFD has a long and proud history of protecting Baltimore City.  It was officially established as a professional, 153-member department in 1858.  Today, BCFD employs approximately 508 firefighters organized into six battalions.  BCFD has 38 fire stations, strategically located throughout the City, providing fire and emergency services across Baltimore's 92 square mile jurisdiction. BCFD responds to more than 270,000 emergencies annually.

45.     BCFD currently owns approximately 1,016 sets of turnout gear suits.  BCFD typically has available two sets of turnout gear per firefighter, so that one can be washed while the other is available for use. After each deployment where gear is used as intended, such as responding to a structure or other fire, the gear must be washed and dried prior to use on another emergency run.

46.     BCFD has historically and into the present, purchased and used turnout gear manufactured by Defendant Lion.

47.     **Plaintiff the County of Charles County, Maryland ("Charles County")** is a home rule county, duly organized and existing by virtue of the laws of the state of Maryland.

48.     Charles County covers 644 square miles of coastal Maryland, and has approximately 167,000 residents.

49.     Charles County's Department of Emergency Services ("DES") is responsible for planning, coordinating, and delivering a wide range of public safety, emergency management, and life-safety services for residents and visitors.

11

50.     Headquartered in La Plata, the DES includes the Hazardous Materials Response Team ("HMRT") which is equipped with turnout gear to provide all-hazards response, mitigation, protection and support services for incidents involving hazardous materials, specialized rescue, chemical, biological, radiological, nuclear and explosives.

51.     Upon information and belief, Charles County has been purchasing turnout gear since approximately 2004.  Since 2019, Charles County has purchased 205 sets of turnout gear.

52.     The County has historically purchased and currently owns turnout gear manufactured by Defendants Fire-Dex and Globe.

**5.      Missouri Plaintiffs**

53.     **Plaintiff the City of St. Louis, Missouri ("St. Louis")** is a duly organized constitutional charter city, and a body corporate and politic, established under the laws of the state of Missouri.

54.     St. Louis was founded in 1764 by French fur traders. It was formally incorporated as a city by the State of Missouri in 1822.

55.     In 1876, following what is commonly called the "Great Divorce," St. Louis separated from St. Louis County. From 1876 forward, St. Louis has been an independent city, operating as its own county-level jurisdiction.  It is home to roughly 300,000 residents.

56.     The St. Louis Fire Department ("SLFD") is, a City department and, provides fire prevention, fire suppression, and emergency services, through 32 stations.

57.     In 1857, SLFD transitioned from informal bucket brigades and volunteer companies to a fully paid professional fire department, which currently employs approximately 610 firefighters. Each firefighter is issued two turnout gear suits so that one can be in cleaning while the other is ready for use.

12

58.    SLFD historically has purchased turnout gear, and currently purchases and owns approximately 1,200 sets of Morning Pride turnout gear.

**B.    Defendants**

59.    Defendant 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, is a Delaware corporation that does business throughout the United States, including in Montana. 3M has its principal place of business in St. Paul, Minnesota.

60.    Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation that does business throughout the United States, including in Montana. New DuPont has its principal place of business in Wilmington, Delaware.

61.    Defendant The Chemours Company ("Chemours") is a Delaware corporation that does business throughout the United States, including in Montana. Chemours has its principal place of business in Wilmington, Delaware. In 2015, Old DuPont spun off its performance chemical business as a new, publicly traded company, Chemours. In connection with the transfer, Chemours assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit.

62.    Defendant The Chemours Company, FC, LLC ("Chemours FC") is a Delaware limited liability company that does business throughout the United States, including in Montana. Chemours FC has its principal place of business in Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours and manufactures certain materials and/or chemicals that are the subject of this lawsuit.

63.    Defendant Corteva, Inc. ("Corteva") is a Delaware corporation that does business throughout the United States, including in Montana. Corteva has its principal place of business in Indianapolis, Indiana. In 2019, New DuPont spun off its agricultural business as a new, publicly

13

traded company, Corteva, which currently holds Old DuPont as a subsidiary. In connection with these transfers, Corteva assumed certain Old DuPont assets and liabilities, which include business lines and liabilities relating to the design, manufacture, marketing, distribution, and/or sale of certain materials and/or chemicals that are the subject of this lawsuit. This First Amended Complaint refers to Old DuPont, DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. collectively as "DuPont."

64. Defendant Fire-Dex LLP ("Fire-Dex") is a Delaware limited liability company that does business throughout the United States, including in Montana, California, Connecticut, Maryland and Missouri. Fire-Dex has its principal place of business in Medina, Ohio. Fire-Dex, at times relevant to this action, sold turnout gear with PFAS in the United States, including in Montana.

65. Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire limited liability company that does business throughout the United States, including in Montana. Globe has its principal place of business in Pittsfield, New Hampshire. Globe, at times relevant to this action, sold turnout gear with PFAS.

66. Defendant W. L. Gore & Associates, Inc. ("Gore") is a Delaware corporation that does business throughout the United States, including in Montana. Gore has its principal place of business in Newark, Delaware. Gore, at times relevant to this action, sold turnout gear with PFAS.

67. Defendant Lion Group, Inc. ("Lion") is an Ohio corporation that does business throughout the United States, including in Montana. Lion has its principal place of business in Dayton, Ohio.

68. Defendant Morning Pride Manufacturing LLC ("Morning Pride") is a Delaware Limited Liability Company that does business throughout the United States, including in Montana,

California, Connecticut, Maryland, and Missouri. Morning Pride does business under the name "Honeywell First Responder Products" and has its principal place of business in Golden Valley, Minnesota. At times relevant to this action, Morning Pride sold turnout gear with PFAS in the United States, including in Montana.

69.     Plaintiffs allege that each named Defendant is in some manner responsible for the acts alleged herein and that they proximately caused injuries to Plaintiffs and members of the Class, as alleged herein.

70.     Plaintiffs allege that each named Defendant derived substantial revenue from the equipment, materials, and/or chemicals that are the subjects of this lawsuit. Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold the equipment, materials, and/or chemicals in Montana and caused harm to Plaintiff Butte-Silver Bow and members of the Class in Montana.

71.     Defendants expected or should have expected their actions to have consequences in Montana.

72.     Defendants purposefully availed themselves of the privilege of conducting activities in Montana, thus invoking the benefits and protections of its laws.

### III.    JURISDICTION AND VENUE

73.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because it is a class action where the aggregate claims of all members of the proposed nationwide Class exceed \$5,000,000.00, exclusive of interests and costs, and the Plaintiffs and most members of the proposed Class are citizens of a state different from each Defendant. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331, as this case asserts claims under 18 U.S.C. § 1964(a).

15

74.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District, and because some of the actions giving rise to this First Amended Complaint took place within this District.

75.    This Court has personal jurisdiction over Defendants because Defendants have maintained substantial contacts, and/or committed overt acts in furtherance of the conduct alleged in the First Amended Complaint throughout the United States, including within Montana. The conduct was directed at, or had the effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including within Montana.

### IV.    SUBSTANTIVE ALLEGATIONS

**A.    General Allegations Regarding Per- and Polyfluoroalkyl Substances**

76.    Per- and polyfluoroalkyl substances ("PFAS" or "PFAS Chemicals") are a class of synthetic chemical compounds that consist of nearly indestructible chains of carbon and fluorine atoms.

77.    PFAS do not exist naturally in the environment.

78.    PFAS were first developed in the 1930s and 1940s.

79.    PFAS' high chemical and thermal stability have led to their use in a wide range of commercial products and industries.

80.    PFAS' same qualities cause them to persist in the environment and in the human body for long (if not indefinite) periods of time, earning them the nickname "forever chemicals."

81.    In recent decades, researchers, environmentalists, and government agencies have all raised concerns regarding the persistence and toxicity of PFAS, as well as their ability to absorb into and bioaccumulate in the human body.

82.    Such concerns have prompted a dramatic increase in epidemiological studies regarding the adverse effects of PFAS exposure on human health.

83.    Peer-reviewed scientific research reflecting the best and most recent scientific information available has concluded that nearly any amount of PFAS exposure is hazardous to human health.

84.    PFAS exposure in humans can occur via dermal absorption, as well as ingestion and inhalation. PFAS also crosses the placenta from mother to fetus and by passing to infants through breast milk.

85.    When exposed to heat, PFAS can off-gas, break down, and degrade into highly mobile and toxic particles and dust,[7] *increasing* the risk of PFAS exposure via dermal absorption, ingestion, and inhalation.

86.    PFAS exposure has been linked to multiple, serious adverse health effects in humans, including various cancers, tumors, liver damage, immune system and endocrine disorders, high cholesterol, thyroid disease, ulcerative colitis, birth defects, decreased fertility, and pregnancy-induced hypertension.

87.    PFAS have been found to concentrate in human blood, bones, and organs.

88.    Perfluorooctanoic Acid ("PFOA") and other PFAS bioaccumulate in humans' blood and organs, including the kidneys and the liver.

89.    PFOA and other PFAS interfere with the human body's functions, including the functions of the organs and immune systems, leading to adverse health outcomes.

90.    Negative health effects may occur because of exposure to PFOA and other PFAS at levels below most laboratories' ability to detect at this time.

---

[7] A.S. Young et al., *Per- and Polyfluoroalkyl Substances (PFAS) and Total Fluorine in Fire Station Dust,* J. Expo. Sci. Environ. Epidemiology (2021), https://pubmed.ncbi.nlm.nih.gov/33542478/.

91.     The following is a non-exhaustive list of adverse health outcomes that can result from exposure to PFOA and other PFAS, many of which can manifest after years of exposure:

a.     increased risk of kidney cancer, testicular cancer, thyroid cancer, prostate cancer, bladder cancer, breast cancer, and ovarian cancer;

b.     reduced ability of the body's immune system to fight off infections, including reduced vaccine response;

c.     interference with the body's natural hormones and liver enzymes;

d.     changes in liver enzymes;

e.     reproductive effects including decreased fertility;

f.     developmental effects or delays in children, including low birthweight, accelerated puberty, bone variations, or behavioral changes;

g.     increased cholesterol levels and/or risk of obesity;

h.     increased risk of high blood pressure or pre-eclampsia in pregnant women; and

i.     interference with and suppression of vaccine response (decreased serum antibody concentrations) in children.

92.     PFOA has additionally been observed to cause Leydig cell tumors, pancreatic cancer cell tumors, and hepatocellular adenomas in rats.

93.     The United States Environmental Protection Agency ("EPA") has classified PFOA as likely human carcinogens.

94.     The EPA has concluded that there is *no safe level* of PFOA exposure in human beings.

18

95.     In 2022, the EPA initiated a proposed rulemaking to designate PFOA and other PFAS as a hazardous substance under the Comprehensive Environmental Response, Compensation, and Liability Act. In support of this rulemaking, the EPA stated that "evidence indicates that these chemicals may present a substantial danger to public health or welfare or the environment[.]"

96.     On or around April 10, 2024, the EPA finalized a National Primary Drinking Water Regulation ("NPDWR") establishing legally enforceable levels, called Maximum Contaminant Levels ("MCLs"), for six PFAS in drinking water. The EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals ("MCLGs") for the six PFAS. Notably, the MCLGs for both PFOA is listed as "Zero":

| Compound | Final MCLG | Final MCL (enforceable levels) |
|---|---|---|
| PFOA | Zero | 4.0 parts per trillion (ppt) (also expressed as ng/L) |
| PFOS | Zero | 4.0 ppt |
| PFHxS | 10 ppt | 10 ppt |
| PFNA | 10 ppt | 10 ppt |
| HFPO-DA (commonly known as GenX Chemicals) | 10 ppt | 10 ppt |
| Mixtures containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS | 1 (unitless) Hazard Index | 1 (unitless) Hazard Index |

97.     The International Agency for Research on Cancer has classified PFOA as "carcinogenic to humans" based on strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it and sufficient evidence it can cause cancer in lab animals.

98.     In 2022, the California Office of Environmental Health Hazard Assessment listed PFOA as a chemical known to the state of California to cause cancer.

99.     PFAS includes polytetrafluorethylene ("PTFE"), one of the most well-known and commonly used PFAS Chemicals.

19

100. The use of fluoropolymers (including PTFE) in manufacturing and commercial products poses substantial risks to human health.

101. When PTFE is used in commercial products such as textiles, other PFAS used in the manufacturing process will generally be present and pose substantial risks to human health.

102. Peer-reviewed scientific research has cautioned that:

    a.    "there is no sufficient evidence to consider fluoropolymers as being of low concern for environmental and human health";

    b.    "a blanket statement that [fluoropolymers] cannot enter cells is factually inaccurate";

    c.    "there is no scientific basis to separate and subsequently remove fluoropolymers from discussions of other PFAS as a class or in terms of their impacts on human or environmental health";

    d.    "[t]he conclusion that all fluoropolymers are of low concern … ignores major [PFAS] emissions linked to their production," among other issues; and

    e.    "it would be impossible to verify the safety of all fluoropolymer products on the market based on the information available in the public domain."

103. The use of fluorinated polymers in manufacturing and commercial products poses substantial risks to human health.

104. The use of fluorinated polymers in manufacturing and commercial products such as textiles can lead (and often leads) to the formation of non-polymeric PFAS (e.g., PFOA and PFOS), which can then contaminate (and often contaminate) human beings, as well as the environment.

105.    The EPA has denied certain exemptions to side-chain fluorinated polymers as a result of the serious risks involved in their use.[8]

106.    The EPA has cautioned that it "can no longer conclude that [side-chain fluorinated polymers] 'will not present an unreasonable risk to human health or the environment.'"[9]

**B.    General Allegations Regarding PFAS-Containing Turnout Gear**

107.    Plaintiffs and members of the Classes have employees who, as first responders to fire, hazardous materials incidents, and other emergency and medical calls, risk their lives on a daily basis. They not only save lives and protect property, but they also provide emergency services and medical care, perform rescues, and offer support to people in traumatic circumstances. To prepare them for and protect them during this enormously challenging work, firefighters wear turnout gear and receive extensive and ongoing training in fire suppression.

108.    Turnout gear is the personal protective equipment (PPE) used by firefighters, depicted below. During their training, and when responding to fires, firefighters wear turnout gear intended to provide limited thermal, chemical, and biological protection.

109.    Turnout gear includes several components, namely helmets, hoods, jackets, pants (with suspenders), boots, and gloves.

110.    These components are made up of three layers: a durable water repellant outer shell, a middle moisture barrier, and an inner thermal liner closest to the wearer's skin.

111.    The primary purpose of the outer shell is to protect the firefighter from direct flame.

---

[8] EPA, *Premanufacture Notification Exemption for Polymers; Amendment of Polymer Exemption Rule to Exclude Certain Perfluorinated Polymers*; 2010; Vol. 75, https://www.federalregister.gov/documents/2010/01/27/2010-1477/premanufacture-notification-exemption-for-polymers-amendment-of-polymer-exemption-rule-to-exclude.

[9] *Id.*

112.    The primary purpose of the middle moisture barrier is to block the penetration of water, liquid chemicals, and heat, while also allowing perspiration and body heat to escape. Liquid resistance and vapor permeability are particularly important for the prevention of steam burns, which can occur if water and heat get trapped inside the turnout gear.

113.    The primary purpose of the thermal liner is to protect the firefighter from ambient heat.

114.    Peer-reviewed scientific research has confirmed that *all three* layers of the turnout gear contain PFAS.

115.    In a 2020 study conducted by a group of physicists at the University of Notre Dame (the "Peaslee study"),[10] turnout gear (specifically, jackets and pants) was collected from firefighters across the United States and tested. The study included turnout gear manufactured by Defendants Globe and Lion, as well as turnout gear manufactured with specialty fabrics from Defendant Gore, over several production years.

116.    In the Peaslee study, the researchers found significant quantities of PFAS in every layer of both new (still in the original packaging) and used turnout gear.

117.    In "every textile sample tested," the researchers found "very high" total fluorine levels (a reliable indicator of total PFAS concentration) in both the moisture barrier and outside shell layers.[11]

118.    The turnout gear also contained significant levels of a number of other PFAS, including PTFE.

---

[10] Graham F. Peaslee, et al., "Another Pathway for Firefighter Exposure to Per- and Polyfluoroalkyl Substances: Firefighter Textiles," Environmental Science & Technology Letters 2020, 7, 8, 594-599 (June 23, 2020), https://pubs.acs.org/doi/10.1021/acs.estlett.0c00410.

[11] *Id.*

22

119.    In the middle moisture barriers, total fluorine levels were typically greater than 30%, a result too high to be quantified by particle-induced gamma-ray emission and consistent with use of PTFE in the middle moisture barriers.

120.    In all three layers of tested turnout gear, PFOA was present at alarmingly high levels—for instance, in one set of gear that was tested, the outer shell contained 182 parts per billion and the thermal liner contained 78 parts per billion.

121.    To put these numbers into perspective, the EPA has set the MCL for PFOA in drinking water at 4 parts per trillion. The amount of PFOA present in the turnout gear that was tested was 182,000 parts per trillion (182 parts per billion) in the outer shell and 78,000 parts per trillion (78 parts per billion) in the thermal liner. In the thermal liners, "significant fluorine signatures" were found, indicating that "PFAS appear to migrate from the highly fluorinated layers and collect in the untreated layer of clothing worn against the skin."[12]



Credit: *Environ. Sci. Technol. Lett.*

---

[12] *Id.*

122.    "Startlingly, garment-to-hand transfer of total fluorine [] was also observed when researchers simply manipulated the textiles in our laboratory," which is an observation that "strongly supports the premise that side-chain fluoropolymers and the PFAS they bind do release to the environment upon wear."[13]

123.    Lead researcher Graham Peaslee commented that firefighter turnout gear is composed of "the most highly fluorinated textiles [he had] ever seen"[14] and that the level of PFAS in the turnout gear means that firefighters are "swimming in a sea of [PFAS]. Those numbers for scientists are scarily high[.]"[15]

124.    Other peer-reviewed scientific research has confirmed that elevated blood levels of PFAS have been found in firefighters, with dermal absorption through direct contact between the firefighters' skin and turnout gear being "a key exposure route."[16]

125.    The Indiana Department of Homeland Security released a report in November 2025 ("the Indiana Report") and confirmed that turnout gear contains PFAS, and that turnout gear use is correlated to high blood serum levels in firefighters.[17]

---

[13] *Id.*

[14] Raleigh McElvery, *Protective Gear Could Expose Firefighters to PFAS*, Chemical and Engineering News (July 1, 2020), https://cen.acs.org/environment/persistent-pollutants/Protective-gear-expose-firefighters-PFAS/98/i26?fbclid=IwAR3ktyIcasjnxHiv3RNDRJldZmunQleAEoS3Av225uOscj2hFbffVcO3-Go.

[15] Andrew Wallender, *Firefighters Face New Possible Risk From Toxic PFAS: Their Gear*, Bloomberg Law (June 23, 2020), https://news.bloomberglaw.com/pfas-project/firefighters-face-new-possible-risk-from-toxic-pfas-their-gear.

[16] G.E. Campbell, et al., *PFAS-free Moisture Barriers in Structural Firefighting Gear, in Toward a PFAS-free Future: Safer Alternatives to Forever Chemicals*, Green Chemistry Series No. 81 (Simona A. Bălan, Thomas A. Bruton, and Kimberly G. Hazard, ed., 2024).

[17] Indiana Dep't of Homeland Security, *Per- and Polyfluoroalkyl Substances (PFAS) in an Occupational Cohort: Findings from a Pilot Program Among Indiana Firefighters* (Nov. 2025), pp. 17-18, https://www.in.gov/dhs/files/IDHS-PFAS-Final-Report-full-v2.pdf.

126.    The Indiana Report surveyed the literature and concluded:

*What we know from the literature*

**PFAS in gear:** Laboratory and field studies have identified multiple PFAS classes in turnout textiles (outer shells, moisture barriers). Gear can shed PFAS and contribute to contact and dust pathways.

**Migration/off-gassing:** Coatings used for durable water repellency can release volatile and non-volatile PFAS into indoor air; these compounds have been measured in indoor environments.

**Handling risk:** Repeated donning/doffing, wear and repairs likely increase transfer of PFAS to hands and station environments, consistent with measured PFAS on station wipes and gear surfaces.

**Station dust as a reservoir:** Studies in U.S. fire stations measured both total fluorine and specific PFAS in dust. PFAS were also detected on gear stored in stations. This suggests stations can accumulate PFAS from gear and past foam activities, leading to incidental ingestion or inhalation.

**Dust to serum linkage:** In occupational and office settings, PFAS in indoor dust correlate with serum levels, indicating a plausible contribution pathway, particularly relevant to stations with heavy gear and frequent gear handling.

**Laundry and wastewater:** Functional textiles with side-chain fluorinated polymers can shed PFAS-bearing microfibers during washing, contributing to wastewater PFAS loads (a facility-level concern for turnout-gear maintenance areas).[18]

127.    The Indiana Report concluded that the greater a firefighter's contact with PFAS-infused turnout gear, the more likely they were to be in the "high risk" category of PFAS blood serum levels.  Firefighters who reported handling or wearing turnout gear during *most or every shift* —had higher median PFAS biomarker levels compared with those with lower gear contact (rarely or only on some shifts).[19]

---

[18] *Id.* at 16.

[19] *Id.* at 17-18.

128.    Occupational cancer is presently the leading cause of line-of-duty death in the fire service.[20]

129.    Over the past thirty to forty years, the leading cause of line-of-duty death in the fire services has changed from cardiac events to cancer.[21]

130.    Seventy percent of firefighters are predicted to die eventually from cancer, which is significantly higher than the general population.[22]

## C.    Defendants' Contributions to PFAS-Containing Turnout Gear

131.    In 1938, a chemist employed by Defendant DuPont invented PTFE. Less than a decade later, DuPont commercialized PTFE.

132.    By the 1950s, PFAS were widely used in commercial manufacturing, including by Defendants 3M and Dupont. Prior to the 1950s, PFAS had never been detected in the bodies or blood of human beings.

133.    Since the 1950s, 3M and Dupont have continued to manufacture, market, and sell PFAS.

134.    In 1966, Defendant Globe began manufacturing, marketing, and selling turnout gear containing PFAS.

135.    Since 1966, Globe has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants 3M, DuPont, Gore, and PFAS manufactured by Defendants 3M and/or DuPont.

---

[20] Peaslee, *supra* note 10.

[21] *Id.*

[22] *Id.*

136.    In 1969, Robert Gore, an employee of his father's company, Defendant Gore, invented an expanded form of PTFE ("ePTFE"). Shortly thereafter, Gore commercialized ePTFE.

137.    In 1970, Defendant Lion began manufacturing, marketing, and selling turnout gear containing PFAS.

138.    Since 1970, Defendant Lion has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials supplied by Defendants DuPont and Gore and PFAS manufactured by Defendants 3M and/or DuPont.

139.    In 1983, Defendant Fire-Dex began manufacturing, marketing, and selling turnout gear containing PFAS.

140.    Since 1983, Fire-Dex has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials including those supplied by Defendants 3M (including Scotchlite$^{TM}$ Reflective Material), DuPont (including Nomex® and Kevlar®), and Gore (including GORE-TEX®), as well as PFAS manufactured by Defendants 3M and DuPont.

141.    In 2008, Defendant Morning Pride acquired Norcross Safety Products LLC and began manufacturing, marketing, and selling turnout gear containing PFAS.

142.    Since 2008, Morning Pride has continued to manufacture, market, and sell turnout gear containing PFAS, using PFAS-containing materials including that supplied by Defendants DuPont (including Nomex® and Kevlar®), and Gore (including GORE-TEX®), and PFAS manufactured by Defendants 3M and/or DuPont. Morning Pride manufactures, markets, and sells turnout gear manufactured, in whole or in part, by and under the brands MorningPride® and Honeywell First Responder Products.

143.    In 2013, DuPont announced that it was planning to spin off its "performance chemicals business" into a new publicly traded company, which ultimately became Defendant Chemours.

144.    In 2015, Chemours began manufacturing, marketing, and selling performance chemicals, including PFAS.

145.    Since 2015, Chemours has continued to manufacture, market, and sell performance chemicals, including PFAS.

146.    Defendants designed, developed, manufactured, tested, packaged, promoted, marketed, advertised, distributed, and/or sold PFAS and the turnout gear worn by Plaintiffs, and members of the Class and/or the PFAS-containing materials therein and/or the PFAS therein.

147.    Defendants 3M and DuPont expected their PFAS to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiffs and members of the Class.

148.    Defendants 3M, DuPont, and Gore expected their PFAS-containing materials to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiffs and members of the Classes.

149.    Defendants Globe, Fire-Dex, Morning Pride, and Lion expected their turnout gear to reach their ultimate users without substantial change in the condition in which they were designed and manufactured, and they did so reach Plaintiffs and members of the Classes.

**D.    Defendants' Knowledge of the Dangers of PFAS**

**1.    Defendant 3M's Long-Standing Knowledge of the Dangers of PFAS**

150.    Defendant 3M was the largest manufacturer of PFAS in the United States from the 1940s through the early 2000s.

28

151.    3M has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

152.    As early as the 1950s, 3M began a series of studies on the physiological and toxicological properties of PFAS, concluding that PFAS were harmful to animals, humans, and the environment. The findings of these studies were discussed internally (and often shared with DuPont), but they were not publicized or shared with any regulatory agencies. Notably:

    a.    In 1950, 3M documented that PFAS bioaccumulate in the blood of mice following exposure.

    b.    In 1963, 3M documented PFAS as being "toxic," stable in the environment, and "completely resistant to biological attack."

    c.    By the 1970s, 3M had documented PFAS in fish and were aware that PFAS were hazardous to marine life.

    d.    In 1976, 3M began monitoring the blood of its employees for PFAS because the company was concerned about potential health effects.

    e.    In 1978, 3M conducted multiple PFAS studies in monkeys and rats. The studies showed that PFAS affected the liver and gastrointestinal tract of the animals tested. 3M documented that PFAS "should be regarded as toxic."

    f.    In 1979, an internal 3M report stated that the PFAS were "more toxic than anticipated," recommending that "lifetime rodent studies [] be undertaken as soon as possible."[23]

---

[23] Sharon Lerner, *3M Knew About Dangers of Toxic Chemicals Decades Ago, Internal Documents Show*, The Intercept (July 31, 2018), https://www.typeinvestigations.org/investigation/2018/07/31/3m-knew-dangers-pfoa-pdos-decades-ago-internal-documents-show/.

g.      In 1979, an internal 3M memo concluded that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."[24]

h.      In 1981, 3M moved twenty-five female employees "of childbearing potential" off production lines at its Decatur, Alabama plant "[a]s a precautionary measure" based on internal researching showing that PFAS were causing birth defects in rats.

i.      In 1987, 3M shared with DuPont the results of a two-year study where rats were fed a diet with added PFAS, resulting in the growth of cancerous tumors.

j.      In 1989, a review of mortality data among 3M's chemical division workers found, compared to Minnesota death rates, a "statistically significant excess" of deaths by "cancer of the digestive organs and peritoneum."

153.    Section 8(e) of the Toxic Substances Control Act (TSCA) requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or to the environment." TSCA § 8(e), 15 U.S.C. § 2607(e). This reporting requirement has been included in the TSCA since its enactment in 1976. *See* Pub. L. 94-469, Title I, § 8, Oct. 11, 1976, 90 Stat. 2027.

---

[24] *Id.*

30

154. Despite the decades of alarming data, 3M did not share any of its concerns about the risks of PFAS with regulatory agencies until 1998, when the company submitted a TSCA § 8(e) letter to the EPA regarding PFOS.

155. In 1998, the EPA first learned that PFAS was in the blood of the general human population. Shortly thereafter, 3M produced over 1,000 studies it had previously withheld from the EPA.

156. In 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for violations of the TSCA, including violations for failing to disclose studies regarding PFOA and other PFAS.

157. In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing 3M, along with DuPont, for manufacturing PFAS with knowledge of its carcinogenic properties. In response, 3M spokesperson Carolyn LaViolette released a statement that the company "acted responsibly in connection with products containing PFAS and will defend its record of environmental stewardship."[25]

158. The same year, 3M announced that it would work to discontinue the use of PFAS across its product portfolio by the end of 2025. In its announcement, 3M fell far short of transparency: Mike Roman, 3M's chairman and chief executive officer, asserted that "[w]hile PFAS can be safely made and used, we also see an opportunity to lead in a rapidly evolving

---

[25] *California sues 3M, DuPont over toxic 'forever chemicals'*, CNN (Nov. 10, 2022), https://www.cnn.com/2022/11/10/business/california-3m-dupont/index.html.

external regulatory and business landscape for those we serve."[26] In connection with the announcement, 3M falsely maintained that "3M's products are safe for their intended uses."[27]

**2.      Defendant DuPont's Long-Standing Knowledge of the Dangers of PFAS**

159.     Prior to spinning off portions of the company into other entities, DuPont was the largest chemical company in the world in terms of sales.

160.     Dupont has known for decades that PFAS exposure is associated with adverse, substantial, and potentially lethal effects on human health.

161.     In 1935, DuPont established Haskell Laboratories, one of the first in-house toxicology facilities, at the urging of a staff doctor worried over the company's demonstrated "tendency to believe [chemicals] are harmless until proven otherwise."[28]

162.     In 1954, a DuPont employee named R.A. Dickinson noted that he had received an inquiry regarding PFOA's "possible toxicity."[29]

163.     As early as the 1960s, DuPont was repeatedly made aware, via both internal and external research and data, that PFAS were harmful to animals, humans, and the environment. Notably:

        a.      In 1961, a team of in-house researchers at DuPont concluded that PFOA was indeed toxic and should be "handled with extreme care." By 1962, a series of experiments by in-house researchers at DuPont had confirmed that

---

[26] *3M to Exit PFAS Manufacturing by the End of 2025*, 3M (Dec. 20, 2022), https://news.3m.com/2022-12-20-3M-to-Exit-PFAS-Manufacturing-by-the-End-of-2025#:~:text=3M%20will%3A,obligations%20during%20the%20transition%20period.

[27] *Id.*

[28] Sheron Lerner, *The Teflon Toxin: DuPont and the Chemistry of Deception*, The Intercept (Aug. 11, 2015), https://theintercept.com/2015/08/11/dupont-chemistry-deception/.

[29] *Id.*

PFOA was associated with the enlargement of various, specific organs in rats.[30]

b. In 1965, fourteen employees at DuPont, including the then-director of Haskell Laboratories, received a memo describing preliminary studies that even low doses of a related surfactant could increase the size of rat's livers, a classic response to exposure to a poison.

c. In 1978, Dupont alerted employees to the results of a study done by 3M, which showed that 3M's employees were accumulating PFOA in their blood. Later the same year, DuPont began reviewing employee medical records and measuring the levels of PFOA in the blood of its own workers, noting adverse patterns, including increased rates of endocrine disorders.

d. By 1979, Dupont was aware of studies showing that beagles exposed to PFOA had abnormal enzyme levels "indicative of cellular damage" as well as a recent 3M study showing that some rhesus monkeys died when exposed to PFOA.[31]

e. In 1981, DuPont transferred women out of work assignments with potential for exposure to PFOA, alerting them to the results of a 3M study which suggested an association between PFAS exposure and birth defects.

f. By 1982, DuPont's corporate medical director had become worried about the possibility of "current or future exposure of members of the local

---

[30] *Id.*

[31] *Id.*

community from emissions leaving the plant's perimeter," as he explained in a letter to a colleague.[32]

g.   By the 1990s, DuPont knew that PFOA caused cancerous testicular, pancreatic, and liver tumors in lab animals.

h.   In the 1990s, DuPont began developing an alternative to PFOA. In 1993, an interoffice memo announced that "for the first time, we have a viable candidate" that appeared to be less toxic and stayed in the body for a much shorter duration of time. "Discussions were held at DuPont's corporate headquarters to discuss switching to the new compound. DuPont decided against it [because] [p]roducts manufactured with PFOA were an important part of DuPont's business, worth $1 billion in annual profit."[33]

i.   In 1994, a small committee drafted a top-secret document, which was distributed to high-level DuPont employees around the world, discussing the need to "evaluate replacement of [PFOA] with other more environmentally safe materials" and presenting evidence of toxicity, which included study finding an association between prostate cancer and exposure to PFOA.[34]

164.   In 2000, DuPont and 3M met to "clear [the parties'] mutual understanding of the pertinent data on PFOA." Meeting notes documented that "DuPont was interested in any

---

[32] *Id.*

[33] Nathaniel Rich, *The Lawyer Who Became DuPont's Worst Nightmare*, The New York Times Magazine (Jan. 6, 2016), https://www.nytimes.com/2016/01/10/magazine/the-lawyer-who-became-duponts-worst-nightmare.html.

[34] Lerner, *supra* note 22.

measurements of PFOA in general population samples." 3M informed DuPont that the half-life of PFOA was much longer than animal studies showed.[35]

165.    In 2001, a class action lawsuit was filed against DuPont on behalf of people whose water had been contaminated by the nearby DuPont chemical plant where PFAS were manufactured.

166.    In 2003, a consultant service with substantial experience helping companies manage issues "allegedly related to environmental exposures," beginning with Agent Orange in 1983, wrote to DuPont in anticipation of a planned meeting:

> The constant theme which permeates our recommendations on the issues faced by DuPont is that DUPONT MUST SHAPE THE DEBATE AT ALL LEVELS. We must implement a strategy at the outset which discourages government agencies, the plaintiff's bar, and misguided environmental groups from pursuing this matter any further than the current risk assessment contemplated by the Environmental Protection Agency (EPA) and the matter pending in West Virginia. …
>
> As we understand this situation, there is currently a great deal of attention focused on the safety of perfluorochemicals generally and PFOA in particular. Specifically, due to the situation in West Virginia and the activities of the Environmental Working Group, the threat of expanded litigation and additional regulation by the EPA has become acute. In response to this threat, it is necessary for DuPont to prepare an overall technical and scientific defense strategy.[36]

167.    In 2005, the EPA reached a settlement with Dupont related to violations of the TSCA for concealing the environmental and health effects of PFOA. The settlement included the largest civil administrative penalty the EPA had ever obtained under any environmental statute,

---

[35] Internal DuPont Memorandum, DuPont Haskell Laboratory Visit Meeting Minutes (June 30, 2000), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1721.pdf.

[36] Letter from P. Terrance Gaffney, Esq. of The Weinberg Group to Jane Brooks, Vice President, Special Initiatives, DuPont de Nemours & Company, regarding PFOA (April 29, 2003).

$10.25 million, and further required DuPont to perform supplemental environmental projects worth $6.25 million.

168.    In 2015, DuPont spun off its "performance chemicals" business, as well as two-thirds of its environmental liabilities and 90% of its active litigation to Defendant Chemours.

169.    In 2019, Paul Kirsch, then-president of the fluoroproducts business at Chemours, testified before Congress that "DuPont designed the separation of Chemours to create a company where it could dump its liabilities and protect itself from environmental cleanup and related responsibilities."

170.    In 2022 and following a multi-year probe into both companies, the state of California announced that it was suing DuPont, along with 3M, for manufacturing PFAS with knowledge of its carcinogenic properties. DuPont's response was to deny its role and maintain that California's claims were without merit:

> DuPont has never manufactured PFOA, PFOS or firefighting foam, said spokesperson Daniel Turner, referring to two PFAS substances. He added the company believes the complaint incorrectly names it as a defendant. "We believe these complaints are without merit … We look forward to vigorously defending our record of safety, health and environmental stewardship."[37]

### 3.    The Remaining Defendants' Knowledge of the Dangers of PFAS

171.    Defendant Gore openly advertises that its in-house scientists "are active participants in the scientific community, lending their expertise, research and time to broaden the understanding of [PFAS]."[38] For example, in efforts to garner support for its open, long-standing commercial use of PTFE, Gore asserts:

---

[37] *California sues 3M, DuPont over toxic 'forever chemicals'*, *supra* note 24.

[38] *Gore's Commitment to Material Stewardship*, GORE, https://www.gore.com/about/materials-stewardship.

> The present paper brings together fluoropolymer toxicity data, human clinical data, and physical, chemical, thermal, and biological data for review and assessment to show that fluoropolymers satisfy widely accepted assessment criteria to be considered as "polymers of low concern" (PLC) and to show that fluoropolymers are distinctly different enough from other classes of PFAS to not be grouped with them for hazard assessment or regulatory purposes.
>
> Scientists, regulators, and concerned communities often fall into one of two groups: one says all PFAS should be banned and the other says PFAS are so different that each must be evaluated, classified, and regulated individually. Barbara J. Henry, PhD, a toxicologist with [Gore], says there's a middle way forward if PFAS are grouped by their properties.[39]

172.    Defendants have continued to misrepresent the safety of PFAS and engaged in campaigns aimed to direct the public's attention away from the issue of PFAS in their products.

173.    Defendant 3M maintains and publicly advertises that "[PFAS] are safely used in many modern products for their important properties and can be safely manufactured."[40]

174.    3M maintains and publicly advertises that:

> Researchers from around the world have studied these materials for decades and haven't found a definitive causal relationship between PFOA or PFOS exposure and any health condition … . While some research shows that these materials are associated with negative health outcomes, other studies don't reach the same conclusions.[41]

175.    Defendant New DuPont maintains and publicly advertises that:

> In June 2019, DuPont de Nemours, Inc. (DuPont) was established as a new multi-industrial specialty products company. DuPont de Nemours has never manufactured PFOA, PFOS or firefighting foam. While DuPont is not a PFAS commodity chemical manufacture, it does use select PFAS compounds within industrial processes pursuant to relevant environmental, health and safety rules and standards. Such uses are necessary to impart specific

---

[39] *Id.*

[40] *Health, Safety & Environmental Stewardship*, 3M, https://pfas.3m.com/health-safety-and-environmental-stewardship.

[41] *How Fluorochemistries Are Safely Used*, 3M, https://pfas.3m.com/how-fluorochemistries-are-safely-used.

product performance criteria and only in products that are essential to safety and the critical functioning of society.[42]

176.    Defendant Chemours maintains and publicly advertises that: "We take very seriously our obligation to manage the PFAS compounds in our manufacturing processes in a responsible manner and our commitment to eliminate at least 99% of our PFAS air and water emissions from our manufacturing processes by 2030." Chemours further maintains and publicly advertises that "not all PFAS are the same," arguing that fluoropolymers such as PTFE are "critical to modern life" and "enable nearly every major sector of the economy."[43]

177.    In 2017, Defendant Lion's President, Stephen Schwartz, wrote a letter to the editor of The Columbus Dispatch demanding the newspaper's *retraction* of a story headlined "Lawyer: Firefighters' gear may be hazardous." Schwartz asserted:

> PFOAs and PFOSs have never been components of Lion's turn-out gear, either as a coating or as a textile. All textiles we use are woven or knit with technical fibers that are engineered to be heat, flame and abrasion resistant, some of which are treated with a PTFE durable water repellant finish … . [B]ecause these manufacturers used PFOA in their manufacturing process as a processing aid, it is possible that trace amounts may have been present as a residue when the films and finishes were incorporated into Lion's turn-out gear. However, based on all available scientific data, such nominal trace amounts … would not have posed any health risks to firefighters. There is absolutely no connection at all between PFOS and firefighter turnout gear. …
>
> We, as a part of the fire protective equipment industry, are concerned and saddened by the undeniable scientific evidence that firefighters have elevated cancer risks … . However, the elevated risks derives from the hazardous substances produced by the fire, not the turnout gear that protects firefighters.

---

[42] *DuPont de Nemours, Inc. Statement on Poly and Per-Fluorinated Alkyl Substances (PFAS)*, DuPont, https://www.dupont.com/pfas.html.

[43] Our Commitment to Responsible Chemistry, CHEMOURS,

https://www.chemours.com/en/sustainability/sustainability-safety/our-commitment-to-pfas-stewardship.

178.    In 2017, Defendant Lion launched its "NOT IN OUR HOUSE" initiative to "spread awareness of the cancer threat facing the fire service" and "educat[e] firefighters on the actions they can take to reduce their exposure to cancer-causing agents."

179.    In 2019, Lion issued a "Customer Safety Alert" for "PFOA and Turnout Gear," asserting: "Your Lion turnout gear continues to be safe and ready for action especially when properly maintained. It is extremely important that firefighters continue to wear and properly care for their gear to stay safe on the job":

**HERE'S ALL YOU NEED TO KNOW ABOUT PFOA AND YOUR TURNOUT GEAR.**

**What is PFOA and why are we talking about it?**

**Perfluorooctanic Acid (PFOA) is a chemical that until recently was used in the process to make many different industrial chemicals and products.** The manufacture and use of PFOA was mostly phased out by major chemical companies by 2010. By 2015, its manufacture was eliminated in the United States.

In the firefighting protective clothing industry, PFOA was used as a processing agent in the manufacture of resins used to make PFTE films – the primary component of the moisture barrier used in turnout gear. While most residual PFOA was eliminated from the manufacturing process of PTFE, some tiny trace amounts remained.

**LION does not use PFOA or PFOS in our turnout gear or any of our protective products.**

PFOS has never been a component of turnout gear. PFOS health and environmental concerns are largely related to AFFF foams and are not connected to turnout gear.

180.    In 2019, Defendant Gore issued a public statement, asserting that "the potential exposures and associated risks of cancer effects from PFOA alternatives and non-polymeric perfluoroalkyl substances in Gore Components [turnout gear] are insignificant."

181.    In 2020, Paul Chrostowski, Ph.D., a consultant hired by Defendant Lion, took out a full page in the publication Firefighter Nation to argue that turnout gear is completely safe and that any evidence to the contrary, including the Peaslee study, is unreliable fearmongering. Chrostowski argued:

> The evidence [] shows that firefighters are not exposed to PFAS at levels greater than control groups including the general population.

> So even if PFAS were found in their turnout gear, at this time there is no credible evidence that it ends up in firefighters bodies in amounts that would be higher than the general population … .

> At this point, it would be irresponsible to dissuade firefighters from using their protective gear out of fear of cancer. The materials used in turnout gear are the safest materials available, and without them, firefighters would be at extreme risk for burns and exposure to known cancer-causing toxic chemicals present on the fireground, as well as metabolic heat stress.

182. In 2021, Defendant Lion confirmed that the representations articulated by Chrostowski reflect the company's position.

183. In 2021, Defendant Gore maintained in a New York Times article that its turnout gear products were safe for wearers.

184. In 2022, Defendant 3M publicly stated that it was not necessary or appropriate to declare any PFAS hazardous.

185. Moreover, Defendants have repeatedly represented to firefighter unions and the public that their products are safe for their intended uses, including the ways in which Plaintiffs have alleged they were used.

186. For example, Defendant DuPont maintains and publicly advertises that turnout gear manufactured with DuPont's materials "work hard to help keep your professionals safe, inside and out," "help protect professionals even when the fire is out," and "are helping keep first responders safe."

187. Defendant Fire-Dex maintains and publicly advertises that its turnout gear is made with "the best materials the industry has to offer" and provides the specific benefit of "reduc[ing] [] carcinogen exposure." Fire-Dex advertises that the company goes "beyond industry standards to ensure a proper fit for your comfort and safety," making its turnout gear products "key to keeping your crew safe!"

40

188.    Defendant Globe maintains and publicly advertises that the company is "committed to firefighter health & safety" and that:

> At [Globe], your health, safety and well-being are what drive us to not only develop technologically-advanced safety equipment to help protect you on the job, but to advocate for your well-being. In fact, after more than 100 years in business, our mission remains unchanged: that men and women may work in safety and live in health.

189.    Defendant Gore maintains and publicly advertises that the company's protective fabrics enable firefighters "to stay safe and engaged," emphasizing that to do their jobs, firefighters "need protective garments that keep them protected with a limited amount of physiological burden."

190.    Defendant Morning Pride maintains and publicly advertises that its firefighter turnout gear is "[d]esigned to provide safety," referring to its turnout gear products as "the pioneer of safety by design."

191.    Defendant Lion maintains and publicly advertises that the company "makes the gear emergency service providers, civilian responders and militaries need to stay safe in the line of duty," emphasizing that "[w]hen it comes to firefighting, safety is a top concern."

192.    Another manufacturer, StedFast, maintains and publicly advertises that all of its products "are manufactured with safety in mind," asserting that "[k]eeping people safe is a core value of our business."

E.    **Defendants' Failure to Provide Safety Warnings on Product Labels**

193.    As alleged above, the turnout gear does not contain any labeling information or warnings:

      a.    indicating that the gear contains or may contain PFAS,

b. indicating that the gear specifically contains or may specifically contain PFOA,

c. regarding the health risks associated with exposure to PFAS, or

d. regarding the health risks associated with exposure to PFOA.

194. Below are photos typical of warning labels for turnout gear designed, manufactured, marketed, sold, and distributed by Globe, Morning Pride, and Lion. As depicted below, the labels do not disclose that the turnout gear contains PFAS or PFAS-containing materials, and contain no warning that handling, wearing, or using the turnout gear as it was intended to be handled, worn, or used can result in exposure to PFAS and adverse effects to human health.



**Honeywell**
#1 INNOVATION CT
DAYTON, OHIO 45414
USA 1-800-688-6148

MORNING PRIDE MFG., LLC., DBA HONEYWELL FIRST RESPONDER PRODUCTS

THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA 1971, 2013 EDITION. DO NOT REMOVE THIS LABEL

PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH NFPA 1971-2013

CLASSIFIED UL  #59F1    PROUDLY MADE IN THE USA

FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT: COMPLIANT OUTER SHELL AND LINER SYSTEM.

Serial #  1503000037

Model #  LTO24CDTN

OS    Brigade 750 - 7.5 osy
TL    Spun Aramid / 2-Layer Spu
MB    5.2 oz Stedair 3000

Mfg Date 03/02/2015

Wash/dry shell and liner separately. Use mild detergent with pH between 7 and 10. Hang dry when possible. No wash water/dryer temperatures above 105F (40C). No chlorinated bleaches or solvents. No spin rates over 100 Gs. Store out of direct or indirect sunlight. Reduce exposure to fluorescent light. See NFPA 1851 and USER INFORMATION GUIDE for more details.

Size: Chest  42 Front    30 Back  36    Sleeve  32.0

Originally manufactured for and Property of:

**⚠ DANGER**

DO NOT USE THIS GARMENT IF YOU HAVE NOT BEEN PROPERLY TRAINED AND SUPERVISED IN ITS USE! ALL EMERGENCY OPERATIONS ARE EXTREMELY HAZARDOUS AND DANGEROUS. DESPITE THE PROTECTIVE QUALITIES OFFERED BY THIS PROTECTIVE GARMENT YOU MAY STILL BE KILLED, INJURED, BECOME ILL OR BE EXPOSED TO HAZARDOUS SUBSTANCES WITH NO WARNING/ SIGN OF DAMAGE TO THIS GARMENT.

IN ORDER TO REDUCE - BUT NOT ELIMINATE - YOUR RISKS, YOU MUST NOT WEAR THIS GARMENT UNLESS:

1) You have read, fully understood, and strictly follow: the USER INFORMATION GUIDE and all LABELS for this garment; the standards listed on the garment certification label; and applicable National, State/Provincial and Local regulations pertinent to emergency operations.
2) Your department, organization or employer has conducted a risk/hazard assessment and determined that this garment provides an acceptable level of protection for the intended application.
3) You have been trained and understand that not all garments provide every level of protection and how to select and properly use the appropriate garment to meet the expected exposure.
4) You understand the limitations of this protective garment and the hazards that it can create while providing protection; in particular: (a) that you may not feel heat under this garment before suffering a BURN, even when contacting a hot surface, (b) that the garment will lower your ability to feel heat and you may be burned underneath the garment with NO warning and NO sign of damage to the garment, and (c) that this protective garment may increase your risk of heat stress which may cause heart attack, stroke, dehydration, or other conditions resulting in injuries, illness or DEATH.
5) Where applicable, all garment layers and components are in place, all closures are secured, and any special features are properly deployed.
6) The garment is properly inspected, maintained and cared for by your department, organization or employer consistent with the Morning Pride manufacturing's instructions and applicable National, State/Provincial and Local regulations , and is free of soiling, contamination, damage, and any alteration that would compromise its protective value.
7) The garment is worn as a part of an overall protective ensemble that includes other appropriate protective elements.
8) That contamination of this garment may warrant its disposal.
9) This garment is NOT warranted to be fit for a particular purpose. Read carefully the "Warranty Information" in the USER INFORMATION GUIDE.

Garment Safety Label

**⚠ DANGER**    6150

You must read and understand these warnings and instructions. Failure to follow these warnings and instructions will result in serious injury or death.

- Wear this garment ONLY FOR FIREFIGHTING ACTIVITIES.
- THIS GARMENT DOES NOT PROVIDE PROTECTION AGAINST CBRN TERRORISM AGENTS.
- Before wearing this garment, you must read and understand the User Instruction, Safety and Training Guide provided with this garment. The guide explains: 1. critical safety information and protective clothing limitations. 2. proper sizing/adjustment. 3. procedures for putting on and removing protective clothing. 4. how to clean, decontaminate, inspect and store this garment. 5. use consistent with NFPA1500. 6. limitations on useful life and retirement procedures.
- You should wear this garment only if you have been **properly trained in firefighting techniques**, and have knowledge of the proper selection, fit, use, care and limitations of protective clothing and equipment. To obtain a free user guide, write Lion @7200 Poe Ave., Suite 400 Dayton, OH 45414 or call 1-800-421-2926.

- **This garment provides limited protection against heat and flame.** Minimize exposure to heat. You may be burned without warning or without receiving damage to garment. Avoid contact with hot objects. Skin burns occur when skin reaches a temperature of 118°F. Fires burn at temperatures up to 2000°F.
- **Moisture and/or compression in your garment may reduce protection.**
- **Exertion in hot conditions may result in heat exhaustion or poor judgment.** If you feel dizziness, dehydration, loss of focus, or shortness of breath, get to a safe area, remove this garment, and seek medical attention.
- **Do not use this garment if it is damaged or dirty**, garments will NOT provide the intended protection. ALWAYS follow manufacturer's cleaning instructions.
- **This garment has limited useful life.** You must inspect regularly and retire when appropriate according to the User Instruction, Safety and Training Guide See also NFPA 1851.

DO NOT REMOVE OR WRITE ON THIS LABEL!

Garment Cleaning Label                    Garment Information Label

**🦁 LION**    6484

Questions, write or call immediately:
Lion
7200 Poe Ave., Suite 400 Dayton, OH 45414. 1-800-421-2926

**CLEANING AND STORAGE INSTRUCTIONS**
- Users must clean, inspect, maintain, store and alter only in accordance with the User Instruction, Safety and Training Guide.
- Never use chlorine bleach. Chlorine bleach will significantly compromise the protector afforded by textile and film materials utilized in the construction of this garment.
- For coats only, remove DRD and launder DRD by hand washing with mild detergent and warm water.
- Fasten all hooks and D-rings and turn inside out or place in a laundry bag.
- Machine wash, warm water, using only liquic detergent and if needed, liquid non-chlorine bleach. Double rinse in cool water. Never use fabric softeners.
- Never dry clean.
- Dry by hanging in open area, out of direct or indirect sunlight and fluorescent light.
- Store out of direct or indirect sunlight and fluorescent light.

THIS STRUCTURAL FIRE FIGHTING PROTECTIVE GARMENT MEETS THE GARMENT REQUIREMENTS OF NFPA1971, 2013 EDITION.

PROTECTIVE GARMENT FOR STRUCTURAL FIRE FIGHTING IN ACCORDANCE WITH NFPA 1971-2013. 58F6

When worn with the inner liner and outer shell assembled together, this garment meets the personal protective equipment criteria of US Dept. of Labor OSHA Bloodborne Pathogens Standard, Title 29 CFR, Part 1910.1030, and CAL-OSHA Standard Title 8 Section 3406.

Rev.1.0 12112    DO NOT REMOVE OR WRITE ON THIS LABEL

**Janesville**
CROSSTECH MOISTURE BARRIER (PTFE) GLIDE 2L ARAFLO E-89 (K) THERM.LINER NOMEX E-89 QUILT
REQ#:401971
MFG DATE:10/5/2012
CUT:104246AA006
MODEL:CVFM
LINER:C2K7CVFM
SIZE:4632R

0000652642

Garment Liner Attachment Safety Label

**⚠ WARNING**

FOR COMPLIANCE WITH THE STRUCTURAL FIRE FIGHTING GARMENT REQUIREMENTS OF NFPA 1971, THE FOLLOWING PROTECTIVE ITEMS MUST BE WORN IN CONJUNCTION WITH THIS GARMENT: OUTER SHELL 7.0 OZ MINIMUM WEIGHT

This INNER LINER alone does not provide protection against heat, flame, chemical or biological hazards. NEVER wear this INNER LINER without the SAME SIZE AND MODEL OUTER SHELL, as identified on labels located on each detachable component.

To reduce the risk of injury or death, you must assemble and wear together ALL of the following items:
1. protective coat and pant with outer shell, attached inner liner and DRD installed in coat 2. gloves 3. boots 4. helmet with eye protection 5. protective hood 6. SCBA 7. PASS device
ALWAYS make sure that all ensemble layers have the proper overlap and that all items fit with adequate looseness.Tight fit lowers insulation protection and restricts mobility.

MADE IN THE U.S.A.
DO NOT REMOVE OR WRITE ON THIS LABEL!    FI# 6151

Drag Rescue Device (DRD) Label

43

**F.      Defendants' Ability to Design Safer Turnout Gear**

195.    PFAS-free turnout gear was, at all relevant times, technologically and economically feasible.

196.    In fact, certain companies now offer PFAS-free options for waterproof fabrics, durable fabrics, and/or outer shells in turnout gear.

197.    For example, in or around 2021, Gore announced its upcoming launch of a PFAS-free fabric-waterproofing technology, which was praised for its apparent potential to "greatly increase the availability of PFAS-free water-repellant garments."[44]

198.    In or around 2021, Todd Herring, Vice President of Product Innovation and Strategy at Fire-Dex, stated in a press release that the company had "partnered with Milliken to develop a non-fluorinated version of our exclusive materials … that meets the increasing market demand for PFAS free PPE material options."[45]

199.    In or around 2021, Deana Stankowski, Senior Offering Manager for first responder gear at Morning Pride spoke out about Morning Pride's newly available PFAS-free outer shell layer "options," explaining: "We are making sure that we have every PFAS-free outer shell available in the market as *part of our portfolio* … . We have customers field testing PFAS-free outer shells, and we will eventually transition over completely to PFAS free." Stankowski added:

> There's no reason to offer both options … . Any minor tradeoffs
> with PFAS-free fabrics are outweighed by worker safety. And the
> protection level is unchanged. PFAS-free gear offers the same

---

[44] WL Gore to release PFAS-free waterproof material for apparel, Enhesa (Oct. 4, 2021), https://product.enhesa.com/346695/wl-gore-to-release-pfas-free-waterproof-material-for-apparel.

[45] Fire-Dex Launches Non-Fluorinated PPE Fabrics, Firehouse (Feb. 17, 2021), https://www.firehouse.com/safety-health/ppe/turnout-gear/press-release/21210722/fire-dex-fire-dex-launches-nonfluorinated-ppe-fabrics.

thermal protection and moves the same way … . The color fastness
and wear remain the same.[46]

200.    In or around 2022, a group of students at UC Berkley's Center for Green Chemistry, in partnership with the IAFF, conducted their own semester-long study into safer alternatives to PFAS in turnout gear and were able to offer multiple, alternative recommendations for manufacturers. For example, the students concluded that polyethylene laminate could be used as a potential alternative to PTFE in the middle moisture barrier of firefighter turnout gear.

## V.    CLASS ALLEGATIONS

### A.    Class Definitions

201.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3) on behalf of themselves, their members, and the following individuals (together, the "Classes"):

202.    Nationwide Class:

All entities in the United States who bought turnout gear that
contained PFAS that was manufactured, designed, distributed,
applied, utilized, marketed,  and/or sold, in whole or in part, by any
of the Defendants during the Class Period.

203.    State Law Subclasses:

All entities in Alabama, Alaska, Arizona, Arkansas, California, Colorado,
Connecticut, Delaware, Georgia, Hawaii, Illinois, Indiana, Iowa, Maryland,
Massachusetts, Minnesota, Missouri, Montana, Nevada, New Hampshire, New
Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon,
Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington,
West Virginia, and/or Wisconsin that purchased turnout gear that contained PFAS
that was manufactured, designed, distributed, applied, utilized, marketed, and/or
sold, in whole or in part, by any of the Defendants during the Class Period.

---

[46] Ronnie Wendt, *Innovations in Turnout Gear*, INDUSTRIAL FIRE WORLD (Mar. 17, 2021)(on file with Plaintiffs' Counsel) .

204.    Plaintiffs reserve the right to expand, narrow, or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

205.    Excluded from the Classes are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

## B.    Class Characteristics under Rule 23

206.    **Ascertainability.** The proposed Class is readily ascertainable because it is defined using objective criteria, so as to allow class members to determine if they are part of the Class. Further, the members of the class can be readily identified through records and information in Defendants' possession, custody, or control.

207.    **Numerosity.** The Class is so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of class members.

208.    **Commonality and Predominance.** Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Class, including the following:

a.    Whether Defendants violated RICO;

b.    Whether Defendants engaged in the conduct alleged herein;

c.    Whether Defendants designed, advertised, marketed, distributed, leased, sold, or otherwise placed PFAS products into the stream of commerce in the United States;

d.    Whether Defendants knew about the dangers of PFAS and, if so, how long they have known;

e.    Whether Defendants are liable under RICO;

f.    Whether there is an enterprise within the meaning of RICO;

g.    Whether Defendants participated in the enterprise;

h.    Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount;

i.    Whether Defendants breached their duty to warn the members of the Class of, and protect the members of the Class from, the long- term health risks and consequences of exposure to high levels of PFAS; and

j.    Whether Defendants violated applicable state laws.

209.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs, and members of the Class sustained damages arising out of Defendants' common course of conduct as described in this First Amended Complaint. The injuries of Plaintiffs, and each member of the Class were directly caused by Defendants' wrongful conduct, and Plaintiffs and members of the Class assert similar claims for relief.

210.    **Adequacy.** Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in

complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class.

211.    **Substantial Benefits.** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable. This proposed class action is manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

## VI.    TOLLING AND ESTOPPEL OF APPLICABLE STATUTE OF LIMITATIONS DISCOVERY RULE TOLLING

212.    Defendants had knowledge of the hazard to the health and safety of Plaintiffs, and Class members caused by exposure to PFAS Chemicals for decades.

213.    Beginning in the 1960s and continuing through to the 1990s, Defendants conducted internal studies that demonstrated the toxicity of PFAS Chemicals.

214.    Defendants knew or should have known that they were creating an unacceptable health risk to Plaintiffs, and Class members by designing, manufacturing, and selling turnout gear that was infused with PFAS.

215.    Defendants intentionally concealed this information from Plaintiffs, Class members, and the public.

216.    Defendants intentionally and continuously misrepresented the safety of the turnout gear, PFAS-contaminated materials, and/or PFAS therein, assuring firefighters, the government, and the public that the turnout gear, PFAS-contaminated materials, and PFAS were safe.

217. At all relevant times, Plaintiffs, and the Class members did not know or have reason to know of the Defendants' conduct that caused PFAS contamination.

218. Neither Plaintiffs, nor any other Class members, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein. Further, Plaintiffs and Class members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

219. For these reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and the Class members.

## VII. FRAUDULENT CONCEALMENT TOLLING

220. Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiffs, and Class members for decades.

221. Because of Defendants' active and ongoing concealment of the hazards of PFAS Chemicals, and the unique dangers posed to firefighters through dermal absorption, ingestion, and inhalation of PFAS Chemicals through off-gassing and migration, Plaintiffs could not have reasonably discovered the causes of action alleged herein.

222. For this reason, applicable limitations of actions and claims, at law or in equity, asserted herein or any statute of limitations that otherwise may apply to the claims of Plaintiffs or Class members should be tolled.

## VIII. CLAIMS ON BEHALF OF PLAINTIFFS AND ALL CLASS MEMBERS

### COUNT I (against all Defendants)

### Violations of Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1962(c), (d)

223. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

224. Plaintiffs bring this Count individually and on behalf of the Class against all Defendants.

225. All Defendants are "persons" under 18 U.S.C. § 1961(3) because they are capable of holding, and do hold, "a legal or beneficial interest in property."

226. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Section 1962(d), in turn, makes it unlawful for "any person to conspire to violate."

227. For many years, each of the Defendants created and/or participated in the affairs of an illegal enterprise (the "PFAS Concealment Enterprise") whose purpose was to conceal the dangers of their PFAS products, including PFAS-infused products sold to turnout gear manufacturers. As set forth below, the acts of Defendants in furtherance of the PFAS Concealment Enterprise violate Section 1962(c) and (d).

**1.      The members of the PFAS Concealment Enterprise.**

228. The PFAS Concealment Enterprise members are all Defendants.

229. Concealment of the dangers of PFAS benefitted the enterprise in several ways. First, many of the Defendants, including 3M, Chemours, DuPont, and Gore, make other products infused with PFAS. To disclose the dangers of PFAS in turnout gear would have called into question the safety of other products they manufactured. Second, DuPont, Gore, and Chemours were facing increasing and substantial potential liability for environmental damage caused by the manufacture of PFAS in the United States and other countries. Defendants were thus unwilling to state the truth about the dangers of PFAS in turnout gear so as to avoid fueling the fire about their

50

products. Third, if Defendants had disclosed the dangers caused by PFAS in turnout gear, other firms would have competed far earlier to develop PFAS free turnout gear.

230. 3M had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

     a.    Manufacturing, distributing, and selling turnout gear to fire departments and others;

     b.    Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiffs, members of the Class, and the public generally;

     c.    Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

     d.    Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

     e.    Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

     f.    Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

231. DuPont had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

     a.    Manufacturing, distributing, and selling turnout gear to fire departments;

     b.    Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to fire departments, Plaintiffs, members of the Class, and the public generally;

51

  c.  Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused products;

  d.  Persisting in the manufacturing and/or distribution of PFAS products despite knowing about their dangers; and

  e.  Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in turnout gear.

232. Lion. had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

  a.  Manufacturing, distributing, and selling turnout gear to fire departments and others;

  b.  Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiffs, members of the Class, and the public generally;

  c.  Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

  d.  Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

  e.  Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

  f.  Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

233. Globe had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

52

   a.   Manufacturing, distributing, and selling turnout gear to fire departments and others;

   b.   Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiffs, members of the Class, and the public generally;

   c.   Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

   d.   Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

   e.   Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

   f.   Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

234.   Fire-Dex had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

   g.   Manufacturing, distributing, and selling turnout gear to fire departments and others;

   h.   Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiffs, members of the Class, and the public generally;

   i.   Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

   j.   Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

53

k. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

l. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

235. Morning Pride had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

m. Manufacturing, distributing, and selling turnout gear to fire departments and others;

n. Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiffs, members of the Class, and the public generally;

o. Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

p. Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

q. Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

r. Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

236. Gore had substantial control over (and participated in) the affairs of the PFAS Concealment Enterprise by:

54

a.  Manufacturing, distributing, and selling turnout gear to fire departments and others;

b.  Misrepresenting and omitting (or causing such misrepresentations and omissions to be made) the truth about turnout gear to Plaintiffs, members of the Class, and the public generally;

c.  Introducing PFAS-laden turnout gear into the stream of U.S. commerce;

d.  Concealing from government regulators the truth about the dangers of PFAS in PFAS-infused turnout gear;

e.  Persisting in the manufacturing and distribution of PFAS products despite knowing about their dangers; and

f.  Designing and distributing marketing materials that misrepresented and concealed the truth about the dangers of PFAS in PFAS-infused turnout gear.

237.   All members of the PFAS Concealment Enterprise directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiffs cannot fully know at present because such information lies in Defendants' and others' hands.

238.   All members of the PFAS Concealment Enterprise served the common purpose of concealing the emissions, absorption, and ingestion dangers of PFAS-infused products from turnout gear manufacturers, Plaintiffs, members of the Class, and the public generally. Each member of the PFAS Concealment Enterprise shared the bounty generated by the PFAS Concealment Enterprise—i.e., by continuing to sell PFAS-infused products for decades even though they knew that PFAS in those products posed grave dangers.

55

239. Concealment of the dangers of PFAS benefited the enterprise in several ways. First, many of the Defendants, including 3M, Chemours, DuPont, and Gore, make other products infused with PFAS. To disclose the dangers of PFAS in turnout gear would have called into question the safety of other products they manufactured. Second, DuPont, Gore, and Chemours were facing potential liability for environmental damage caused by the manufacture of PFAS. Defendants were thus unwilling to state the truth about the dangers of PFAS. Third, if Defendants had disclosed the truth about the dangers caused by PFAS in turnout gear, other firms would have competed far earlier to develop turnout gear.

240. So, for example, Gore manufactures Gore-Tex Fabric[47] and spends considerable marketing resources to position itself as an exemplary environmental steward while also promising that its products represent a sound choice for the environmentally conscious consumer if fabric used in many brands of rain gear has forms of PFAS. More specifically, Gore relies on an umbrella public relations campaign with "Responsible Performance" and "Committed to Sustainability" and "Environmentally Sound" themes to consistently disseminate environmental stewardship claims.

241. Gore promotes its products via its distinctive "Hang Tags" that are affixed to all products that are made with Gore-Tex Fabric. The Hang Tags are prominently attached to all Gore-Tex Fabric products at point of sale and must be removed prior to use:

---

[47] Gore-Tex Fabric means material produced by Gore and consisting of an ePTFE (expanded polytetrafluoroethylene) based Gore-Tex membrane and/or a durable water treatment ("DWR") that contains PFAS (per- and polyfluoroalkyl substances).

56







242.     Disclosing the danger in PFAS in turnout gear would potentially call into question the validity of these claims.

243.     Likewise, 3M makes dozens of products that have PFAS and faced billions of dollars in potential liabilities. As noted in its 2024 SEC Form 10-K, its PFAS liability is substantial and was for years a liability 3M sought to concede:

> The Company has been voluntarily cooperating with various local, state, federal (primarily the U.S. Environmental Protection Agency (EPA)), and international agencies in their reviews of the environmental and health effects of certain PFAS produced by the Company. 3M currently is defending lawsuits concerning various PFAS-related products and chemistries, and is subject to unasserted and asserted claims and governmental regulatory proceedings and inquiries related to the production and use of PFAS in a variety of jurisdictions, as discussed in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements. 3M has seen increased public and private lawsuits being filed on behalf

of states, counties, cities, and utilities alleging, among other things, harm to the general public and damages to natural resources, some of which are pending in the AFFF multi-district litigation and some of which are pending in other jurisdictions. Various factors or developments in these and other disclosed actions could result in future charges that could have a material adverse effect on 3M. For example, the Company recorded a pre-tax charge of $897 million, inclusive of legal fees and other related obligations, in the first quarter of 2018 with respect to the settlement of a matter brought by the State of Minnesota involving the presence of PFAS in the groundwater, surface water, fish or other aquatic life, and sediments in the state. In addition, as described in greater detail in Note 19, "Commitments and Contingencies," within the Notes to Consolidated Financial Statements, in June 2023, the Company entered into a class-action settlement ("PWS Settlement") to resolve a wide range of drinking water claims by public water suppliers in the United States regarding PFAS. The court approved that settlement in March 2024. 3M will pay $10.5 billion to $12.5 billion in total to resolve the claims released by the PWS Settlement, with payments to be made from 2024 through 2036, in exchange for a release of certain claims, as described further in Note 19. Unexpected events related to the PWS Settlement, including the potential impact of the PWS Settlement on other PFAS-related matters, could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position. In addition, as previously disclosed, in connection with the separation of Solventum, the Company agreed to retain liabilities related to PFAS for certain products sold by the Company's health care businesses prior to the separation and by Solventum for a limited period of time following the separation.

Governmental inquiries, lawsuits, or laws and regulations involving PFAS could lead to the Company incurring liability for damages or other costs, civil or criminal proceedings, the imposition of fines and penalties, or other remedies, including orders to conduct remediation, as well as restrictions on or added costs for business operations going forward, including in the form of restrictions on discharges at manufacturing facilities, requiring the installation of control technologies, suspension or shutdown of facility operations, switching costs in seeking alternative sources of supply, potential customer damage claims due to supply disruptions or otherwise, restoration of and/or compensation for damages to natural resources, personal injury and property damages, and reporting requirements or bans on PFAS and PFAS-containing products manufactured by the Company. The Company may also record asset retirement obligations, some of which may be material, depending in part on how the Company manages related assets in connection with these activities. Any of the foregoing could have a material adverse effect on the Company's results of operations, cash flows or consolidated financial position.

244.    Likewise, as described in its parent company's 10-K, Globe  is also facing substantial liabilities that it fought for years to conceal:

Globe, a subsidiary of the Company, is defending claims in which plaintiffs assert that certain products allegedly containing per- and polyfluoroalkyl substances ("PFAS") have caused harm, including injury or health issues. PFAS are a large class of substances that are widely used in everyday products. Specifically, Globe builds firefighter turnout gear from technical fabrics sourced from a small pool of specialty textile manufacturers. These protective fabrics have been tested and certified to meet current National Fire Protection Association safety standards, and some of them as supplied to Globe contain or historically have contained PFAS to achieve performance characteristics such as water, oil, or chemical resistance.

Globe believes it has valid defenses to these claims. These matters are at a very early stage with numerous factual and legal issues to be resolved. Defense costs relating to these lawsuits are recognized in the Consolidated Statements of Income as incurred. Globe is also pursuing insurance coverage and indemnification related to the lawsuits. As of February 4, 2025, Globe was named as a defendant in approximately 663 lawsuits comprised of about 8,801 claims, predominantly styled as individual personal injury claims and including two putative class actions. Certain of these lawsuits include [parent company] MSA Safety Inc. or other Globe affiliates as defendants.

MSA LLC is also a defendant in a number of PFAS lawsuits predominantly relating to Aqueous Film-Forming Foam. The Purchaser assumed responsibility for these and any similar future claims specific to MSA LLC, including such claims that have been or may be brought against MSA Safety Inc. or its subsidiaries, under the terms of the Purchase Agreement governing the Company's January 5, 2023, divestiture of MSA LLC. Further information about the transaction can be found in the Company's Current Report on Form 8-K filed on January 6, 2023.

**2.    The Predicate Acts**

245.    To carry out or attempt to carry out the scheme to defraud, the members of the PFAS Concealment Enterprise conducted or participated in the conduct of the affairs of that enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §§ 1341 (mail fraud) and 1343 (wire fraud).

246.    Specifically, the members of the PFAS Concealment Enterprise participated in the scheme to defraud by using mail, telephone, and the Internet to transmit writings travelling in interstate or foreign commerce.

247.    The PFAS Concealment Enterprise members' use of the mails and wires include but are not limited to the transmission, delivery, or shipment of the following by the members or

third parties that were foreseeably caused to be sent as a result of the PFAS Concealment Enterprise members' illegal scheme:

a.    PFAS products to fire departments and others;

b.    Documents and communications accompanying the shipments of PFAS products to fire departments and others;

c.    False or misleading Material Safety Data Sheets, Safety Data Sheets, Technical Data Sheets, and product labels;

d.    Sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of turnout gear products;

e.    Documents intended to facilitate the manufacture and sale of PFAS-infused products, including invoices, shipping records, reports and correspondence;

f.    Documents to process and receive payment for PFAS-infused turnout products, including invoices and receipts;

g.    Payments to the PFAS Concealment Enterprise members for PFAS-infused turnout gear;

h.    Deposits of proceeds from sales of PFAS-infused turnout gear by PFAS Concealment Enterprise members; and

i.    Other documents and things, including electronic communications.

248.    The PFAS Concealment Enterprise members utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described therein.

249.    The PFAS Concealment Enterprise members also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships, and other third-party entities in furtherance of the scheme.

250.    The mail and wire transmissions described herein were made in furtherance of the PFAS Concealment Enterprise members' scheme and common course of conduct to deceive regulators and consumers and lure turnout gear manufacturers into purchasing products that the PFAS Concealment Enterprise members knew emit PFAS.

251.    Many of the precise dates of the fraudulent uses of U.S. Mail and interstate wire facilities have been deliberately hidden and cannot be alleged without access to the PFAS Concealment Enterprise members' books and records. But Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the scheme, including the things and documents described in the preceding paragraphs.

252.    The PFAS Concealment Enterprise members have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the PFAS Concealment Enterprise members conspired to violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this First Amended Complaint, have participated as co-conspirators with the PFAS Concealment Enterprise members in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for the PFAS Concealment Enterprise members and their unnamed co-conspirators throughout the illegal scheme and common course of conduct.

253. The PFAS Concealment Enterprise members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

254. To achieve their common goals, the PFAS Concealment Enterprise members hid from the general public, fire departments, and others the emission, absorption and ingestion dangers of PFAS.

255. The PFAS Concealment Enterprise members, with knowledge and intent, have agreed to the overall objectives of the PFAS Concealment Enterprise and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and/or selling PFAS-infused products to turnout gear manufacturers.

256. The PFAS Concealment Enterprise members' conduct in furtherance of this scheme was intentional. Plaintiffs and the Class members were harmed as a result of the PFAS Concealment Enterprise members' intentional conduct. Plaintiffs, the Class members, regulators, and consumers, among others, relied on the PFAS Concealment Enterprise members' material misrepresentations and omissions.

257. As described herein, the PFAS Concealment Enterprise members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Class members and obtaining significant monies and revenues from them and through them while providing PFAS-infused products to turnout gear manufacturers and others. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

258. The predicate acts all had the purpose of generating significant revenue and profits for the PFAS Concealment Enterprise members at the expense of Plaintiffs, the Class members, and consumers. The predicate acts were committed or caused to be committed by the PFAS Concealment Enterprise members through their participation in the PFAS Concealment Enterprise and in furtherance of its fraudulent scheme.

259. The PFAS Concealment Enterprise members had a duty to disclose the truth about the emissions dangers of PFAS-infused products to turnout gear manufacturers, consumers, and others but never do so. The Hazard Communication Standard requires that the chemical manufacturer, distributor, or importer provide Safety Data Sheets ("SDSs") (formerly Material Safety Data Sheets) for each hazardous chemical to downstream users to communicate information on these hazards.[48] The information contained in the SDS is largely the same as the Material Safety Data Sheets, except now the SDSs are required to be presented in a consistent user-friendly, 16-section format.[49]

260. On information and belief, Plaintiffs allege that the PFAS Concealment Enterprise members never disclosed the emissions dangers of PFAS in PFAS-infused products in SDSs and Material Safety Data Sheets for PFAS-infused products that they sold to turnout gear manufacturers and others.

261. The PFAS Concealment Enterprise members' violations of 18 U.S.C. § 1962(c) and (d) have directly and proximately caused injuries and damages to Plaintiffs and Class members, all of whom are entitled to bring this action for three times their actual damages, costs,

---

[48] The Standard was first adopted in 1983 in the United States with limited scope (48 FR 53280; November 25, 1983). In 1987, it was expanded to cover all industries where employees are potentially exposed to hazardous chemicals (52 FR 31852; August 24, 1987).

[49] https://www.osha.gov/sites/default/files/publications/OSHA3514.pdf.

and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Each member of the PFAS Concealment Enterprise knew, understood, and intended for fire departments to purchase PFAS-infused turnout gear sold to Plaintiffs and Class members, knowing that the PFAS emitted by turnout gear would injure Plaintiffs and Class members. As a result of the conduct of the Enterprise, Plaintiffs and Class members overpaid for turnout gear and/or were deprived of the ability to buy PFAS-free turnout gear.

## A.      State Law Claims

### 1.      Claim brought on behalf of all Class members relating to their state-law claims for a single state law class in each state.

### COUNT II (against all Defendants)

### Conspiracy

262.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs of this First Amended Complaint.

263.    As alleged in detail above, Defendants specifically agreed to coordinate misleading safety representations, suppress scientific evidence, jointly influence industry standards or regulators, and continue selling PFAS Chemicals and PFAS-infused turnout gear despite the known risks.

264.    Under the common law of each state for which claims are alleged below, Plaintiffs allege on information and belief that Defendants knowingly and intentionally conspired to engage in the wrongful conduct alleged in each Count under state law set forth below.

**2.      Claims brought by Butte-Silver Bow and the Montana class for purchase of turnout gear in Montana.**

**COUNT III (against all Defendants)**

**Strict Liability**
**(design defect)**

265.    Plaintiffs incorporate by reference the allegations contained in the proceeding paragraphs of this First Amended Complaint.

266.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

267.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Montana Class members, who might be foreseeably harmed by PFAS-infused products.

268.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

      a.      PFAS contamination causes extensive and persistent contamination of the environment even when use in their foreseeable and intended manner.

      b.      PFAS contamination poses significant threats to public health, economic welfare, and the environment.

      c.      Defendants failed to disclose these threats to fire departments, Montana Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

269.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Montana Class members, to an extent beyond that which would be

expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

270. At all relevant times, Montana Class members used turnout gear infused with PFAS as intended.

271. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

272. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

273. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

274. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Montana Class members have been injured.

275. These and other acts by Defendants were a direct and proximate cause of damages to Montana Class members.

**COUNT IV (against all Defendants)**

**Strict Products Liability**
**(Failure to Warn)**

276.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

277.    As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Montana Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Montana Class members.

278.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Montana Class members of those risks.

279.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

280.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

281.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

282.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Montana Class members, who would have heeded legally adequate warnings about the dangers of

67

PFAS products. At all relevant times, Montana Class members used their turnout gear with PFAS-infused products as intended.

283. These and other acts by Defendants were a direct and proximate cause of damages to Montana Class members.

**COUNT V (against all Defendants)**

**Implied Warranty of Merchantability**
**Mont. Code Ann. § 30-2-314**
**For Plaintiff Butte-Silver Bow and the Montana Class**

284. Plaintiffs incorporates by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

285. Plaintiffs brings this claim individually and on behalf of the other members of the Montana Class.

286. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

287. Pursuant to Mont. Code § 30-2-314, a warranty that the PFAS-infused products were in merchantable condition was implied by law, and the PFAS-infused products were bought and sold subject to an implied warranty of merchantability.

288. Defendants were provided notice of these issues and defects.

289. The PFAS-infused products did not comply with the implied warranty of merchantability because, at the time of sale and at all times thereafter, they were defective and not in merchantable condition, would not pass without objection in the trade, and were not fit for the ordinary purpose for which they were used.

290. Defendants were provided notice of these issues and defects.

291. Plaintiffs and other Class members suffered injuries due to the defective nature of the PFAS-infused products and the Defendants' breach of the warranty of merchantability.

68

292.    As a direct and proximate result of the Defendants' breach of the warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

## COUNT VI (against all Defendants)

### VIOLATIONS OF MONTANA CONSUMER PROTECTION ACT
### Mont. Code Ann §§ 30-14-101 et seq.
### Brought on Behalf of the Montana Class

293.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

294.    The Montana Consumer Protection Act (Montana CPA) prohibits "Unfair methods of competition and unfair and or deceptive acts or practices in the conduct of any trade or commerce…." Mont. Code Ann. § 30-14-103.

295.    Defendants, Plaintiffs, and the Montana Class members are "persons" within the meaning of Mont. Code Ann. § 30-14-102 (6).

296.    Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Mont. Code. Ann. § 30-14-102 (8)(a).

297.    In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Montana Class members were treated with PFAS-infused products, with the intent that other rely upon the concealment, suppression, or omission.

298.    In purchasing their turnout gear, the Montana Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

299.    The Montana Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

69

300. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

301. Defendants knew or should have known that their conduct violated the Montana CPA.

302. Defendants owed the Montana Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a. Possessed superior knowledge that the PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Montana Class members; and

    b. Intentionally concealed the foregoing from the Montana Class members.

303. Defendants' conduct proximately caused injuries to the Montana Class members.

304. The Montana Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

305. Defendants' violations present a continuing risk to the Montana Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

306. The Montana Class members seek damages in amounts to be proven at trial, along with attorney's fees, costs, and punitive damages, and any other just and proper relief under Mont. Code Ann. § 30-14-102(8)(a).

**3.      Claims brought on behalf of Santa Monica and Class members who installed their turnout gear in California ("California Class members").**

**COUNT VII (against all Defendants)**

**Breach of Implied Warrant of Merchantability**

307.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

308.    By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS Chemicals and PFAS-infused turnout gear impliedly warranted to California Class members that the turnout gear was of merchantable quality and safe for its intended and ordinary uses.

309.    Defendants breached the implied warranty of merchantability in connection with the manufacture, sale, and distribution of turnout gear. The turnout gear contained toxic levels of PFAS Chemicals, rendering them unsuitable and unsafe for their ordinary purposes.

310.    In purchasing Defendants' turnout gear, the California Class members were acting in their commercial proprietary capacity, as managers of municipal entities responsible for cost-effectively purchasing protective gear for their employees.

311.    The fact that the turnout gear was unsafe, and that it contained PFAS that would be ingested and absorbed by firefighters, was a latent defect undiscoverable at the time of sale.

312.    Had the California Class members known the turnout gear they were purchasing was unsafe for its ordinary uses, they would not have purchased the products.

313.    California Class members reasonably expected, at the time of purchase, that the turnout gear was safe for its intended and ordinary uses.

314.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the California Class members will need to replace and dispose of all PFAS-

infused turnout gear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear, and they have sustained damages in an amount to be determined at trial.

315. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the California Class members have suffered losses in an amount to be determined at trial.

## COUNT VIII (against all Defendants)

## Design Defect (strict liability)

316. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

317. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS Chemicals and/or PFAS-infused turnout gear.

318. As manufacturers or distributors of PFAS Chemicals and/or PFAS-infused turnout gear, Defendants had a duty not to place into the stream of commerce a product that is substantially and unreasonably dangerous, and presents a substantial and unreasonable risk of death or personal injury, and they owed that duty to all persons, including the California Class members, who might be foreseeably harmed by PFAS Chemicals and/or PFAS-infused turnout gear.

319. PFAS Chemicals and/or PFAS-infused turnout gear are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c. PFAS in turnout gear is absorbed through the skin, inhaled and ingested, especially when exposed to heat, which poses substantial and unreasonable

72

        risks to firefighters' health, and to others exposed to their turnout gear, including risks of cancers, reproductive and neurological health disorders among other health injuries.

    d.  Defendants failed to disclose these risks to firefighters, fire departments, California Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

320.    At all relevant times, PFAS Chemicals and/or PFAS-infused turnout gear were in a defective condition unreasonably dangerous to the California Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

321.    At all relevant times, California Class members used turnout gear infused with PFAS as intended.

322.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS Chemicals and/or PFAS-infused turnout gear. Defendants could have made different chemicals and/or products that did not contain PFAS Chemicals or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

323.    At all relevant times, the foreseeable risk of harm to firefighter health, the public health more generally, property, and the environment posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

324.    Defendants' PFAS Chemicals and/or PFAS-infused turnout gear were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

325.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS Chemicals and/or PFAS-infused turnout gear, California Class members have been injured.

326.    These and other acts by Defendants were a direct and proximate cause of damages to California Class members, including the costs of replacing and disposing of contaminated gear, and measures to eliminate and mitigate the injuries from the PFAS-infused turnout gear.

### COUNT IX(against all Defendants)

### Design Defect (negligence)

327.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

328.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS Chemicals and/or PFAS-infused turnout gear.

329.    As a product seller and/or manufacturer each Defendant had a duty of reasonable care to avoid manufacturing and selling PFAS Chemicals and turnout gear infused with unsafe levels of PFAS to its customers, including the California Class members

330.    The California Class members were known purchasers of each of Defendant's turnout gear and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent manufacture and design of PFAS Chemicals and PFAS-infused turnout gear.

331.    Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination in the turnout gear sold to its customers.

332.    Defendants knew or should have known that their PFAS Chemicals, and turnout gear products containing PFAS, were not safe and were likely to leach PFAS into firefighters' skin, to be inhaled and ingested, and to endanger their health. Defendants knew or should have known their PFAS Chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

333.    The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS Chemicals, and turnout gear products containing PFAS, without disclosing the dangers posed to human health and the environment.

334.    The rights, interests, and inconvenience to the California Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS Chemicals, and turnout gear products containing PFAS.

335.    The defective and unreasonably dangerous condition of the PFAS Chemicals and the PFAS-infused turnout gear existed at the time the PFAS-infused turnout gear was manufactured, distributed, and sold by Defendants.

336.    Defendants expected the PFAS Chemicals and PFAS-infused turnout gear to reach their ultimate user without substantial change in the condition in which the PFAS Chemicals and the turnout gear were designed and manufactured, and the PFAS-infused turnout gear did reach California Class members without substantial change in condition.

337. The foreseeable risk to the health and welfare of firefighters posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear, and the foreseeable injury to California Class members, outweigh the cost to Defendants of reducing or eliminating such risk.

338. Defendants knew or should have known about reasonably safer and feasible alternatives to the PFAS Chemicals and the PFAS-infused turnout gear they manufactured and sold.

339. Defendants breached their duty to use reasonable care in one or more of the following ways:

    a. By failing to prevent the PFAS contamination of turnout gear purchased by the California Class members;

    b. By failing to cease the manufacture, sale, and/or distribution of PFAS Chemicals and PFAS-infused turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

    c. By failing to reduce or minimize the PFAS contamination in turnout gear manufactured, sold, and distributed by each Defendant;

    d. By failing to design and manufacture alternative chemicals and PFAS-free turnout gear, as an alternative to the PFAS-infused turnout gear after learning of the adverse health consequences associated with PFAS exposure;

340. Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to minimize or mitigate such risks, and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons.

341. At all relevant times, California Class members used turnout gear infused with PFAS as intended.

76

342.    As a direct and proximate result of each Defendant's negligence, the California Class members bear replacement and disposal costs, and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear

343.    Defendants are thus liable to California Class members for fair compensation for the resulting injuries, which include replacement and disposal, education and advocacy costs, and other mitigation costs.

**COUNT X (against all Defendants)**

**Failure to Warn (strict liability)**

344.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

345.    As manufacturers or distributors of PFAS Chemicals and PFAS-infused turnout gear, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including California Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to California Class members.

346.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS Chemicals and PFAS-infused turnout gear, Defendants failed to warn the public and California Class members of those risks.

347.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS Chemicals and PFAS-infused turnout gear, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

348. Defendants' inadequate warnings and instructions rendered PFAS Chemicals and PFAS-infused turnout gear defective and not reasonably safe.

349. Defendants' PFAS Chemicals and PFAS-infused turnout gear were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS Chemicals and PFAS-infused turnout gear reached their end user without substantial change in their condition.

350. Defendants' failure to warn proximately caused reasonably foreseeable injuries to California Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, California Class members used their PFAS-infused turnout gear as intended.

351. These and other acts by Defendants were a direct and proximate cause of damages to California Class members, including the costs of replacing and disposing of contaminated gear measures to eliminate and mitigate the damage from the PFAS-infused gear.

## COUNT XI (against all Defendants)

### Failure to Warn (negligence)

352. Plaintiffs re-allege and incorporate here the allegations set forth above.

353. As a product seller and/or manufacturer each Defendant had a duty of reasonable care to avoid manufacturing and selling PFAS chemicals and turnout gear infused with unsafe levels of PFAS without adequate warnings to its customers, including the California Class members

354. The California Class members were known purchasers of each of Defendant's turnout gear and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent failure to warn concerning PFAS Chemicals, and PFAS-infused turnout gear.

355. Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination from the turnout gear sold to its customers by providing adequate warnings.

356. Defendants knew or should have known that their PFAS Chemicals and turnout gear products containing PFAS were not safe and were likely to leach PFAS into firefighters' skin, to be inhaled and ingested, and to endanger their health. Defendants knew or should have known their PFAS Chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

357. The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS Chemicals, and turnout gear products containing PFAS, without warning about or even disclosing the dangers posed to human health and the environment.

358. The rights, interests, and inconvenience to the California Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS Chemicals, and turnout gear products containing PFAS.

359. The defective and unreasonably dangerous condition of the PFAS-infused turnout gear existed at the time the turnout gear was manufactured, distributed, and sold by Defendants.

360. Defendants expected the PFAS Chemicals and PFAS-infused turnout gear to reach their ultimate user without substantial change in the condition in which the PFAS Chemicals and

the PFAS-infused turnout gear were designed and manufactured, and the turnout gear did reach California Class members without substantial change in condition.

361. The foreseeable risk to the health and welfare of firefighters, to the public health and environment posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear, and the foreseeable injury to California Class members, outweigh the cost to Defendants of issuing warnings to reduce or eliminate such risk.

362. Defendants knew or should have known about reasonably safer and feasible alternatives to PFAS Chemicals and the PFAS-infused turnout gear, and of warnings they could have issued to eliminate or reduce the risks.

363. Defendants breached their duty to use reasonable care in one or more of the following ways:

   a. By failing to warn of the PFAS contamination of turnout gear purchased by the California Class members;

   b. By failing to cease the manufacture, sale, and/or distribution of PFAS-infused turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

   c. By failing issue warnings to reduce or minimize the damage from PFAS contamination in turnout gear manufactured, sold, and distributed by each Defendant;

   d. By failing to design and manufacture PFAS-free turnout gear, as an alternative to the PFAS-infused turnout gear after learning of the adverse health consequences associated with PFAS exposure;

   e. By negligently failing to warn their products' purchasers and users, including California Class members.

364. Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to

minimize or mitigate such risks, and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons.

365. Defendants' failure to warn proximately caused reasonably foreseeable injuries to California Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, California members used their PFAS-infused turnout gear as intended.

366. As a direct and proximate result of each Defendant's negligence, the California Class members will bear replacement and disposal costs, and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear

367. Defendants are thus liable to California Class members for fair compensation for the resulting injuries, which include replacement and disposal, education and advocacy costs, and other mitigation costs.

**4.    Claims brought on behalf of Class members who installed their turnout gear in Connecticut (collectively, "Connecticut Class members").**

**COUNT XII (against all Defendants)**

**Breach of the Implied Warranty of Merchantability**
**(CONN. GEN. STAT. ANN. §§ 42a-2314, *et seq*.)**

368. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

369. By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS-infused turnout gear impliedly warranted to Connecticut Class members that the turnout gear was of merchantable quality and safe for its intended and ordinary uses. Conn. Gen. Stat. Ann. §§ 42a-2314, *et seq*.

81

370.   Defendants breached the implied warranty of merchantability in connection with the manufacture, sale, and distribution of turnout gear. The turnout gear contained toxic levels of PFAS Chemicals, rendering them unsuitable and unsafe for their ordinary purposes.

371.   In purchasing Defendants' turnout gear, the Connecticut Class members were acting in their commercial proprietary capacity, as managers of municipal entities responsible for cost- effectively purchasing protective gear for their employees.

372.   Had the Connecticut Class members known the turnout gear they were purchasing was unsafe for its ordinary uses, they would not have purchased the products.

373.   The Connecticut Class members reasonably expected, at the time of purchase, that the turnout gear was safe for its intended and ordinary uses.

374.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Connecticut Class members will need to replace and dispose of all turnout gear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear, and sustained damages in an amount to be determined at trial.

375.   As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Connecticut Class members have suffered commercial losses in an amount to be determined at trial.

### COUNT XIII (against all Defendants)

**Breach of the Implied Warranty of Fitness for
a Particular Purpose
(CONN. GEN. STAT. ANN. §§ 42a-2-314, *et seq*.)**

376.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

377.   By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS-infused turnout gear, impliedly warranted to Connecticut Class members that

82

the turnout gear was fit for its particular and specialized purpose of keeping firefighters safe while carrying out their duties. Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq.*;

378. Defendants breached the implied warranty of fitness for a particular purpose in connection with the manufacture, sale, and distribution of turnout gear. The turnout gear contained toxic levels of PFAS chemicals, rendering the products unfit for their specialized purpose of keeping firefighters safe, especially when preparing for and encountering high temperatures and toxic chemicals when fighting fires.

379. Connecticut Class members relied upon the Defendants' skill and expertise in designing, manufacturing, and supplying turnout gear when they selected personal protective equipment to purchase for their firefighters.

380. In purchasing Defendants' turnout gear, the Connecticut Class members were acting in their commercial proprietary capacity, as managers of municipal entities responsible for cost- effectively purchasing protective gear for their employees.

381. Had Connecticut Class members known the turnout gear they were purchasing was unfit for its particular purpose, they would not have purchased the products.

382. The Connecticut Class members reasonably expected, at the time of purchase, that the turnout gear was fit for its particular purpose.

383. As a direct and proximate result of Defendants' breach of the implied warranty of fitness for a particular purpose, the Connecticut Class members will need to replace and dispose of all PFAS-infused turnout gear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear, and sustained damages in an amount to be determined at trial.

## COUNT XIV (against all Defendants)

### Violations of the Connecticut Unfair Trade Practices Act
### (CONN. GEN. STAT. ANN. §§ 42-110a, *et seq.*)

384.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

385.    Each Defendant is a "person" that engaged in "trade" and/or "commerce" within the state of Connecticut as defined by the Connecticut Unfair Trade Practices Act. Conn. Gen. Stat. Ann. § 42-110a(1)&(4).

386.    The Connecticut Class members are "persons" within the meaning of the Act. Conn. Gen. Stat. Ann.  § 42-110a(1).

387.    Each Defendant's deceptive and/or unfair actions in the conduct of trade and/or commerce within Connecticut caused the Connecticut Class members, acting reasonably under the circumstances, to suffer ascertainable harm through the purchase of PFAS-contaminated turnout gear to their detriment.

388.    Each Defendant's deceptive conduct was likely to, and did in fact, deceive and mislead the Connecticut Class members as to the safety and suitability of the turnout gear for their intended uses.

389.    Defendants also engaged in unfair conduct in connection with marketing and sale of the turnout gear to the Connecticut Class members  in that their conduct: (1) caused the Connecticut Class members to purchase turnout gear that was contaminated with PFAS and was therefore worthless or worth less than they paid for it; (2) caused injury that could not have been reasonably avoided by the Connecticut Class members, and (4) caused injury to the Connecticut Class members that is not outweighed by any countervailing benefits to the Connecticut Class members.

390.    Defendants' unfair conduct caused the Connecticut Class members to suffer ascertainable harm.

391.    Defendants intentionally engaged in conduct that failed to prevent or mitigate PFAS contamination of turnout gear, despite being aware of its presence, and despite knowing the significant health risks associated with even low levels of PFAS exposure. Defendants repeatedly made public statements assuring the Connecticut Class members that the turnout gear   was safe and fit to be used for its intended purposes. This unfair conduct caused substantial injury to the Connecticut Class members in that it caused them to purchase unsafe turnout gear which must now be replaced with safe gear. These injuries could not have been reasonably avoided by the Connecticut Class members as, due to Defendants' efforts to conceal the dangers of PFAS in the turnout gear, and their failure to prevent or mitigate these dangers by providing safer alternatives.

392.    Because Defendants knew or should have known that their conduct was deceptive and/or unfair under Conn. Gen. Stat. Ann.   § 42-110b(a), their conduct was willful and/or was undertaken with reckless disregard for the harm it would cause the Connecticut Class members.

393.    The Connecticut Class members reasonably expected, at the time of purchase, that the turnout gear was safe for its intended uses by their volunteer and employee firefighters.

394.    Had Connecticut Class members known the turnout gear they were purchasing were contaminated with PFAS and unsafe for use, they would not have purchased the products.

395.    As a direct and proximate result of Defendants' unfair and deceptive conduct, the Connecticut Class members will need to replace all turnout gear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear, and have sustained damages in an amount to be determined at trial.

396.    Accordingly, Plaintiffs, individually and on behalf of the Connecticut Class members, seek (a) a declaration that Defendants' conduct described above violates the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. Ann. § 42-110a, *et seq.;* (b) an award of actual damages; (c) an award of attorneys' fees and costs pursuant to the Act. Conn. Gen. Stat. Ann. § 42-110g(d); (d) an order enjoining Defendants from continuing to engage in the unfair and deceptive acts and practices described above; and (e) any further relief the Court deems just and proper.

## COUNT XV (against all Defendants)

### Connecticut Product Liability Act, Design Defect (strict liability)
### (CONN. GEN. STAT. ANN.  § 52-572m, *et seq.*)

397.    Plaintiffs re-allege and incorporate here the allegations set forth above.

398.    As defined by the Connecticut Product Liability Act **("CPLA")** and at all relevant times, each Defendant was a "Product Seller" and/or a "Manufacturer" of the PFAS-contaminated firefighter turnout gear purchased by the Connecticut Class members. *See* Conn. Gen. Stat. Ann. § 52-572m(b)&(e).

399.    At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, selling, and/or distributing commercial PFAS formulations, and firefighter turnout gear infused with PFAS.

400.    Defendants' PFAS and turnout gear products containing PFAS were not reasonably safe as designed at the time they left Defendants' control. The toxicity, volatility, tendency to enter the human body through dermal absorption and inhalation, inability to be contained, bioaccumulation, and environmental persistence of Defendants' PFAS chemicals, and turnout gear containing PFAS, rendered them unreasonably dangerous at all times.

86

401. Defendants knew or should have known their PFAS and turnout gear products containing PFAS, were not safe and were likely to cause toxic contamination. Defendants knew or should have known their PFAS chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

402. These risks were not obvious to Connecticut Class members or the public.

403. Defendants manufactured, distributed, marketed, promoted, and/or sold PFAS, and turnout gear containing PFAS, despite such knowledge. The seriousness of the human health risk posed by Defendants' products far outweighs any purported social utility of Defendants' conduct in manufacturing and distributing their commercial PFAS chemicals, and turnout gear containing PFAS. The rights, interests, and inconvenience to the Connecticut Class members and general public far outweigh the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture, sale, and distribution of their PFAS, and turnout gear containing PFAS.

404. Practical and feasible alternative designs capable of reducing or eliminating the Connecticut Class members' injuries were available. Such alternatives include alternative chemical formulations to reduce or eliminate PFAS in turnout gear. Alternative chemical formulations would have reduced the Connecticut Class members' injuries by materially decreasing or eliminating the toxicity of PFAS in turnout gear while providing firefighters with appropriate PPE protection.

405. Defendants' conduct requires the Connecticut Class members to replace their firefighter turnout gear, and to dispose of the contaminated turnout gear.

406.     The seriousness of the human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS chemicals, and turnout gear containing PFAS, without disclosing the dangers posed to human health and the environment. The rights, interests, and inconvenience to Connecticut Class members, their firefighters and the general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS chemicals, and turnout gear containing PFAS.

407.     The Connecticut Class members have suffered and will continue to suffer injuries and damages to their public treasury as a result of Defendants' conduct and the presence of PFAS within firefighter turnout gear, which must be replaced. Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn the Connecticut Class members and the public about the human and environmental risks posed by its PFAS. Defendants are strictly liable for all damages arising out of their defectively designed PFAS chemicals, and turnout gear containing PFAS.

408.     As a direct and proximate result of Defendants' acts and omissions, the Connecticut Class members have suffered and will continue to suffer injuries and damages to their public treasury, in investigation of PFAS content of turnout gear, replacement of firefighter turnout gear, disposal of PFAS-infused turnout gear,  education and training for employees exposed to PFAS-infused  turnout gear on how to reduce and mitigate risks from this gear, and other injuries, for which Defendants are strictly, jointly, and severally liable.

**COUNT XVI (against all Defendants)**

**CPLA Failure to Warn (strict liability)**
**(CONN. GEN. STAT. ANN. § 52-572m, *et seq.*)**

409.     Plaintiffs re-allege and incorporate here the allegations set forth above.

88

410.    As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant had a duty to adequately warn foreseeable purchasers and users of its turnout gear, including the Connecticut Class members.

411.    Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and supplied PFAS and PFAS-infused turnout gear for sale and sold the PFAS and PFAS-infused turnout gear thereof to the Connecticut Class members.

412.    At the time Defendants manufactured, marketed, promoted, sold, and/or distributed PFAS Chemicals, and turnout gear products containing PFAS, they knew or should have known their PFAS Chemicals and turnout gear containing PFAS were not safe for their intended purpose.

413.    Defendants possess and have always possessed superior knowledge, resources, experience, and other advantages, in comparison to anyone or any agency, including the Connecticut Class members, concerning the manufacture, distribution, nature, and properties of PFAS used in turnout gear and PFAS-infused turnout gear.

414.    By virtue of their economic power and analytical resources, including the employment of scientists such as chemists, engineers, and toxicologists, Defendants have at all relevant times been in a position to know, identify, and confirm the threat PFAS posed and poses to purchasers of firefighter protective equipment, and to Connecticut Class members in particular.

415.    Defendants had a duty to provide reasonable instructions and adequate warnings about the environmental and health hazards posed by PFAS.

416.    Despite Defendants' knowledge and expertise, they failed to provide adequate warnings that their PFAS Chemicals, and turnout gear products containing PFAS, were toxic and would cause PFAS contamination, and to provide adequate instructions to minimize, mitigate, reduce, control, or eliminate such risks.

417. Defendants' PFAS Chemicals, and turnout gear products containing PFAS were not reasonably safe at the time they left the Defendants' control because they lacked adequate warnings and instructions.

418. An adequate warning would have diminished the volume of PFAS absorbed or ingested by firefighters or eliminated the use of PFAS-infused turnout gear altogether.

419. Defendants could have warned of this danger but failed to do so and intentionally concealed information to maximize their profits.

420. Defendants continued to conceal the dangers of PFAS after they manufactured, distributed, marketed, promoted, and sold PFAS and turnout gear products containing PFAS.

421. Without adequate warnings or instructions, Defendants' PFAS and PFAS-infused turnout gear products were unsafe to an extent beyond that which would be contemplated by an ordinary person.

422. The facts relating to the hazards which PFAS-infused turnout gear pose to firefighters generally and to Connecticut Class members in particular are not the sort of facts which they or the general public could ordinarily discover or protect themselves against absent sufficient warnings.

423. Defendants knowingly failed to issue warnings or instructions concerning the environmental and human health dangers of PFAS, including contrary to the manner in which a reasonably prudent manufacturer would act in the same or similar circumstances.

424. Connecticut Class members utilized Defendants' PFAS-infused turnout gear in a reasonably foreseeable and intended manner.

425.     Defendants' conduct caused and continues to cause injury to the Connecticut Class members as they continue to bear replacement and disposal costs and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear.

426.     Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced and to warn Plaintiffs and the public about the human and environmental risks posed by PFAS and PFAS-infused turnout gear.

427.     Defendants are strictly, jointly, and severally liable for all damages arising out of their failure to provide adequate warnings and instructions.

428.     Defendants acted with reckless indifference to the Connecticut Class members by failing to provide adequate warnings of the known dangers of PFAS Chemicals and PFAS-infused turnout gear.

## COUNT XVII (against all Defendants)

### CPLA Negligent Design, Manufacture and Failure to Warn
(CONN. GEN. STAT. ANN. § 52-572m, *et seq.*)

429.     Plaintiffs re-allege and incorporate here the allegations set forth above.

430.     As a Product Seller and/or Manufacturer as defined by the CPLA, each Defendant had a duty of reasonable care to avoid manufacturing and selling PFAS chemicals and firefighter turnout gear infused with unsafe levels of PFAS to its customers, including the Connecticut Class members.

431.     The Connecticut Class members were known purchasers of each of Defendant's turnout gear and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent manufacture and design of PFAS Chemicals and PFAS-infused turnout gear.

91

432.    Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination in the turnout gear sold to its customers.

433.    Each Defendant owed its purchasers and its end users a duty of reasonable care to warn of the dangers of PFAS contamination in the turnout gear sold to its customers

434.    Defendants knew or should have known that their PFAS Chemicals, and turnout gear products containing PFAS were not safe and were likely to leach PFAS into firefighters' skin and to be inhaled and to endanger their health. Defendants knew or should have known their PFAS chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

435.    The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS chemicals, and turnout gear products containing PFAS, without warning about or even disclosing the dangers posed to human health and the environment. The rights, interests, and inconvenience to the Connecticut Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS chemicals, and turnout gear products containing PFAS.

436.    The defective and unreasonably dangerous condition of the turnout gear existed at the time the turnout gear was manufactured, distributed, and sold by Defendants.

437.    Defendants expected the PFAS Chemicals and turnout gear to reach their ultimate user without substantial change in the condition in which the PFAS Chemicals and the turnout gear

were designed and manufactured, and the turnout gear did reach Connecticut Class members without substantial change in condition.

438. The foreseeable risk to the health and welfare of firefighters posed by Defendants' PFAS Chemicals and turnout gear, and the foreseeable injury to Connecticut Class members, outweigh the cost to Defendants of reducing or eliminating such risk.

439. Defendants knew or should have known about reasonably safer and feasible alternatives to PFAS Chemicals and the turnout gear manufactured and sold during the class period.

440. Defendants breached their duty to use reasonable care in one or more of the following ways:

    a. By failing to prevent the PFAS contamination of firefighter turnout gear purchased by the Connecticut Class members;

    b. By failing to cease the manufacture, sale, and/or distribution of PFAS-infused firefighter turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

    c. By failing to reduce or minimize the PFAS contamination in firefighter turnout gear manufactured, sold, and distributed by each Defendant;

    d. By failing to design and manufacture PFAS-free firefighter turnout gear, as an alternative to the PFAS-infused firefighter turnout gear after learning of the adverse health consequences associated with PFAS exposure;

    e. By negligently failing to warn their products' purchasers and users, including Connecticut Class members.

441. Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to minimize or mitigate such risks, and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons.

442. As a direct and proximate result of each Defendant's negligence, the Connecticut Class members will bear replacement and disposal costs, and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear.

443. Defendants are thus liable to Connecticut Class members for fair compensation for the resulting injuries, which includes replacement and disposal, education and advocacy costs, and other mitigation costs.

### COUNT XVIII (against all Defendants)

### CPLA – Statutory Punitive Damages
### (CONN. GEN. STAT. ANN. § 52-240b)

444. The harm suffered by Connecticut Class members was the result of Defendants' reckless disregard for the safety of their product users and consumers, who were injured by their conduct.

445. At all times relevant, the Defendants owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the Connecticut Class members.

446. Defendants were at all relevant times aware of the considerable health risks that can result from exposure to PFAS Chemicals and PFAS-infused turnout gear, including the risk of causing various forms of cancer to firefighters who were required to wear PFAS-infused turnout gear over a span of years and decades.

447.    Defendants were at all relevant times aware that the turnout gear that they were selling to Connecticut Class members for use by their firefighters was contaminated with significant quantities of PFAS.

448.    Defendants therefore at all relevant times knew that their design, manufacture, and sale of PFAS-infused turnout gear and sale of those products to  Connecticut Class members would be likely to result in injury and damage to the Connecticut Class members including but not limited to the necessity of providing replacement gear, disposing of the toxic turnout gear they now own, and providing mitigation and remediation measures including to reduce exposure to PFAS chemicals by their firefighters.

449.    Notwithstanding this knowledge, Defendants acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the Connecticut Class members by, among other things:

      a.    Failing to take reasonable steps to minimize and/or eliminate the presence of PFAS Chemicals in turnout gear;

      b.    Selling turnout gear to Connecticut Class members for use by their firefighters that Defendants knew had significant and detectable (and therefore dangerous) concentrations of PFAS Chemicals and were thus unreasonably dangerous.

      c.    Failing to warn Connecticut Class members that the turnout gear that they designed, manufactured, and sold to Connecticut Class members was contaminated with dangerous levels of PFAS Chemicals and could not be safely worn.

450.    As a direct and proximate result of Defendants' willful, wanton, and reckless conduct, the Connecticut Class members suffer and will continue to suffer the costs of replacing

95

firefighter turnout gear, disposing of the PFAS contaminated turnout gear, and other costs to mitigate and eliminate their dangers, and should be awarded statutory punitive damages.

**5.      Claims brought on behalf of the City of Baltimore, Charles County and Class members who installed their turnout gear in Maryland ("Maryland Class members").**

**COUNT XIX (against all Defendants)**

**Design Defect (strict liability)**

451.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

452.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS Chemicals and/or PFAS-infused turnout gear.

453.    As manufacturers or distributors of PFAS Chemicals and/or PFAS-infused turnout gear, Defendants had a duty not to place into the stream of commerce a product that is substantially and unreasonably dangerous, and presents a substantial and unreasonable risk of death or personal injury, and they owed that duty to all persons, including the Maryland Class members, who might be foreseeably harmed by PFAS Chemicals and/or PFAS-infused turnout gear.

454.    PFAS Chemicals and/or PFAS-infused turnout gear are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.      PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.      PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.      PFAS in turnout gear is absorbed through the skin, inhaled and ingested, especially when exposed to heat, which poses substantial and unreasonable risks to firefighters' health, and to others exposed to their turnout gear,

96

including risks of cancers, reproductive and neurological health disorders among other health injuries.

d.     Defendants failed to disclose these risks to firefighters, fire departments, Maryland Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

455.   At all relevant times, PFAS Chemicals and/or PFAS-infused turnout gear were in a defective condition unreasonably dangerous to the Maryland Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

456.   At all relevant times, Maryland Class members used turnout gear infused with PFAS as intended.

457.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS Chemicals and/or PFAS-infused turnout gear. Defendants could have made different chemicals and/or products that did not contain the PFAS Chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

458.   At all relevant times, the foreseeable risk of harm to firefighter health, the public health more generally, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

459.    Defendants' PFAS Chemicals and/or PFAS-infused turnout gear were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

460.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS Chemicals and/or PFAS-infused turnout gear, Maryland Class members have been injured.

461.    These and other acts by Defendants were a direct and proximate cause of damages to Maryland Class members, including the costs of replacing and disposing of contaminated gear, and measures to eliminate and mitigate the injuries from the PFAS-infused gear.

## COUNT XX (against all Defendants)

### Design Defect (negligence)

462.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

463.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS Chemicals and/or PFAS-infused turnout gear.

464.    As a product seller and/or manufacturer each Defendant had a duty of reasonable care to avoid manufacturing and selling PFAS Chemicals and turnout gear infused with unsafe levels of PFAS to its customers, including the Maryland Class members

465.    The Maryland Class members were known purchasers of each of Defendant's turnout gear and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent manufacture and design of PFAS Chemicals and PFAS-infused turnout gear.

466.    Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination in the turnout gear sold to its customers.

467. Defendants knew or should have known that their PFAS Chemicals, and turnout gear products containing PFAS, were not safe and were likely to leach PFAS into firefighters' skin to be inhaled and ingested and to endanger their health. Defendants knew or should have known their PFAS Chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

468. The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS Chemicals, and turnout gear products containing PFAS, without warning about or even disclosing the dangers posed to human health and the environment. The rights, interests, and inconvenience to the Maryland Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS Chemicals, and turnout gear products containing PFAS.

469. The defective and unreasonably dangerous condition of the PFAS Chemicals and the PFAS-infused turnout gear existed at the time the PFAS-infused turnout gear was manufactured, distributed, and sold by Defendants.

470. Defendants expected the PFAS Chemicals and turnout gear to reach their ultimate user without substantial change in the condition in which the PFAS Chemicals and the turnout gear were designed and manufactured, and the PFAS-infused turnout gear did reach Maryland Class members without substantial change in condition.

471. At all relevant times, Maryland Class members used turnout gear infused with PFAS as intended.

472.    The foreseeable risk to the health and welfare of firefighters posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear, and the foreseeable injury to Maryland Class members, outweigh the cost to Defendants of reducing or eliminating such risk.

473.    Defendants knew or should have known about reasonably safer and feasible alternatives to PFAS Chemicals and the PFAS-infused turnout gear they manufactured and sold.

474.    Defendants breached their duty to use reasonable care in one or more of the following ways:

a.  By failing to prevent the PFAS contamination of turnout gear purchased by the Maryland Class members;

b.  By failing to cease the manufacture, sale, and/or distribution of PFAS-infused turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

c.  By failing to reduce or minimize the PFAS contamination in turnout gear manufactured, sold, and distributed by each Defendant;

d.  By failing to design and manufacture PFAS-free turnout gear, as an alternative to the PFAS-infused turnout gear after learning of the adverse health consequences associated with PFAS exposure.

475.    Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to minimize or mitigate such risks, and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused

100

products. Defendants could have made products that did not contain the PFAS Chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused turnout gear in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

476.    At all relevant times, the foreseeable risk of harm to firefighter health, the public health more generally, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

477.    As a direct and proximate result of each Defendant's negligence, the Maryland Class members will bear replacement and disposal costs, and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear.

478.    Defendants are thus liable to Maryland Class members for fair compensation for the resulting injuries, which includes replacement and disposal, education and advocacy costs, and other mitigation costs.

## COUNT XXI (against all Defendants)

### Failure to Warn (strict liability)

479.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

480.    As manufacturers or distributors of PFAS Chemicals and PFAS-infused turnout gear, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse

of their products, including Maryland Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Maryland Class members.

481. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS Chemicals and PFAS-infused turnout gear, Defendants failed to warn the public and Maryland Class members of those risks.

482. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS Chemicals and PFAS-infused turnout gear, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

483. Defendants' inadequate warnings and instructions rendered PFAS Chemicals and PFAS-infused turnout gear defective and not reasonably safe.

484. Defendants' PFAS Chemicals and PFAS-infused turnout gear were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS Chemicals and PFAS-infused turnout gear reached their end user without substantial change in their condition.

485. Had Defendants provided adequate warnings, Maryland Class members could have taken measures to limit PFAS contamination from turnout gear, or they could have used turnout gear that was not infused with PFAS.

486. The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS chemicals, and turnout gear products containing PFAS, without warning about or even disclosing the dangers posed to human health and the

environment. The rights, interests, and inconvenience to the Maryland Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS Chemicals, and turnout gear products containing PFAS.

487.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Maryland Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Maryland Class members used their PFAS-infused turnout gear as intended.

488.    These and other acts by Defendants were a direct and proximate cause of damages to Maryland Class members, including the costs of replacing and disposing of contaminated gear measures to eliminate and mitigate the damage from the PFAS-infused gear.

## COUNT XXII (against all Defendants)

### Failure to Warn (negligence)

489.    Plaintiffs re-allege and incorporate here the allegations set forth above.

490.    As a product seller and/or manufacturer each Defendant had a duty of reasonable care to avoid manufacturing and selling PFAS chemicals and turnout gear infused with unsafe levels of PFAS without adequate warnings to its customers, including the Maryland Class members

491.    The Maryland Class members were known purchasers of each of Defendant's turnout gear and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent failure to warn concerning PFAS Chemicals and PFAS-infused turnout gear.

492.    Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination from the turnout gear sold to its customers by providing adequate warnings.

493.    Each Defendant owed its purchasers and its end users a duty of reasonable care to warn of the dangers of PFAS contamination in the turnout gear sold to its customers

494.    Defendants knew or should have known that their PFAS Chemicals and turnout gear products containing PFAS were not safe and were likely to leach PFAS into firefighters' skin, to be inhaled and ingested, and to endanger their health. Defendants knew or should have known their PFAS Chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

495.    The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS chemicals, and turnout gear products containing PFAS, without warning about or even disclosing the dangers posed to human health and the environment. The rights, interests, and inconvenience to the Maryland Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS Chemicals, and turnout gear products containing PFAS.

496.    The defective and unreasonably dangerous condition of the turnout gear existed at the time the turnout gear was manufactured, distributed, and sold by Defendants.

497.    Defendants expected the PFAS Chemicals and turnout gear to reach their ultimate user without substantial change in the condition in which the PFAS Chemicals and the PFAS-

infused turnout gear were designed and manufactured, and the turnout gear did reach Maryland Class members without substantial change in condition.

498.    The foreseeable risk to the health and welfare of firefighters posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear, and the foreseeable injury to Maryland Class members, outweigh the cost to Defendants of reducing or eliminating such risk.

499.    Defendants knew or should have known about reasonably safer and feasible alternatives to PFAS Chemicals and the PFAS-infused turnout gear, and of warnings they could have issued to eliminate or reduce the risks.

500.    Defendants breached their duty to use reasonable care in one or more of the following ways:

    a.  By failing to warn of the PFAS contamination of turnout gear purchased by the Maryland Class members;

    b.  By failing to cease the manufacture, sale, and/or distribution of PFAS-infused turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

    c.  By failing issue warnings to reduce or minimize the damage from PFAS contamination in turnout gear manufactured, sold, and distributed by each Defendant;

    d.  By failing to design and manufacture PFAS-free turnout gear, as an alternative to the PFAS-infused turnout gear after learning of the adverse health consequences associated with PFAS exposure;

    e.  By negligently failing to warn their products' purchasers and users, including Maryland Class members.

501.    Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to minimize or mitigate such risks, and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons.

502.    As a direct and proximate result of each Defendant's negligence, the Maryland Class members will bear replacement and disposal costs, and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear

503.    Defendants are thus liable to Maryland Class members for fair compensation for the resulting injuries, which includes replacement and disposal, education and advocacy costs, and other mitigation costs.

## COUNT XXIII (against all Defendants)

### Violation of Maryland Consumer Protection Act
### (MD. CODE ANN., COM. LAW § 13-101 *et seq.*)

504.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

505.    The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale or lease of any consumer good, including "failure to state a material fact if the failure deceives or tends to deceive" and "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same," MD. CODE ANN., COM. LAW § 13-301, regardless of whether the consumer is actually deceived or damaged, MD. CODE ANN., COM. LAW § 13-302.

106

506.    Defendants and Maryland Class members are "persons" within the meaning of the Maryland CPA. MD. CODE ANN., COM. LAW § 13-101(h).

507.    In purchasing their turnout gear, the Maryland Class members were deceived by Defendants' failure to disclose that their turnout gear was infused with PFAS.

508.    The Maryland Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

509.    Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

510.    Defendants knew or should have known that their conduct violated the Maryland CPA.

511.    Defendants owed the Maryland Class members a duty to disclose the truth about PFAS-infused turnout gear because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Maryland Class members; and

    b.    Intentionally concealed the foregoing from the Maryland Class members.

512.    Defendants' conduct proximately caused injuries to the Maryland Class members.

513.    The Maryland Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

514.    Defendants' violations present a continuing risk to the Maryland Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

107

515.    Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA. MD. CODE ANN., COM. LAW § 13-408.

**COUNT XXIV(against all Defendants)**

**Breach of Implied Warrant of Merchantability**
**(MD. CODE ANN., COM. LAW § 2-314, *et seq.*)**

516.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

517.    By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS-infused turnout gear impliedly warranted to Maryland Class members that the turnout gear was of merchantable quality and safe for its intended and ordinary uses. MD. CODE ANN., COM. LAW § 2-314, *et seq.*

518.    Defendants breached the implied warranty of merchantability in connection with the manufacture, sale, and distribution of turnout gear. The turnout gear contained toxic levels of PFAS Chemicals, rendering them unsuitable and unsafe for their ordinary purposes.

519.    In purchasing Defendants' turnout gear, the Maryland Class members were acting in their commercial proprietary capacity, as managers of municipal entities responsible for cost-effectively purchasing protective gear for their employees.

520.    Had the Maryland Class members known the turnout gear they were purchasing was unsafe for its ordinary uses, they would not have purchased the products.

521.    Maryland Class members reasonably expected, at the time of purchase, that the turnout gear was safe for its intended and ordinary uses.

522.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Maryland Class members will need to replace and dispose of all turnout gear

108

they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear, and sustained damages in an amount to be determined at trial.

523.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Maryland Class members have suffered commercial losses in an amount to be determined at trial.

**6.    Claims brought on behalf of Class members who installed their turnout gear in Missouri ("Missouri Class members").**

**COUNT XXV (against all Defendants)**

**Design Defect (strict liability)**

524.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

525.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS Chemicals and PFAS-infused turnout gear.

526.    As manufacturers or distributors of PFAS Chemicals and PFAS-infused turnout gear, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Missouri Class members, who might be foreseeably harmed by PFAS Chemicals and PFAS-infused turnout gear.

527.    PFAS Chemicals and PFAS-infused turnout gear are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

      a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

      b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    PFAS in turnout gear is absorbed through the skin, inhaled and ingested, especially when exposed to heat, which poses substantial and unreasonable risks to firefighters' health, and to others exposed to their turnout gear, including risks of cancers, reproductive and neurological health disorders among other health injuries.

d.    Defendants failed to disclose these threats to firefighters, fire departments, Missouri Class members and the public generally, but instead downplayed and misrepresented the dangers posed by their PFAS products.

528.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Missouri Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

529.    At all relevant times, Missouri Class members used turnout gear infused with PFAS as intended.

530.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS Chemicals and PFAS-infused turnout gear. Defendants could have made different chemicals and/or products that did not contain PFAS Chemicals or could have designed their chemicals and PFAS-infused turnout gear in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

531.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear

110

outweighed the utility of using PFAS in turnout gear and outweighed the cost to Defendants of reducing or eliminating such risk.

532.    Defendants' PFAS Chemicals and PFAS-infused turnout gear were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

533.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS Chemicals and PFAS-infused turnout gear, Missouri Class members have been injured.

534.    These and other acts by Defendants were a direct and proximate cause of damages to Missouri Class members.

## COUNT XXVI (against all Defendants)

### Design Defect (negligence)

535.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

536.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS Chemicals and/or PFAS-infused turnout gear.

537.    As a product seller and/or manufacturer each Defendant had a duty of reasonable care to avoid manufacturing and selling PFAS Chemicals and PFAS-infused turnout gear to its customers, including the Missouri Class members.

538.    The Missouri Class members were known purchasers of each of Defendant's turnout gear and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent manufacture and design of PFAS Chemicals and PFAS-infused turnout gear.

539.    Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination in the turnout gear sold to its customers.

540.    Defendants knew or should have known that their PFAS Chemicals, and turnout gear products containing PFAS, were not safe and were likely to leach PFAS into firefighters' skin, to be inhaled and ingested, and to endanger their health. Defendants knew or should have known their PFAS Chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

541.    The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS Chemicals, and turnout gear products containing PFAS, without disclosing the dangers posed to human health and the environment.

542.    The rights, interests, and inconvenience to the Maryland Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS Chemicals, and turnout gear products containing PFAS.

543.    The defective and unreasonably dangerous condition of the PFAS Chemicals and the PFAS-infused turnout gear existed at the time the PFAS-infused turnout gear was manufactured, distributed, and sold by Defendants.

544.    Defendants expected the PFAS Chemicals and PFAS-infused turnout gear to reach their ultimate user without substantial change in the condition in which the PFAS Chemicals and the turnout gear were designed and manufactured, and the PFAS-infused turnout gear did reach Missouri Class members without substantial change in condition.

545. The foreseeable risk to the health and welfare of firefighters posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear, and the foreseeable injury to Missouri Class members, outweigh the cost to Defendants of reducing or eliminating such risk.

546. Defendants knew or should have known about reasonably safer and feasible alternatives to the PFAS Chemicals and the PFAS-infused turnout gear they manufactured and sold.

547. Defendants breached their duty to use reasonable care in one or more of the following ways:

    a. By failing to prevent the PFAS contamination of turnout gear purchased by the Missouri Class members;

    b. By failing to cease the manufacture, sale, and/or distribution of PFAS Chemicals and PFAS-infused turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

    c. By failing to reduce or minimize the PFAS contamination in turnout gear manufactured, sold, and distributed by each Defendant;

    d. By failing to design and manufacture alternative chemicals and PFAS-free turnout gear, as an alternative to the PFAS-infused turnout gear after learning of the adverse health consequences associated with PFAS exposure;

    e. Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to minimize or mitigate such risks,

and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons.

548. At all relevant times, Missouri Class members used turnout gear infused with PFAS as intended.

549. As a direct and proximate result of each Defendant's negligence, the Missouri Class members bear replacement and disposal costs, and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear

550. Defendants are thus liable to Missouri Class members for fair compensation for the resulting injuries, which include replacement and disposal, education and advocacy costs, and other mitigation costs.

**COUNT XXVII (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

551. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

552. As manufacturers or distributors of PFAS Chemicals and PFAS-infused turnout gear, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Missouri Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Missouri Class members.

553. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS Chemicals and PFAS-infused turnout gear, Defendants failed to warn the public and Missouri Class members of those risks.

554. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS Chemicals and PFAS-infused turnout gear, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

555. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

556. Defendants' PFAS Chemicals and PFAS-infused turnout gear were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

557. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Missouri Class members, who would have heeded legally adequate warnings about the dangers of PFAS Chemicals and PFAS-infused turnout gear. At all relevant times, Missouri Class members used their PFAS-infused turnout gear as intended.

558. These and other acts by Defendants were a direct and proximate cause of damages to Missouri Class members.

### COUNT XXVIII (against all Defendants)

### Failure to Warn (negligence)

559. Plaintiffs re-allege and incorporate here the allegations set forth above.

560. As a product seller and/or manufacturer each Defendant had a duty of reasonable care to avoid manufacturing and selling PFAS chemicals and turnout gear infused with unsafe levels of PFAS without adequate warnings to its customers, including the Missouri Class members

561. The Missouri Class members were known purchasers of each of Defendant's turnout gear and were therefore within the scope of the risk created by each Defendant's conduct and were the foreseeable victims of the negligent failure to warn concerning PFAS Chemicals and PFAS-infused turnout gear.

562. Each Defendant owed its purchasers and its end users a duty of reasonable care to eliminate or minimize PFAS contamination from the turnout gear sold to its customers by providing adequate warnings.

563. Defendants knew or should have known that their PFAS Chemicals and turnout gear products containing PFAS were not safe and were likely to leach PFAS into firefighters' skin, to be inhaled and ingested, and to endanger their health. Defendants knew or should have known their PFAS Chemicals, and turnout gear containing PFAS, were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the information and evidence available to them associating PFAS exposure with adverse human and animal health effects.

564. The seriousness of the environmental and human health risks posed by Defendants' conduct and products far outweighs any purported social utility of Defendants' conduct in manufacturing and/or distributing their PFAS Chemicals, and turnout gear products containing PFAS, without warning about or even disclosing the dangers posed to human health and the environment.

565. The rights, interests, and inconvenience to the Missouri Class members and general public far outweigh the rights, interests, and inconvenience to the Defendants, which profited heavily from the manufacture, sale, and/or distribution of their commercial PFAS Chemicals, and turnout gear products containing PFAS.

116

566. The defective and unreasonably dangerous condition of the PFAS-infused turnout gear existed at the time the turnout gear was manufactured, distributed, and sold by Defendants.

567. Defendants expected the PFAS Chemicals and PFAS-infused turnout gear to reach their ultimate user without substantial change in the condition in which the PFAS Chemicals and the PFAS-infused turnout gear were designed and manufactured, and the turnout gear did reach Missouri Class members without substantial change in condition.

568. The foreseeable risk to the health and welfare of firefighters, to the public health and environment posed by Defendants' PFAS Chemicals and PFAS-infused turnout gear, and the foreseeable injury to Missouri Class members, outweigh the cost to Defendants of issuing warnings to reduce or eliminate such risk.

569. Defendants knew or should have known about reasonably safer and feasible alternatives to PFAS Chemicals and the PFAS-infused turnout gear, and of warnings they could have issued to eliminate or reduce the risks.

570. Defendants breached their duty to use reasonable care in one or more of the following ways:

    a. By failing to warn of the PFAS contamination of turnout gear purchased by the Missouri Class members;

    b. By failing to cease the manufacture, sale, and/or distribution of PFAS-infused turnout gear after learning of the adverse health consequences associated with exposure to PFAS;

    c. By failing to issue warnings to reduce or minimize the damage from PFAS contamination in turnout gear manufactured, sold, and distributed by each Defendant;

d.  By failing to design and manufacture alternative chemicals and PFAS-free turnout gear, as an alternative to the PFAS-infused turnout gear after learning of the adverse health consequences associated with PFAS exposure;

e.  By negligently failing to warn their products' purchasers and users, including Maryland Class members.

571.  Defendants failed to exercise ordinary care because a reasonably careful company would not manufacture or distribute those products, would warn of the products' toxic and environmentally hazardous properties and instruct on the proper use and disposal thereof to minimize or mitigate such risks, and/or would take steps to enhance the safety and/or reduce the toxicity, persistence, and other effects of the products, among other reasons.

572.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to Missouri Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Missouri Class members used their PFAS-infused turnout gear as intended.

573.  As a direct and proximate result of each Defendant's negligence, the Missouri Class members will bear replacement and disposal costs, and other costs to eliminate and mitigate the health risks of PFAS-infused turnout gear

574.  Defendants are thus liable to Missouri Class members for fair compensation for the resulting injuries, which include replacement and disposal, education and advocacy costs, and other mitigation costs.

118

**COUNT XXIX (against all Defendants)**

**Violation of the Missouri Merchandising Practices Act**
**(MO. REV. STAT. § 407.005 *et seq.*)**

575.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

576.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020(1).

577.    Defendants, Plaintiffs, and Missouri Class members are "persons" within the meaning of the Missouri MPA. MO. REV. STAT. § 407.010(5).

578.    Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of the Missouri MPA. MO. REV. STAT. § 407.010(7).

579.    In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Missouri Class members contained PFAS and was therefore toxic and dangerous to human health and the environment, with the intent that others rely upon the concealment, suppression, or omission.

580.    In purchasing their turnout gear, the Missouri Class members were deceived by Defendants' failure to disclose that their turnout gear contained PFAS and was toxic and dangerous to human health and the environment.

581.    The Missouri Class members reasonably relied on Defendants' statements and omissions, and they did not and could not unravel Defendants' deception on their own.

119

582. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

583. Defendants knew or should have known that their conduct violated the Missouri MPA.

584. Defendants owed the Missouri Class members a duty to disclose the truth about PFAS Chemicals and PFAS-infused turnout gear because Defendants possessed superior knowledge:

   a. That their products were infused with PFAS;

   b. That PFAS Chemicals cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

   c. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

   d. PFAS in turnout gear is absorbed through the skin, inhaled and ingested, especially when exposed to heat, which poses substantial and unreasonable risks to firefighters' health, and to others exposed to their turnout gear, including risks of cancers, reproductive and neurological health disorders among other health injuries.

585. Despite their superior knowledge, Defendants failed to disclose these known risks to firefighters, fire departments, Missouri Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

586. Defendants through their actions and omissions intentionally concealed the risks from the Missouri Class members.

587. Defendants' conduct proximately caused injuries to the Missouri Class members.

120

588. The Missouri Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' actions and omissions.

589. Defendants' violations present a continuing risk to the Missouri Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

590. The Missouri Class members seek damages in amounts to be proven at trial, along with attorneys' fees, costs, and punitive damages, and any other just and proper relief under the Missouri MPA. MO. REV. STAT. § 407.025.

## COUNT XXX (against all Defendants)

### Breach of the Implied Warranty of Merchantability

591. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

592. By operation of law, Defendants, as the manufacturers and sellers, in whole or in part, of the PFAS-infused turnout gear impliedly warranted to Missouri Class members that the turnout gear was of merchantable quality and safe for its intended and ordinary uses.

593. Defendants breached the implied warranty of merchantability in connection with the manufacture, sale, and distribution of turnout gear. The turnout gear contained toxic levels of PFAS Chemicals, rendering them unsuitable and unsafe for their ordinary purposes.

594. In purchasing Defendants' turnout gear, the Missouri Class members were acting in their commercial proprietary capacity, as managers of municipal entities responsible for cost-effectively purchasing protective gear for their employees.

595. Had the Missouri Class members known the turnout gear they were purchasing was unsafe for its ordinary uses, they would not have purchased the products.

121

596.    The Missouri Class members reasonably expected, at the time of purchase, that the turnout gear was safe for its intended and ordinary uses.

597.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Missouri Class members must replace and dispose of all turnout gear they have previously purchased, take measures to mitigate the damage caused by the contaminated turnout gear, and they have sustained damages in an amount to be determined at trial.

598.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, the Missouri Class members have suffered losses in an amount to be determined at trial.

**7.    Claims brought on behalf of Class members who installed their turnout gear in Alabama (the "Alabama Class members").**

**COUNT XXXI (against all Defendants)**

**Alabama Extended Manufacturer's Liability Doctrine**
**(design defect)**

599.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

600.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

601.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Alabama Class members, who might be foreseeably harmed by PFAS-infused products.

602.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

122

a.  PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.  PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

c.  Defendants failed to disclose these threats to fire departments, Alabama Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

603.  At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Alabama Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

604.  At all relevant times, Alabama Class members used turnout gear infused with PFAS as intended.

605.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

606.  At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using

123

PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

607. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

608. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Alabama Class members have been injured.

609. These and other acts by Defendants were a direct and proximate cause of damages to Alabama Class members.

**COUNT XXXII (against all Defendants)**

**Alabama Extended Manufacturer's Liability Doctrine
(failure to warn)**

610. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

611. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Alabama Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Alabama Class members.

612. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Alabama Class members of those risks.

613. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and

124

their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

614. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

615. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

616. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Alabama Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Alabama Class members used turnout gear infused with PFAS as intended.

617. These and other acts by Defendants were a direct and proximate cause of damages to Alabama Class members.

**8.    Claims brought on behalf of Class members who installed their turnout gear in Alaska (the "Alaska Class members").**

### COUNT XXXIII (against all Defendants)

### Strict Products Liability
### (design defect)

618. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

619. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

620. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed

that duty to all persons, including the Alaska Class members, who might be foreseeably harmed by PFAS-infused products.

621.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

    c.    Defendants failed to disclose these threats to fire departments, Alaska Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

622.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to Alaska Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

623.    At all relevant times, Alaska Class members used turnout gear infused with PFAS as intended.

624.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative

126

designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

625. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

626. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

627. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Alaska Class members have been injured.

628. These and other acts by Defendants were a direct and proximate cause of damages to Alaska Class members.

### COUNT XXXIV (against all Defendants)

### Strict Products Liability
### (failure to warn)

629. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

630. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Alaska Class members.

631. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Alaska Class members of those risks.

632. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

633. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

634. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

635. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Alaska Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Alaska Class members used their turnout gear with PFAS-infused products as intended.

636. These and other acts by Defendants were a direct and proximate cause of damages to Alaska Class members.

**COUNT XXXV (against all Defendants)**

**Violation of the Alaska Unfair Trade Practices and
Consumer Protection Act
(ALASKA STAT. ANN. § 45.50.471 *et seq.*)**

637. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

638. The Alaska Unfair Trade Practices and Consumer Protection Act (Alaska CPA) declares unfair methods of competition and unfair or deceptive acts or practices in the conduct of

128

trade or commerce unlawful, including "using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged." ALASKA STAT. ANN. § 45.50.471(b)(12).

639. The Alaska Class members are "consumers" within the meaning of ALASKA STAT. ANN. § 45.50.561(4).

640. Defendants were engaged "in the conduct of trade or commerce" within the meaning of ALASKA STAT. ANN. § 45.50.471(a) when they sold their PFAS-infused products to turnout gear manufacturers.

641. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Alaska Class members was treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

642. In purchasing their turnout gear, the 669 Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

643. The Alaska Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

644. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

645. Defendants knew or should have known that their conduct violated the Alaska CPA.

646. Defendants owed the Alaska Class members a duty to disclose the truth about PFAS-infused products because Defendants:

129

a.    Possessed superior knowledge that their products were infused with PFAS and were applied to turnout gear purchased by the Alaska Class members; and

b.    Intentionally concealed the foregoing from the Alaska Class members.

647.    Defendants' conduct proximately caused injuries to the Alaska Class members.

648.    The Alaska Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

649.    Defendants' violations present a continuing risk to the Alaska Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

650.    Pursuant to ALASKA STAT. ANN. § 45.50.531(a), Alaska Class members seek "to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater."

651.    The Alaska Class members also seek attorneys' fees and any other just and proper relief available under the Alaska CPA.

652.    On April 1, 2025, Plaintiffs sent a letter to Defendants complying with ALASKA STAT. ANN. § 45.50.535(b)(1).

**9.    Claims brought on behalf of Class members who installed their turnout gear in Arizona (the "Arizona Class members").**

**COUNT XXXVI (against all Defendants)**

**Strict Products Liability**
**(design defect)**

653.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

130

654.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

655.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Arizona Class members, who might be foreseeably harmed by PFAS-infused products.

656.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

    c.    Defendants failed to disclose these threats to fire departments, Arizona Class members, and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

657.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Arizona Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

658.    At all relevant times, the Arizona Class members used turnout gear infused with PFAS as intended.

659.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain

131

the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

660. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

661. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

662. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Arizona Class members have been injured.

663. These and other acts by Defendants were a direct and proximate cause of damages to Arizona Class members.

## COUNT XXXVII (against all Defendants)

### Strict Products Liability
### (failure to warn)

664. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

665. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who

might be foreseeably harmed by the ordinary use and misuse of their products, including Arizona Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Arizona Class members.

666. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Arizona Class members of those risks.

667. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

668. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

669. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

670. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Arizona Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Arizona Class members used their turnout gear with PFAS-infused products as intended.

671. These and other acts by Defendants were a direct and proximate cause of damages to Arizona Class members.

**COUNT XXXVIII (against all Defendants)**

**Violation of the Arizona Consumer Fraud Act**
**(ARIZ. REV. STAT. § 44-1521 *et seq.*)**

672.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

673.   The Arizona Consumer Fraud Act ("Arizona CFA") provides that the "act, use or employment by any person of any deception, deceptive act or practice, fraud … , misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." ARIZ. REV. STAT. § 44-1522(A).

674.   Each Defendant and each Arizona Class member is a "person" within the meaning of the Arizona CFA. ARIZ. REV. STAT. § 44-1521(6).

675.   PFAS-infused products are "merchandise" within the meaning of ARIZ. REV. STAT. § 44-1521(5).

676.   Defendants' conduct, as set forth above, occurred in the conduct of trade or commerce.

677.   In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Arizona Class members was treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

678.   In purchasing their turnout gear, the Arizona Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

679. The Arizona Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

680. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

681. Defendants knew or should have known that their conduct violated the Arizona CFA.

682. Defendants owed the Arizona Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Arizona Class members; and

    b. Intentionally concealed the foregoing from the Arizona Class members.

683. Defendants' conduct proximately caused injuries to the Arizona Class members.

684. The Arizona Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

685. Defendants' violations present a continuing risk to the Arizona Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

686. Pursuant to the Arizona CFA, Plaintiffs seek monetary relief against each Defendant in an amount to be determined at trial. Plaintiffs also seek punitive damages because each Defendant engaged in aggravated and outrageous conduct with an evil mind.

**10.** **Claims brought on behalf of Class members who installed their turnout gear in Arkansas ("Arkansas Class members").**

**COUNT XXXIX (against all Defendants)**

**Strict Products Liability**
**(design defect)**

687. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

688. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

689. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Arkansas Class members, who might be foreseeably harmed by PFAS-infused products.

690. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b. PFAS contamination poses significant threats to public health, economic welfare, and the environment and to those who wear turnout gear.

c. Defendants failed to disclose these threats to fire departments, Arkansas Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

691. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Arkansas Class members, to an extent beyond that which would be

136

expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

692.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

693.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

694.    At all relevant times, Arkansas Class members used turnout gear infused with PFAS as intended.

695.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

696.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Arkansas Class members have been injured.

697.    These and other acts by Defendants were a direct and proximate cause of damages to the Arkansas Class members.

**COUNT XL (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

698.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

699.    As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Arkansas Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Arkansas Class members.

700.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Arkansas Class members of those risks.

701.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

702.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

703.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

704.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Arkansas Class members, who would have heeded legally adequate warnings about the dangers of

PFAS products. At all relevant times, Arkansas Class members used their turnout gear with PFAS-infused products as intended.

705. These and other acts by Defendants were a direct and proximate cause of damages to the Arkansas Class members.

**11.    Claims brought on behalf of Class members who installed their turnout gear in Colorado ("Colorado Class members").**

**COUNT XLI (against all Defendants)**

**Strict Products Liability**
**(design defect)**

706. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

707. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

708. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Colorado Class members, who might be foreseeably harmed by PFAS-infused products.

709. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.  Defendants failed to disclose these threats to fire departments, Colorado Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

710.  At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Colorado Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

711.  At all relevant times, the Colorado Class members used turnout gear infused with PFAS as intended.

712.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

713.  At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

714.  Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

715.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Colorado Class members have been injured.

716.    These and other acts by Defendants were a direct and proximate cause of damages to the Colorado Class members.

**COUNT XLII (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

717.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

718.    As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Colorado Class members, as well as to all turnout gear, manufacturers who treated their turnout gear, with PFAS-infused products before selling them to Colorado Class members.

719.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Colorado Class members of those risks.

720.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

721.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

141

722.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

723.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Colorado Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Colorado Class members used their turnout gear, with PFAS-infused products as intended.

724.    These and other acts by Defendants were a direct and proximate cause of damages to the Colorado Class members.

**COUNT XLIII (against all Defendants)**

**Violation of the Colorado Consumer Protection Act**
**(COLO. REV. STAT. § 6-1-101 *et seq.*)**

725.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

726.    The Colorado Consumer Protection Act ("Colorado CPA") prohibits deceptive practices in the course of a person's business, including but not limited to "fail[ing] to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction." COLO. REV. STAT. § 6-1-105.

727.    Plaintiffs, Colorado Class members, and Defendants are "persons" within the meaning of the Colorado CPA. COLO. REV. STAT. § 6-1-102(6).

728.    The Colorado Class members are "consumers" for purposes of the Colorado CPA. COL. REV. STAT § 6-1-113(1)(a).

142

729.    Each Defendant's conduct, as set forth above, occurred in the conduct of trade or commerce.

730.    In purchasing their turnout gear, the Colorado Class members were deceived by Defendants' failure to disclose the material information that their turnout gear was treated with PFAS-infused products.

731.    The Colorado Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

732.    Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

733.    Defendants knew or should have known that their conduct violated the Colorado CPA.

734.    Defendants owed the Colorado Class members a duty to disclose the truth about PFAS-infused products because Defendants:

   a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Colorado Class members; and

   b.    Intentionally concealed the foregoing from the Colorado Class members.

735.    Defendants' conduct proximately caused injuries to the Colorado Class members.

736.    Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs seek monetary relief against each Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each plaintiff or class member.

737.    Plaintiffs also seek attorneys' fees and any other just and proper remedy under the Colorado CPA.

**12.    Claims brought on behalf of Class members who installed their turnout gear in Delaware ("Delaware Class members").**

**COUNT XLIV (against all Defendants)**

**Negligence
(design defect)**

738.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

739.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

740.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to negligently place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Delaware Class members, who might be foreseeably harmed by PFAS-infused products.

741.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to fire departments, Delaware Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

144

742. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Delaware Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

743. At all relevant times, Delaware Class members used turnout gear infused with PFAS as intended.

744. Defendants knew of these risks and nevertheless negligently failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

745. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

746. Defendants' PFAS-infused products were defectively and negligently designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

747. As a direct and proximate result of Defendants' negligent design of unreasonably dangerous PFAS-infused products, Delaware Class members have been injured.

748. These and other acts by Defendants were a direct and proximate cause of damages to the Delaware Class members.

## COUNT XLV (against all Defendants)

### Negligence
### (failure to warn)

749. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

750. As manufacturers or distributors of PFAS-infused products, Defendants had a duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Delaware Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Delaware Class members.

751. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants negligently failed to warn turnout gear manufacturers, consumers, the public, and Delaware Class members of those risks.

752. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

753. Defendants' inadequate and negligent warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

754. Defendants' PFAS-infused products were defective by virtue of their negligently inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

755. Defendants' negligent failure to warn proximately caused reasonably foreseeable injuries to Delaware Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Delaware Class members used their turnout gear with PFAS-infused products as intended.

756. These and other acts by Defendants were a direct and proximate cause of damages to the Delaware Class members.

**COUNT XLVI(against all Defendants)**

**Violation of the Delaware Consumer Fraud Act**
**(DEL. CODE TIT. 6, § 2513 *et seq.*)**

757. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

758. The Delaware Consumer Fraud Act ("Delaware CFA") prohibits the "act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale, lease or advertisement of any merchandise, whether or nor any person has in fact been misled, deceived, or damaged thereby." DEL. CODE TIT. 6, § 2513(a).

759. Plaintiffs, Delaware Class members, and Defendants are "persons" within the meaning of the Delaware CFA. DEL. CODE TIT. 6, § 2511(7).

760. Defendants' actions, as set forth above, occurred in the conduct of trade or commerce.

147

761. In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Delaware Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

762. In purchasing their turnout gear, the Delaware Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

763. The Delaware Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

764. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

765. Defendants knew or should have known that their conduct violated the Delaware CFA.

766. Defendants owed the Delaware Class a duty to disclose the truth about PFAS-infused products because Defendants:

      a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Delaware Class members; and

      b. Intentionally concealed the foregoing from the Delaware Class members.

767. Defendants' conduct proximately caused injuries to the Delaware Class members.

768. The Delaware Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

769.    Defendants' violations present a continuing risk to the Delaware Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

770.    Plaintiffs seek damages under the Delaware CFA for injury resulting from the direct and natural consequences of each Defendant's unlawful conduct. *See, e.g.*, *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1980). Plaintiffs also seek attorneys' fees and any other just and proper relief available under the Delaware CFA.

771.    Defendants engaged in gross, oppressive, or aggravated conduct justifying the imposition of punitive damages.

**13.    Claims brought on behalf of Class members who installed their turnout gear in Georgia ("Georgia Class members").**

**COUNT XLVII (against all Defendants)**

**Violation of the Georgia Fair Business Practices Act
(GA. CODE ANN. § 10-1-390 *et seq.*)**

772.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

773.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful. GA. CODE. ANN. § 10-1-393(a).

774.    The Georgia Class members are "consumers" within the meaning of the Georgia FBPA. GA. CODE. ANN. § 10-1-392(a)(6).

775.    Each Defendant engaged in "trade or commerce" within the meaning of the Georgia FBPA. GA. CODE. ANN. § 10-1-393(a)(28).

776.    In purchasing their turnout gear, the Georgia Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

777.    The Georgia Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

778.    Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

779.    Defendants knew or should have known that their conduct violated the Georgia FBPA.

780.    Defendants owed the Georgia Class members a duty to disclose the truth about PFAS-infused products because Defendants:

   a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Georgia Class members; and

   b.    Intentionally concealed the foregoing from the Georgia Class members.

781.    Defendants' conduct proximately caused injuries to the Georgia Class members.

782.    The Georgia Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

783.    Defendants' violations present a continuing risk to the Georgia Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

784.    Plaintiffs and the Georgia Class members are entitled to recover damages and exemplary damages (for intentional violations) pursuant to GA. CODE ANN. § 10-1-399(a). Plaintiffs also seek attorneys' fees and any other just and proper relief available under the Georgia FBPA pursuant to GA. CODE ANN. § 10-1-399.

785.    On April 1, 2025, Plaintiffs sent a letter to Defendants complying with GA. CODE ANN. § 10-1-399(b).

**COUNT XLVIII (against all Defendants)**

**Violation of the Georgia Uniform Deceptive Trade Practices Act**
**(GA. CODE ANN. § 10-1-370 *et seq.*)**

786.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

787.    Georgia's Uniform Deceptive Trade Practices Act ("Georgia UDTPA") prohibits "deceptive trade practices." GA. CODE ANN. § 10-1-372(a).

788.    Defendants, Plaintiffs, and Georgia Class members are "persons" within the meaning of the Georgia UDTPA. GA. CODE ANN. § 10-1-371(5).

789.    Defendants engaged in deceptive conduct, as alleged above for their violations of the Georgia FBPA.

790.    The Georgia Class members seek attorneys' fees and any other just and proper relief available under GA. CODE ANN. § 10-1-373.

14.    **Claims brought on behalf of Class members who installed their turnout gear in Hawaii ("Hawaii Class members").**

**COUNT XLIX (against all Defendants)**

**Strict Products Liability**
**(design defect)**

791.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

792.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

151

793.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Hawaii Class members, who might be foreseeably harmed by PFAS-infused products.

794.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

   a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

   b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

   c.    Defendants failed to disclose these threats to fire departments, Hawaii Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

795.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Hawaii Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

796.    At all relevant times, Hawaii Class members used turnout gear infused with PFAS as intended.

797.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental

dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

798.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

799.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

800.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Hawaii Class members have been injured.

801.    These and other acts by Defendants were a direct and proximate cause of damages to Hawaii Class members.

## COUNT L (against all Defendants)

### Strict Products Liability
### (failure to warn)

802.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

803.    As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Hawaii

153

Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Hawaii Class members.

804.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Hawaii Class members of those risks.

805.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

806.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

807.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

808.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Hawaii Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Hawaii Class members used their turnout gear with PFAS-infused products as intended.

809.    These and other acts by Defendants were a direct and proximate cause of damages to the Hawaii Class members.

**15.    Claims brought on behalf of Class members who installed their turnout gear in Illinois ("Illinois Class members").**

**COUNT LI (against all Defendants)**

**Strict Products Liability**
**(design defect)**

810.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

811.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

812.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Illinois Class members, who might be foreseeably harmed by PFAS-infused products.

813.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

    b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

    c.    Defendants failed to disclose these threats to fire departments, Illinois Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

814.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Illinois Class members, to an extent beyond that which would be

expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

815. At all relevant times, the Illinois Class members used turnout gear infused with PFAS as intended.

816. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

817. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

818. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

819. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Illinois Class members have been injured.

820. These and other acts by Defendants were a direct and proximate cause of damages to the Illinois Class members.

156

## COUNT LII (against all Defendants)

## Strict Products Liability
### (failure to warn)

821.   Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

822.   As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Illinois Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Illinois Class members.

823.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Illinois Class members of those risks.

824.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

825.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

826.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

827.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Illinois Class members, who would have heeded legally adequate warnings about the dangers of

PFAS products. At all relevant times, Illinois Class members used their turnout gear with PFAS-infused products as intended.

828.    These and other acts by Defendants were a direct and proximate cause of damages to Illinois Class members.

**COUNT LIII (against all Defendants)**

**Violation of Illinois Consumer Fraud and
Deceptive Business Practices Act
(815 ILL. COMP. STAT. ANN. 505/1 *et seq.*)**

829.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

830.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") declares several specific actions to be unlawful, including "any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

831.    The Illinois Class members are "consumers" within the meaning of the ICFA. 815 ILCS 505/1(e).

832.    Defendants were engaged in "trade" and "commerce" within the meaning of the ICFA, 815 ILCS 505/1(f), when they sold their PFAS-infused products to turnout gear manufacturers.

833.    In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the Illinois Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

834.    In purchasing their turnout gear, the Illinois Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

158

835. The Illinois Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

836. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

837. Defendants knew or should have known that their conduct violated the ICFA.

838. Defendants owed the Illinois Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Illinois Class members; and

    b. Intentionally concealed the foregoing from the Illinois Class members.

839. Defendants' conduct proximately caused injuries to the Illinois Class members.

840. The Illinois Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

841. Defendants' violations present a continuing risk to the Illinois Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

842. Pursuant to 815 ILCS 505/10a(a), the Illinois Class members seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each plaintiff.

843. The Illinois Class members seek attorneys' fees and any other just and proper relief available under 815 ILCS 505/10a(c).

**16.**      **Claims brought on behalf of Class members who installed their turnout gear in Indiana ("Indiana Class members").**

## COUNT LIV (against all Defendants)

### Violation of Indiana Products Liability Act
IND. CODE ANN. § 34-20-1-1 *et seq.*
(design defect)

844.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

845.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

846.    At all times relevant to this action, Defendants had a duty to ensure that the design of PFAS-infused products made them reasonably fit and safe for the purpose for which they were intended.

847.    Defendants' PFAS-infused products were not reasonably safe as designed and have been unreasonably dangerous for their intended, foreseeable, and ordinary use and disposal.

848.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to fire departments, Indiana Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

160

849.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Indiana Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

850.    At all relevant times, Indiana Class members used turnout gear infused with PFAS as intended.

851.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

852.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

853.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control. Defendants expected that their PFAS-infused products would reach consumers without a substantial change in their condition, and those products reached their end users without substantial change in their condition.

854.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Indiana Class members have been injured.

161

855.    These and other acts by Defendants were a direct and proximate cause of damages to Indiana Class members.

## COUNT LV (against all Defendants)

### Violation of Indiana Products Liability Act
#### IND. CODE ANN. § 34-20-1-1 *et seq.*
#### (failure to warn)

856.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint

857.    Defendants had a duty to reasonably warn Indiana Class members of the dangers posed by their PFAS-infused products.

858.    Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including the Indiana Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to the Indiana Class members. Defendants, by exercising reasonable diligence, could have made such warnings available to those third parties. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants unreasonably failed to warn turnout gear manufacturers, consumers, the public, and Indiana Class members in particular of those risks.

859.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

860.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

861. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

862. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Indiana Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Indiana Class members used their turnout gear with PFAS-infused products as intended.

863. These and other acts by Defendants were a direct and proximate cause of damages to Indiana Class members.

**17.    Claims brought on behalf of Class members who installed their turnout gear in Iowa ("Iowa Class members").**

### COUNT LVI (against all Defendants)

### Design Defect claim

864. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

865. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

866. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Iowa Class members, who might be foreseeably harmed by PFAS-infused products.

867. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

163

a.   PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

b.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.   Defendants failed to disclose these threats to fire departments, Iowa Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

868.   At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Iowa Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

869.   At all relevant times, Iowa Class members used turnout gear infused with PFAS as intended.

870.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

871.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using

164

PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

872. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

873. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Iowa Class members have been injured.

874. These and other acts by Defendants were a direct and proximate cause of damages to Iowa Class members.

**COUNT LVII (against all Defendants)**

**Failure to Warn Claim**

875. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

876. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Iowa Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Iowa Class members.

877. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Iowa Class members of those risks.

878. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and

165

their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

879.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

880.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

881.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Iowa Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Iowa Class members used their turnout gear with PFAS-infused products as intended.

882.    These and other acts by Defendants were a direct and proximate cause of damages to Iowa Class members.

**COUNT LVIII (against all Defendants)**

**Violation of Iowa Private Right of Action for Consumer Frauds Act**
**(IOWA CODE § 714h.1 *et seq.*)**

883.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

884.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression or omission in

connection with the advertisement, sale, or lease of consumer merchandise." IOWA CODE § 714H.3.

885.   Each Defendant and each Iowa Class member is a "person" under the Iowa CFA. IOWA CODE § 714H.2(7).

886.   The Iowa Class members are "consumers" as defined by the Iowa CFA. IOWA CODE § 714H.2(3).

887.   In purchasing their turnout gear, the Iowa Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

888.   The Iowa Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

889.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

890.   Defendants knew or should have known that their conduct violated the Iowa CFA.

891.   Defendants owed the Iowa Class members a duty to disclose the truth about PFAS-infused products because Defendants:

  a.   Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Iowa Class members; and

  b.   Intentionally concealed the foregoing from the Iowa Class members.

892.   Defendants' conduct proximately caused injuries to the Iowa Class members.

893.   The Iowa Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

167

894. Defendants' violations present a continuing risk to the Iowa Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

895. Pursuant to IOWA CODE § 714H.5, Plaintiffs seek actual damages, statutory damages up to three times the amount of actual damages awarded as a result of each Defendant's willful and wanton disregard for the rights of others, and attorneys' fees.

**18.  Claims brought on behalf of Class members who installed their turnout gear in Massachusetts ("Massachusetts Class members").**

**COUNT LIX (against all Defendants)**

**Breach of the implied warranty of merchantability**
**(design defect)**

896. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

897. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

898. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Massachusetts Class members, who might be foreseeably harmed by PFAS-infused products.

899. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

　　　　a.　PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

　　　　b.　PFAS contamination poses significant threats to public health, economic welfare, and the environment.

c.    Defendants failed to disclose these threats to fire departments, Massachusetts Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

900.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Massachusetts Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

901.    At all relevant times, Massachusetts Class members used turnout gear infused with PFAS as intended.

902.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

903.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

904.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

169

905. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Massachusetts Class members have been injured.

906. These and other acts by Defendants were a direct and proximate cause of damages to Massachusetts Class members.

**COUNT LX (against all Defendants)**

**Breach of the Implied Warranty of Merchantability**
**(failure to warn)**

907. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

908. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Massachusetts Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Massachusetts Class members.

909. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Massachusetts Class members of those risks.

910. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

911. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

170

912. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

913. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Massachusetts Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Massachusetts Class members used their turnout gear with PFAS-infused products as intended.

914. These and other acts by Defendants were a direct and proximate cause of damages to Massachusetts Class members.

COUNT LXI (against all Defendants)

Violation of the Massachusetts Consumer Protection Act<br>(MASS. GEN. LAWS CH. 93A, § 1 <em>et seq.</em>)

915. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

916. On April 1, 2025, Plaintiffs timely sent a letter to Defendants complying with the Massachusetts Consumer Protection Act ("MCPA"). MASS. GEN. LAWS CH. 93A, § 9(3).

917. The Massachusetts Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

918. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

919. Defendants knew or should have known that their conduct violated the MCPA.

920. Defendants owed the Massachusetts Class members a duty to disclose the truth about PFAS-infused products because Defendants:

171

a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Massachusetts Class members; and

b.    Intentionally concealed the foregoing from the Massachusetts Class members.

921.    Defendants' conduct proximately caused injuries to the Massachusetts Class members.

922.    The Massachusetts Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

923.    Defendants' violations present a continuing risk to the Massachusetts Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

924.    The Massachusetts Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of the Defendants' conduct. These injuries are the direct and natural consequence of the Defendants' misrepresentations and omissions.

925.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, the Massachusetts Class members seek attorneys' fees, costs, and any other just and proper relief available under the MCPA.

**19.    Claims brought on behalf of Class members who installed their turnout gear in Minnesota ("Minnesota Class members").**

**COUNT LXII (against all Defendants)**

**Strict Products Liability**
**(design defect)**

926.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

172

927.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

928.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Minnesota Class members, who might be foreseeably harmed by PFAS-infused products.

929.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

      a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

      b.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

      c.    Defendants failed to disclose these threats to fire departments, Minnesota Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

930.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Minnesota Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

931.    At all relevant times, Minnesota Class members used turnout gear infused with PFAS as intended.

932.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain

the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

933. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

934. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

935. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Minnesota Class members have been injured.

936. These and other acts by Defendants were a direct and proximate cause of damages to Minnesota Class members.

## COUNT LXIII (against all Defendants)

### Strict Products Liability
### (failure to warn)

937. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

938. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who

174

might be foreseeably harmed by the ordinary use and misuse of their products, including Minnesota Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Minnesota Class members.

939.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Minnesota Class members of those risks.

940.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

941.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

942.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

943.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Minnesota Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Minnesota Class members used their turnout gear with PFAS-infused products as intended.

944.    These and other acts by Defendants were a direct and proximate cause of damages to Minnesota Class members.

**20.**    **Claims brought on behalf of Class members who installed their turnout gear in Nevada ("Nevada Class members").**

**COUNT LXIV (against all Defendants)**

**Strict Products Liability**
**(design defect)**

945.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

946.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

947.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Nevada Class members, who might be foreseeably harmed by PFAS-infused products.

948.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

949.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

950.    Defendants failed to disclose these threats to fire departments, Nevada Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

951.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Nevada Class members, to an extent beyond that which would be

176

expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

952. At all relevant times, Nevada Class members used turnout gear infused with PFAS as intended.

953. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

954. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

955. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

956. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Nevada Class members have been injured.

957. These and other acts by Defendants were a direct and proximate cause of damages to Nevada Class members.

**COUNT LXV (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

958.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

959.    As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Nevada Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Nevada Class members.

960.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Nevada Class members of those risks.

961.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

962.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

963.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

964.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to Nevada Class members, who would have heeded legally adequate warnings about the dangers of

178

PFAS products. At all relevant times, Nevada Class members used their turnout gear with PFAS-infused products as intended.

965.    These and other acts by Defendants were a direct and proximate cause of damages to Nevada Class members.

**COUNT LXVI(against all Defendants)**

**Violation of the Nevada Deceptive Trade Practices Act**
**(NEV. REV. STAT. § 598.0903 *et seq.*)**

966.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

967.    The Nevada Deceptive Trade Practices Act ("Nevada DTPA") prohibits deceptive trade practices. The Nevada DTPA provides that a "person engages in a 'deceptive trade practice" when in the course of his or her business or occupation he or she knowingly … [f]ails to disclose a material fact in connection with the sale or lease of goods or services." NEV. REV. STAT. § 598.0923(1)(b).

968.    In purchasing their turnout gear, the Nevada Class members were deceived by Defendants' failure to disclose the material fact that their turnout gear was treated with PFAS-infused products.

969.    The Nevada Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

970.    Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

971.    Defendants knew or should have known that their conduct violated the Nevada DTPA.

179

972. Defendants owed the Nevada Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Nevada Class members; and

973. Intentionally concealed the foregoing from the Nevada Class members.

974. Defendants' conduct proximately caused injuries to the Nevada Class members.

975. The Nevada Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

976. Defendants' violations present a continuing risk to the Nevada Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

977. The Nevada Class members seek their actual damages, punitive damages, costs, attorney's fees, and all other appropriate and available remedies under the Nevada DTPA. NEV. REV. STAT. § 41.600.

**21.    Claims brought on behalf of Class members who installed their turnout gear in New Hampshire ("New Hampshire Class members").**

### COUNT LXVII (against all Defendants)

### Strict Products Liability
### (design defect)

978. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

979. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

980.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Hampshire Class members, who might be foreseeably harmed by PFAS-infused products.

981.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

   a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

982.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

983.    Defendants failed to disclose these threats to fire departments, New Hampshire Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

984.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the New Hampshire Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

985.    At all relevant times, New Hampshire Class members used turnout gear infused with PFAS as intended.

986.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental

dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

987.    At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

988.    Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

989.    As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Hampshire Class members have been injured.

990.    These and other acts by Defendants were a direct and proximate cause of damages to New Hampshire Class members.

### COUNT LXVIII (against all Defendants)

### Strict Products Liability
### (failure to warn)

991.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

992.    As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New

182

Hampshire Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to New Hampshire Class members.

993. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and New Hampshire Class members of those risks.

994. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

995. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

996. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

997. Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Hampshire Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Hampshire Class members used their turnout gear with PFAS-infused products as intended.

998. These and other acts by Defendants were a direct and proximate cause of damages to New Hampshire Class members.

**COUNT LXIX (against all Defendants)**

**Violation of the New Hampshire Consumer Protection Act
(N.H. REV. STAT. ANN. § 358-A:1 *et seq.*)**

999.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1000.   The New Hampshire Consumer Protection Act ("New Hampshire CPA") makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. REV. STAT. § 358-A:2.

1001.   Defendants, Plaintiffs, and New Hampshire Class members are "persons" within the meaning of the New Hampshire CPA. N.H. REV. STAT. ANN. § 358-A:1.

1002.   Defendants' actions as set forth herein occurred in the conduct of trade and commerce within the meaning of New Hampshire CPA. N.H. REV. STAT. ANN. § 358-A:1.

1003.   In purchasing their turnout gear, the New Hampshire Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1004.   The New Hampshire Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1005.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1006.   Defendants knew or should have known that their conduct violated the New Hampshire CPA.

1007.   Defendants owed New Hampshire Class members a duty to disclose the truth about PFAS-infused products because Defendants:

184

      a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the New Hampshire Class members; and

1008. Intentionally concealed the foregoing from the New Hampshire Class members.

1009. Defendants' conduct proximately caused injuries to the New Hampshire Class members.

1010. The New Hampshire Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct, as a direct and natural consequence of Defendants' omissions.

1011. Defendants' violations present a continuing risk to the New Hampshire Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1012. Because Defendants' willful conduct caused injury to Plaintiffs' property through violations of the New Hampshire CPA, Plaintiffs seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; and any other just and proper relief under N.H. REV. STAT. ANN. § 358-A:10.

**22.    Claims brought on behalf of Class members who installed their turnout gear in New Jersey ("New Jersey Class members").**

**COUNT LXX (against all Defendants)**

**Strict Products Liability
(design defect)**

1013. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1014. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1015.  As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the New Jersey Class members, who might be foreseeably harmed by PFAS-infused products.

1016.  PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

 a. PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1017.  PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1018.  Defendants failed to disclose these threats to fire departments, New Jersey Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1019.  At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the New Jersey Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1020.  At all relevant times, New Jersey Class members used turnout gear infused with PFAS as intended.

1021.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental

dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1022.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1023.   Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1024.   As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Jersey Class members have been injured.

1025.   These and other acts by Defendants were a direct and proximate cause of damages to New Jersey Class members.

**COUNT LXXI (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1026.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1027.   As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New

187

Jersey Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to New Jersey Class members.

1028. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and New Jersey Class members of those risks.

1029. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1030. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1031. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1032. Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Jersey Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Jersey Class members used their turnout gear with PFAS-infused products as intended.

1033. These and other acts by Defendants were a direct and proximate cause of damages to New Jersey Class members.

**COUNT LXXII (against all Defendants)**

**Violation of the New Jersey Consumer Fraud Act**
**(N.J. STAT. ANN. § 56:8-1 *et seq.*)**

1034. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1035. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J. STAT. ANN. § 56:8-2.

1036. Defendants, Plaintiffs, and the New Jersey Class members are "persons" within the meaning of the New Jersey CFA. N.J. STAT. ANN. § 56:8-1(d).

1037. Defendants engaged in "sales" of "merchandise" within the meaning of the New Jersey CFA. N.J. STAT. ANN. § 56:8-1(c), (d).

1038. In purchasing their turnout gear, the New Jersey Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1039. The New Jersey Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1040. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1041. Defendants knew or should have known that their conduct violated the New Jersey CFA.

189

1042. Defendants owed the New Jersey Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the New Jersey Class members; and

    b.    Intentionally concealed the foregoing from the New Jersey Class members.

1043. Defendants' conduct proximately caused injuries to the New Jersey Class members.

1044. The New Jersey Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1045. Defendants' violations present a continuing risk to the New Jersey Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1046. Plaintiffs are entitled to recover treble damages, costs, and reasonable attorneys' fees pursuant to N.J. STAT. ANN. § 56:8-19, and any other just and appropriate relief.

**23.    Claims brought on behalf of Class members who installed their turnout gear in New Mexico ("New Mexico Class members").**

### COUNT LXXIII (against all Defendants)

### Strict Products Liability
### (design defect)

1047. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1048. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1049. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed

that duty to all persons, including the New Mexico Class members, who might be foreseeably harmed by PFAS-infused products.

1050.  PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

      a.  PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1051.  PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1052.  Defendants failed to disclose these threats to fire departments, New Mexico Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1053.  At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to New Mexico Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1054.  At all relevant times, New Mexico Class members used turnout gear infused with PFAS as intended.

1055.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative

191

designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1056. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1057. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1058. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, New Mexico Class members have been injured.

1059. These and other acts by Defendants were a direct and proximate cause of damages to New Mexico Class members.

**COUNT LXXIV (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1060. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1061. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including New Mexico Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to New Mexico Class members.

192

1062. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and New Mexico Class members of those risks.

1063. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1064. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1065. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1066. Defendants' failure to warn proximately caused reasonably foreseeable injuries to New Mexico Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, New Mexico Class members used their turnout gear with PFAS-infused products as intended.

1067. These and other acts by Defendants were a direct and proximate cause of damages to New Mexico Class members.

**COUNT LXXV (against all Defendants)**

**Violation of the New Mexico Unfair Trade Practices Act**
**(N.M. STAT. ANN. § 57-12-1 *et seq.*)**

1068. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1069. The New Mexico Unfair Trade Practices Act ("New Mexico UTPA") makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. STAT. ANN. § 57-12-2(D).

1070. Defendants, Plaintiffs, and the New Mexico Class members are "person[s]" within the meaning of the New Mexico UTPA. N.M. STAT. ANN. § 57-12-2.

1071. Defendants' actions as set forth herein occurred in the conduct of trade or commerce as defined by the New Mexico UTPA. N.M. STAT. ANN. § 57-12-2.

1072. In purchasing their turnout gear, the New Mexico Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1073. The New Mexico Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1074. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1075. Defendants knew or should have known that their conduct violated the New Mexico UTPA.

1076. Defendants owed the New Mexico Class members a duty to disclose the truth about PFAS-infused products because Defendants:

      a.     Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the New Mexico Class members; and

194

b.    Intentionally concealed the foregoing from the New Mexico Class members.

1077.  Defendants' conduct proximately caused injuries to the New Mexico Class members.

1078.  The New Mexico Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1079.  Defendants' violations present a continuing risk to the New Mexico Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1080.  Because Defendants' unconscionable, willful conduct caused actual harm to Plaintiffs, the New Mexico Class members seek recovery of actual damages or $100, whichever is greater; discretionary treble damages; reasonable attorneys' fees and costs; and all other proper and just relief available under N.M. STAT. ANN. § 57-12-10.

**24.    Claims brought on behalf of Class members who installed their turnout gear in New York ("New York Class members").**

### COUNT LXXVI

### New York Consumer Protection Claim

1081.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1082.  Defendants' conduct violates New York Consumer Protection Statute General Business Law § 349

**25.**     **Claims brought on behalf of Class members who installed their turnout gear in North Carolina ("North Carolina Class members").**

### COUNT LXXVII (against all Defendants)

### Products Liability
### (design defect)

1083.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1084.   At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1085.   As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to act negligently in placing into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the North Carolina Class members, who might be foreseeably harmed by PFAS-infused products.

1086.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

   a.     PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1087.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1088.   Defendants failed to disclose these threats to fire departments, North Carolina Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1089.   At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the North Carolina Class members, to an extent beyond that which

would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1090. At all relevant times, North Carolina Class members used turnout gear infused with PFAS as intended.

1091. Defendants knew of these risks and nevertheless failed to use reasonable care and acted negligently in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1092. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1093. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1094. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, North Carolina Class members have been injured.

1095. These and other acts by Defendants were a direct and proximate cause of damages to North Carolina Class members.

**COUNT LXXVIII (against all Defendants)**

**Products Liability**
**(failure to warn)**

1096.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1097.   As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to act unreasonably in failing to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew or should have known about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including North Carolina Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to North Carolina Class members.

1098.   Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, they unreasonably failed to warn turnout gear manufacturers, consumers, the public, and North Carolina Class members in particular of those risks.

1099.   Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1100.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1101.   Defendants' PFAS-infused products acted unreasonably by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1102. Defendants' failure to reasonably warn proximately caused reasonably foreseeable injuries to North Carolina Class members, who would have heeded legally adequate warnings about the dangers of PFAS products.

1103. At all relevant times, North Carolina Class members used turnout gear infused with PFAS as intended.

1104. Had Defendants reasonably provided adequate warnings regarding the dangers of PFAS to turnout gear manufacturers who treated turnout gear with PFAS-infused products, the turnout gear manufacturers would *not* have treated their turnout gear with those products. Similarly, had Defendants provided adequate warnings regarding the dangers of PFAS to North Carolina Class members about the dangers of turnout gear treated with PFAS-infused products, those products would not have gained widespread acceptance in the marketplace, and the North Carolina Class members would not have installed the turnout gear at issue.

1105. These and other acts by Defendants were a direct and proximate cause of damages to North Carolina Class members.

## COUNT LXXIX (against all Defendants)

### Violation of North Carolina Unfair and Deceptive Trade Practices Act
(N.C. GEN. STAT. § 75-1.1 *et seq.*)

1106. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1107. North Carolina's Unfair and Deceptive Acts and Practices Act (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. § 75-1.1(a).

1108. Defendants engaged in "commerce" within the meaning of the North Carolina Act. N.C. GEN. STAT. § 75-1.1(b).

199

1109. In purchasing their turnout gear, the North Carolina Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1110. The North Carolina Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1111. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1112. Defendants knew or should have known that their conduct violated the North Carolina Act.

1113. Defendants owed the North Carolina Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the North Carolina Class members; and

    b.    Intentionally concealed the foregoing from the North Carolina Class members.

1114. Defendants' conduct proximately caused injuries to the North Carolina Class members.

1115. The North Carolina Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1116. Defendants' violations present a continuing risk to the North Carolina Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1117. Plaintiffs seek an order for treble their actual damages, costs, attorney's fees, and any other just and proper relief available under the North Carolina Act. N.C. GEN. STAT. § 75-16.

**26.    Claims brought on behalf of Class members who installed their turnout gear in Oklahoma (collectively, "Oklahoma Class members").**

**COUNT LXXX (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1118. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1119. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1120. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Oklahoma Class members, who might be foreseeably harmed by PFAS-infused products.

1121. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

   a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1122. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1123. Defendants failed to disclose these threats to fire departments, Oklahoma Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1124. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Oklahoma Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1125. At all relevant times, Oklahoma Class members used their turnout gear with PFAS-infused products as intended.

1126. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1127. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1128. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1129. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Oklahoma Class members have been injured.

1130. These and other acts by Defendants were a direct and proximate cause of damages to Oklahoma Class members.

## COUNT LXXXI (against all Defendants)

### Strict Products Liability
### (failure to warn)

1131. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1132. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Oklahoma Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Oklahoma Class members.

1133. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Oklahoma Class members of those risks.

1134. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1135. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1136. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1137. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Oklahoma Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Oklahoma Class members used their turnout gear with PFAS-infused products as intended.

1138. These and other acts by Defendants were a direct and proximate cause of damages to Oklahoma Class members.

**COUNT LXXXII (against all Defendants)**

**Violation of the Oklahoma Consumer Protection Act**
**(OKLA. STAT. TIT. 15, § 751 *et seq.*)**

1139. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1140. The Oklahoma Consumer Protection Act ("Oklahoma CPA") provides that a "person engages in a practice which is declared to be unlawful under the Oklahoma CPA when, in the course of the person's business, the person … [c]ommits an unfair or deceptive trade practice as defined in Section 752 of this title." OKLA. STAT. TIT. 15, § 753(21). Section 752(13) provides that a "deceptive trade practice" means "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."

1141. Defendants, Plaintiffs, and Oklahoma Class members are "persons" within the meaning of the Oklahoma CPA. OKLA. STAT. TIT. 15, § 752.

1142. Each Defendant is a "person," "corporation," or "association" within the meaning of the Oklahoma CPA. OKLA. STAT. TIT. 15, § 15-751(1).

1143. In purchasing their turnout gear, the Oklahoma Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1144. The Oklahoma Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1145. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1146. Defendants knew or should have known that their conduct violated the Oklahoma CPA.

1147. Defendants owed the Oklahoma Class members a duty to disclose the truth about PFAS-infused products because Defendants:

a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Oklahoma Class members; and

b. Intentionally concealed the foregoing from the Oklahoma Class members.

1148. Defendants' conduct proximately caused injuries to the Oklahoma Class members.

1149. The Oklahoma Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1150. Defendants' violations present a continuing risk to the Oklahoma Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1151. Because Defendants' unconscionable conduct caused injury to Plaintiffs, Plaintiffs seek recovery of actual damages, discretionary penalties up to $2,000 per violation, and reasonable attorneys' fees, under OKLA. STAT. TIT. 15, § 761.1. Plaintiffs further seek any other just and proper relief available under the Oklahoma CPA.

**27.   Claims brought on behalf of Class members who installed their turnout gear in Oregon (collectively, "Oregon Class members").**

**COUNT LXXXIII (against all Defendants)**

**Strict Products Liability**
(design defect)

1152. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1153. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1154. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Oregon Class members, who might be foreseeably harmed by PFAS-infused products.

1155. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

   a.   PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1156. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

206

1157. Defendants failed to disclose these threats to fire departments, Oregon Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1158. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Oregon Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1159. At all relevant times, Oregon Class members used their turnout gear with PFAS-infused products as intended.

1160. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1161. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1162. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1163. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Oregon Class members have been injured.

1164. These and other acts by Defendants were a direct and proximate cause of damages to Oregon Class members.

**COUNT LXXXIV (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1165. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1166. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Oregon Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Oregon Class members.

1167. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Oregon Class members of those risks.

1168. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1169. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

208

1170. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1171. Defendants' failure to warn proximately caused reasonably foreseeable injuries to Oregon Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Oregon Class members used their turnout gear with PFAS-infused products as intended.

1172. These and other acts by Defendants were a direct and proximate cause of damages to Oregon Class members.

**COUNT LXXXV (against all Defendants)**

**Violation of the Oregon Unlawful Trade Practices Act**
**(OR. REV. STAT. § 646.605 *et seq.*)**

1173. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1174. The Oregon Unfair Trade Practices Act ("Oregon UTPA") provides that a "person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following: … (u) Engages in any other unfair or deceptive conduct in trade or commerce." OR. REV. STAT. § 646.608(1)(u).

1175. Each Defendant and each Oregon Class member is a "person" within the meaning of the Oregon UTPA. OR. REV. STAT. § 646.605(4).

1176. Their PFAS-infused products are "goods" within the meaning of OR. REV. STAT. § 646.605(6).

1177. In purchasing their turnout gear, the Oregon Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

209

1178.   The Oregon Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1179.   Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1180.   Defendants knew or should have known that their conduct violated the Oregon UTPA.

1181.   Defendants owed the Oregon Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Oregon Class members; and

    b.    Intentionally concealed the foregoing from the Oregon Class members.

1182.   Defendants' conduct proximately caused injuries to the Oregon Class members.

1183.   The Oregon Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1184.   Defendants' violations present a continuing risk to the Oregon Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1185.   The Oregon Class members are entitled to recover the greater of actual damages or $200 pursuant to OR. REV. STAT. § 646.638(1), (8). Plaintiffs are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

1186. The Oregon Class members seek attorneys' fees and any other just and proper relief available under the Oregon UTPA. OR. REV. STAT. § 646.638(1), (8).

**28.    Claims brought on behalf of Class members who installed their turnout gear in Pennsylvania ("Pennsylvania Class members").**

**COUNT LXXXVI (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1187. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1188. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1189. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Pennsylvania Class members, who might be foreseeably harmed by PFAS-infused products.

1190. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1191. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1192. Defendants failed to disclose these threats to fire departments, Pennsylvania Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

211

1193. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Pennsylvania Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1194. At all relevant times, Pennsylvania Class members used their turnout gear with PFAS-infused products as intended.

1195. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1196. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1197. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1198. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Pennsylvania Class members have been injured.

1199. These and other acts by Defendants were a direct and proximate cause of damages to Pennsylvania Class members.

**COUNT LXXXVII (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1200. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1201. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Pennsylvania Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Pennsylvania Class members.

1202. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Pennsylvania Class members of those risks.

1203. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1204. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1205.  Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1206.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to Pennsylvania Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Pennsylvania Class members used their turnout gear with PFAS-infused products as intended.

1207.  These and other acts by Defendants were a direct and proximate cause of damages to Pennsylvania Class members.

**COUNT LXXXVIII (against all Defendants)**

**Violation of the Pennsylvania Unfair Trade Practices
and Consumer Protection Law
(73 PA. CONS. STAT. § 201-1 *et seq.*)**

1208.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

1209.  This claim is brought by Plaintiffs on behalf of Pennsylvania purchasers who are members of the Class.

1210.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including representing that goods or services have characteristics, benefits or qualities that they do not have; representing that goods or services are of a particular standard, quality or grade if they are of another; advertising goods or services with intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4).

214

1211. Defendants, Plaintiffs, and Pennsylvania Class members are "persons" within the meaning of the Pennsylvania CPL. 73 Pa. Cons. Stat. § 201-2(2).

1212. All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of the Pennsylvania CPL. 73 Pa. Cons. Stat. § 201-2(3).

1213. Defendants are liable to Plaintiffs for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 Pa. Cons. Stat. § 201-9.2(a).

**29. Claims brought on behalf of Class members who installed their turnout gear in South Carolina (collectively, "South Carolina Class members").**

**COUNT LXXXIX (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1214. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1215. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1216. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the South Carolina Class members, who might be foreseeably harmed by PFAS-infused products.

1217. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

    a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

215

1218. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1219. Defendants failed to disclose these threats to fire departments, South Carolina Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1220. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the South Carolina Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1221. At all relevant times, South Carolina Class members used their turnout gear with PFAS-infused products as intended.

1222. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1223. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

216

1224. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1225. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, South Carolina Class members have been injured.

1226. These and other acts by Defendants were a direct and proximate cause of damages to South Carolina Class members.

**COUNT XC (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1227. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1228. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including South Carolina Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to South Carolina Class members.

1229. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and South Carolina Class members of those risks.

1230. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and

217

their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1231.  Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1232.  Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1233.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to South Carolina Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, South Carolina Class members used their turnout gear with PFAS-infused products as intended.

1234.  These and other acts by Defendants were a direct and proximate cause of damages to South Carolina Class members.

**COUNT XCI (against all Defendants)**

**Violation of the South Carolina Unfair Trade Practices Act**
**(S.C. CODE ANN. § 39-5-10 *et seq.*)**

1235.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this First Amended Complaint.

1236.  This claim is brought by Plaintiffs on behalf of South Carolina purchasers who are members of the Class.

1237.  The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. CODE ANN. § 39-5-20(a).

218

1238. Each Defendant is a "person" under the South Carolina UTPA. S.C. CODE ANN. § 39-5-10.

1239. Pursuant to S.C. CODE ANN. § 39-5-140(a), Plaintiffs seek monetary relief to recover their economic losses. Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled.

1240. Plaintiffs further allege that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights of others. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

**30.    Claims brought on behalf of Class members who installed their turnout gear in South Dakota ("South Dakota Class members").**

**COUNT XCII (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1241. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1242. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1243. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the South Dakota Class members, who might be foreseeably harmed by PFAS-infused products.

1244. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

219

a.      PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1245.   PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1246.   Defendants failed to disclose these threats to fire departments, South Dakota Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1247.   At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the South Dakota Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1248.   At all relevant times, South Dakota Class members used their turnout gear with PFAS-infused products as intended.

1249.   Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1250.   At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using

PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1251.  Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1252.  As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, South Dakota Class members have been injured.

1253.  These and other acts by Defendants were a direct and proximate cause of damages to South Dakota Class members.

**COUNT XCIII (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1254.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1255.  As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including South Dakota Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to South Dakota Class members.

1256.  Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and South Dakota Class members of those risks.

221

1257. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1258. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1259. Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1260. Defendants' failure to warn proximately caused reasonably foreseeable injuries to South Dakota Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, South Dakota Class members used their turnout gear with PFAS-infused products as intended.

1261. These and other acts by Defendants were a direct and proximate cause of damages to South Dakota Class members.

**COUNT XCIV (against all Defendants)**

**Violation of the South Dakota Deceptive Trade Practices
And Consumer Protection Law**
(S.D. Codified Laws § 37-24-6 et seq.)

1262. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1263. The South Dakota Deceptive Trade Practices and Consumer Protection Law ("South Dakota CPL") provides that it is a "deceptive act or practice for any person to … (1) Knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale

222

or advertisement of any merchandise or the solicitation of contributions for charitable purposes, regardless of whether any person has in fact been misled, deceived, or damaged thereby…." S.D. CODIFIED LAWS §§ 37-24-6.

1264. In purchasing their turnout gear, the South Dakota Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1265. The South Dakota Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1266. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1267. Defendants knew or should have known that their conduct violated the South Dakota CPL.

1268. Defendants owed the South Dakota Class members a duty to disclose the truth about PFAS-infused products because Defendants:

      a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the South Dakota Class members; and

      b. Intentionally concealed the foregoing from the South Dakota Class members.

1269. Defendants' conduct proximately caused injuries to the South Dakota Class members.

1270. The South Dakota Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1271. Defendants' violations present a continuing risk to the South Dakota Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1272. Under S.D. CODIFIED LAWS § 37-24-31, the South Dakota Class members are entitled to a recovery of their actual damages suffered as a result of Defendants' acts and practices.

**31.   Claims brought on behalf of Class members who installed their turnout gear in Tennessee ("Tennessee Class members").**

**COUNT XCV (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1273. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1274. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1275. As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Tennessee Class members, who might be foreseeably harmed by PFAS-infused products.

1276. PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

 a.   PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1277. PFAS contamination poses significant threats to public health, economic welfare, and the environment.

224

1278. Defendants failed to disclose these threats to fire departments, Tennessee Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1279. At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Tennessee Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1280. At all relevant times, Tennessee Class members used their turnout gear with PFAS-infused products as intended.

1281. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1282. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1283. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

225

1284. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Tennessee Class members have been injured.

1285. These and other acts by Defendants were a direct and proximate cause of damages to Tennessee Class members.

**COUNT XCVI (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1286. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1287. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Tennessee Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Tennessee Class members.

1288. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Tennessee Class members of those risks.

1289. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1290. Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

226

1291.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1292.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Tennessee Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Tennessee Class members used their turnout gear with PFAS-infused products as intended.

1293.   These and other acts by Defendants were a direct and proximate cause of damages to Tennessee Class members.

**32.    Claims brought on behalf of Class members who installed their turnout gear in Texas ("Texas Class members").**

### COUNT XCVII (against all Defendants)

### Strict Products Liability
### (design defect)

1294.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1295.   At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1296.   As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Texas Class members, who might be foreseeably harmed by PFAS-infused products.

1297.   PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1298.  PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1299.  Defendants failed to disclose these threats to fire departments, Texas Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1300.  At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Texas Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1301.  At all relevant times, Texas Class members used their turnout gear with PFAS-infused products as intended.

1302.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1303.  At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using

PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1304. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1305. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Texas Class members have been injured.

1306. These and other acts by Defendants were a direct and proximate cause of damages to Texas Class members.

**COUNT XCVIII (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1307. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1308. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Texas Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Texas Class members.

1309. Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Texas Class members of those risks.

1310. Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and

229

their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1311.   Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1312.   Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1313.   Defendants' failure to warn proximately caused reasonably foreseeable injuries to Texas Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Texas Class members used their turnout gear with PFAS-infused products as intended.

1314.   These and other acts by Defendants were a direct and proximate cause of damages to Texas Class members.

**COUNT XCIX (against all Defendants)**

**Violation of the Texas Deceptive Trade Practices and Consumer Protection Act (TEX. BUS. & COM. CODE § 17.4 *et seq.*)**

1315.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1316.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") provides that "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful…." TEX. BUS. & COM. CODE § 17.46(a). The Texas DTPA further declares that "the term 'false, misleading, or deceptive acts or practices' includes, but is not limited to, the following acts: several specific actions to be unlawful, including: … (24) failing to disclose information concerning goods or services which was known at the time of the

transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed…."

1317. Their PFAS-infused products are "goods" within the meaning of the Texas DTPA. TEX. BUS. & COM. CODE § 17.45(1).

1318. Defendants, Plaintiffs, and the Texas Class members are "persons" within the meaning of the Texas DTPA. TEX. BUS. & COM. CODE § 17.45(3).

1319. Each Plaintiff and each Texas Class member is a "consumer" within the meaning of the Texas DTPA. TEX. BUS. & COM. CODE § 17.41(4).

1320. Defendants committed the acts complained of herein in the course of "trade" and "commerce" within the meaning of the Texas DTPA. TEX. BUS. & COM. CODE § 17.41(6)

1321. In purchasing their turnout gear, the Texas Class members were deceived by Defendants' knowing failure to disclose that their turnout gear was treated with PFAS-infused products.

1322. The Texas Class members reasonably relied on Defendants' knowing omissions, and they did not and could not unravel Defendants' deception on their own.

1323. Defendants' knowing concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1324. Defendants knew that their conduct violated the Texas DTPA.

1325. Defendants owed the Texas Class members a duty to disclose the truth about PFAS-infused products because Defendants:

231

a.  Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Texas Class members; and

1326.  Intentionally concealed the foregoing from the Texas Class members.

1327.  Defendants' conduct proximately caused injuries to the Texas Class members.

1328.  The Texas Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1329.  Defendants' violations present a continuing risk to the Texas Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1330.  As a direct and proximate result of Defendants' violations of the Texas DTPA, the Texas Class members have suffered injury-in-fact and/or actual damages.

1331.  Plaintiffs seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

1332.  Alternatively, or additionally, pursuant to TEX. BUS. & COM. CODE § 17.50(b)(3) & (4), the Texas Class members are also entitled to disgorgement or to rescission or to any other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA or which the Court deems proper.

1333.  On April 1, 2025, Plaintiffs sent a letter to Defendants complying with TEX. BUS. & COM. CODE ANN. § 17.505.

**33.    Claims brought on behalf of Class members who installed their turnout gear in Utah ("Utah Class members").**

**COUNT C (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1334.    Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1335.    At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1336.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous, and they owed that duty to all persons, including the Utah Class members, who might be foreseeably harmed by PFAS-infused products.

1337.    PFAS-infused products are unreasonably dangerous for their foreseeable uses and misuses because, among other things:

      a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1338.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1339.    Defendants failed to disclose these threats to fire departments, Utah Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1340.    At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to the Utah Class members, to an extent beyond that which would be

233

expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1341. At all relevant times, Utah Class members used their turnout gear with PFAS-infused products as intended.

1342. Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

1343. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1344. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1345. As a direct and proximate result of Defendants' unreasonably dangerous design of PFAS-infused products, Utah Class members have been injured.

1346. These and other acts by Defendants were a direct and proximate cause of damages to Utah Class members.

**COUNT CI (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1347.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1348.  As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Utah Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Utah Class members.

1349.  Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Utah Class members of those risks.

1350.  Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1351.  Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1352.  Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1353.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to Utah Class members, who would have heeded legally adequate warnings about the dangers of

235

PFAS products. At all relevant times, Utah Class members used their turnout gear with PFAS-infused products as intended.

1354.  These and other acts by Defendants were a direct and proximate cause of damages to Utah Class members.

**34.  Claims brought on behalf of Class members who installed their turnout gear in the state of Washington ("Washington Class members").**

**COUNT CII (against all Defendants)**

**Violation of Washington Consumer Protection Act**
**(WASH. REV. CODE ANN. § 19.86.010 *et seq.*)**

1355.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1356.  The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." WASH. REV. CODE. ANN. § 19.96.010.

1357.  Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of the Washington CPA. WASH. REV. CODE. ANN. § 19.96.010.

1358.  In purchasing their turnout gear, the Washington Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1359.  The Washington Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1360.  Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1361.  Defendants knew or should have known that their conduct violated the Washington CPA.

236

1362. Defendants owed the Washington Class members a duty to disclose the truth about PFAS-infused products because Defendants:

    a.    Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the Washington Class members; and

    b.    Intentionally concealed the foregoing from the Washington Class members.

1363. Defendants' conduct proximately caused injuries to the Washington Class members.

1364. The Washington Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1365. Defendants' violations present a continuing risk to the Washington Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

1366. Defendants are liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under WASH. REV. CODE. ANN. § 19.86.090.

**35.    Claims brought on behalf of Class members who installed their turnout gear in West Virginia ("West Virginia Class members").**

**COUNT CIII (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1367. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1368. At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

237

1369.    As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is not reasonably safe, and they owed that duty to all persons, including the West Virginia Class members, who might be foreseeably harmed by PFAS-infused products.

1370.    PFAS-infused products are not reasonably safe for their foreseeable uses and misuses because, among other things:

      a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1371.    PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1372.    Defendants failed to disclose these threats to fire departments, West Virginia Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1373.    At all relevant times, PFAS-infused turnout gear was in a defective condition not reasonably safe for the West Virginia Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1374.    At all relevant times, West Virginia Class members used their turnout gear with PFAS-infused products as intended.

1375.    Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental

dangers posed by PFAS. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and not reasonably safe for persons and to property.

1376. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1377. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1378. As a direct and proximate result of Defendants' not reasonably safe design of PFAS-infused products, West Virginia Class members have been injured.

1379. These and other acts by Defendants were a direct and proximate cause of damages to West Virginia Class members.

### COUNT CIV (against all Defendants)

### Strict Products Liability
### (failure to warn)

1380. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1381. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including West

239

Virginia Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to West Virginia Class members.

1382.    Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and West Virginia Class members of those risks.

1383.    Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1384.    Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1385.    Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1386.    Defendants' failure to warn proximately caused reasonably foreseeable injuries to West Virginia Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, West Virginia Class members used their turnout gear with PFAS-infused products as intended.

1387.    These and other acts by Defendants were a direct and proximate cause of damages to West Virginia Class members.

**COUNT CV (against all Defendants)**

**Violation of the West Virginia Consumer Credit
and Protection Act
(W. Va. Code § 46A-1-101 et seq.)**

1388.  Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1389.  The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." W. VA. CODE § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include: "The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby…." W. VA. CODE § 46A-6-102(7)(M).

1390.  Each Defendant and each West Virginia Class member is a "person" under W. VA. CODE § 46A-1-102(31).

1391.  The West Virginia Class members are "consumers" as defined by W. VA. CODE §§ 46A-1-102(12) and 46A-6-102(2), who purchased turnout gear treated with PFAS-infused products.

1392.  Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of W. VA. CODE § 46A-6-102(6).

1393.  In the conduct of trade or commerce, Defendants knowingly concealed, suppressed, and omitted the material fact that turnout gear purchased by the West Virginia Class members were treated with PFAS-infused products, with the intent that others rely upon the concealment, suppression, or omission.

241

1394. In purchasing their turnout gear, the West Virginia Class members were deceived by Defendants' failure to disclose that their turnout gear was treated with PFAS-infused products.

1395. The West Virginia Class members reasonably relied on Defendants' omissions, and they did not and could not unravel Defendants' deception on their own.

1396. Defendants' concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

1397. Defendants knew or should have known that their conduct violated the West Virginia CCPA.

1398. Defendants owed the West Virginia Class members a duty to disclose the truth about PFAS-infused products because Defendants:

   a. Possessed superior knowledge that their PFAS-infused products were infused with PFAS and were applied to turnout gear purchased by the West Virginia Class members; and

   b. Intentionally concealed the foregoing from the West Virginia Class members.

1399. Defendants' conduct proximately caused injuries to the West Virginia Class members.

1400. The West Virginia Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of Defendants' conduct. These injuries are the direct and natural consequence of Defendants' omissions.

1401. Defendants' violations present a continuing risk to the West Virginia Class members. Defendants' unlawful acts and practices complained of herein affect the public interest.

242

1402.   Pursuant to W. VA. CODE § 46A-6-106, Plaintiffs seek monetary relief against the Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff.

1403.   Plaintiffs also seek punitive damages against the Defendants because they carried out despicable conduct with willful and conscious disregard of the rights of others, subjecting Plaintiff to cruel and unjust hardship as a result.

1404.   Plaintiffs further seek restitution, punitive damages, costs of Court, attorney's fees under W. VA. CODE § 46A-5-101 *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1405.   On April 1, 2025, Plaintiffs sent a letter to Defendants complying with W. VA. CODE § 46A-6-106(b).

**36.     Claims brought on behalf of Class members who installed their turnout gear in Wisconsin ("Wisconsin Class members").**

**COUNT CVI (against all Defendants)**

**Strict Products Liability**
**(design defect)**

1406.   Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1407.   At all times relevant to this First Amended Complaint, Defendants were engaged in the business of selling PFAS-infused products.

1408.   As manufacturers or distributors of PFAS-infused products, Defendants had a duty not to place into the stream of commerce a product that is unreasonably dangerous and not reasonably safe, and they owed that duty to all persons, including the Wisconsin Class members, who might be foreseeably harmed by PFAS-infused products.

1409.  PFAS-infused products are unreasonably dangerous and not reasonably safe for their foreseeable uses and misuses because, among other things:

   a.    PFAS cause extensive and persistent contamination of the environment even when used in their foreseeable and intended manner.

1410.  PFAS contamination poses significant threats to public health, economic welfare, and the environment.

1411.  Defendants failed to disclose these threats to fire departments, Wisconsin Class members and the public generally but instead downplayed and misrepresented the dangers posed by their PFAS products.

1412.  At all relevant times, PFAS-infused turnout gear was in a defective condition unreasonably dangerous to (and not reasonably safe for) the Wisconsin Class members, to an extent beyond that which would be expected or contemplated by an ordinary consumer when used in an ordinary and reasonably foreseeable manner.

1413.  At all relevant times, Wisconsin Class members used their turnout gear with PFAS-infused products as intended.

1414.  Defendants knew of these risks and nevertheless failed to use reasonable care in the design of their PFAS-infused products. Defendants could have made products that did not contain the PFAS chemicals at issue in this First Amended Complaint or could have designed their PFAS-infused products in ways that substantially reduced or eliminated the health and environmental dangers posed by PFAS, the omission of which renders those products not reasonably safe. Defendants' failure to adopt those reasonable, feasible, safer, alternative designs rendered their products defective, not reasonably safe, and unreasonably dangerous to persons and to property.

244

1415. At all relevant times, the foreseeable risk of harm to public health, property, and the environment posed by Defendants' PFAS-infused products outweighed the utility of using PFAS in those products and outweighed the cost to Defendants of reducing or eliminating such risk.

1416. Defendants' PFAS-infused products were defectively designed at the time they left Defendants' control, and those products reached their end users without substantial change in their condition.

1417. As a direct and proximate result of Defendants' unreasonably dangerous and not reasonably safe design of PFAS-infused products, Wisconsin Class members have been injured.

1418. These and other acts by Defendants were a direct and proximate cause of damages to Wisconsin Class members.

**COUNT CVII (against all Defendants)**

**Strict Products Liability**
**(failure to warn)**

1419. Plaintiffs incorporate by reference the allegations in the preceding paragraphs of this First Amended Complaint.

1420. As manufacturers or distributors of PFAS-infused products, Defendants had a strict duty to adequately warn against latent dangers resulting from foreseeable uses and misuses of their products that Defendants knew about. Defendants' duty to warn extended to all third parties who might be foreseeably harmed by the ordinary use and misuse of their products, including Wisconsin Class members, as well as to all turnout gear manufacturers who treated their turnout gear with PFAS-infused products before selling them to Wisconsin Class members.

245

1421.  Notwithstanding Defendants' superior knowledge of the risks posed by PFAS-infused products, Defendants failed to warn the public and Wisconsin Class members of those risks.

1422.  Any warnings that Defendants might have disseminated were rendered ineffective by their false and misleading public statements about the dangers of PFAS-infused products, and their widespread and longstanding efforts to conceal and misrepresent the public health and environmental impacts of PFAS.

1423.  Defendants' inadequate warnings and instructions rendered PFAS-infused products defective and not reasonably safe.

1424.  Defendants' PFAS-infused products were defective by virtue of their inadequate warnings at the time they left Defendants' control, and those PFAS products reached their end user without substantial change in their condition.

1425.  Defendants' failure to warn proximately caused reasonably foreseeable injuries to Wisconsin Class members, who would have heeded legally adequate warnings about the dangers of PFAS products. At all relevant times, Wisconsin Class members used their turnout gear with PFAS-infused products as intended.

1426.  These and other acts by Defendants were a direct and proximate cause of damages to Wisconsin Class members.

1427.  On April 1, 2025, Plaintiffs mailed the statutory notice required by Wisconsin Statutes § 40-12-109.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves, its members, and members of the Class, seek monetary and equitable relief, including:

A.    Compensatory damages and treble damages as allowed by law;

246

B.        A corrective notice program under Fed. R. Civ. P. (b)(23); and

C.        Such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the Classes, hereby demand a trial by jury as to all issues so triable as a matter of right.

DATED: March 13, 2026.        Respectfully submitted,

HEENAN & COOK

By:/s/ *John Heenan*
    John Heenan
    2224 Montana Avenue
    Billings, MT 59101
    Telephone: (406) 839-9091
    Facsimile: (406) 839-9092
    Email: john@lawmontana.com

    Michael A. Bliven
    BLIVEN LAW FIRM
    704 South Main Street
    Kalispell, MT 59901
    Telephone: (406) 625-0100
    Email: mike@blivenlawfirm.com

    Steve W. Berman (*pro hac vice*)
    Craig R. Spiegel (*pro hac vice*)
    HAGENS BERMAN SOBOL SHAPIRO LLP
    1301 Second Avenue, Suite 2000
    Seattle, WA 98101
    Telephone: (206) 623-7292
    Facsimile: (206) 623-0594
    Email: steve@hbsslaw.com
           craigs@hbsslaw.com

    Ian W. Sloss (*pro hac vice)*
    Jennifer Sclar (*pro hac vice)*
    Kate Sayed (*pro hac vice forthcoming)*
    Samantha Blend (*pro hac vice forthcoming)*
    SILVER GOLUB & TEITELL LLP
    One Landmark Square, 15th Floor
    Stamford, CT 06901

247

Tel. (203) 325-4491
isloss@sgtlaw.com
jsclar@sgtlaw.com
ksayed@sgtlaw.com


Kyle J. McGee (*pro hac vice forthcoming*)
Viola Vetter (*pro hac vice forthcoming*)
Jason H. Wilson (*pro hac vice forthcoming*)
Suzanne Sangree (*pro hac vice forthcoming*)
GRANT & EISENHOFER P.A.
123 S. Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com
ssangree@gelaw.com

*Attorneys for All Plaintiffs in Common*


Erin Bernstein (*pro hac vice forthcoming*)
BRADLEY BERNSTEIN SANDS, LLP
1212 Broadway, Suite 1100
Oakland, CA 94612
ebernstein@bradleybernsteinllp.com
Tel: (501) 380-5801

Kyle J. McGee (*pro hac vice forthcoming*)
Viola Vetter (*pro hac vice forthcoming*)
Jason H. Wilson (*pro hac vice forthcoming*)
Suzanne Sangree (*pro hac vice forthcoming*)
GRANT & EISENHOFER P.A.
123 S. Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com
ssangree@gelaw.com

*Attorneys for Santa Monica, California*

248